**Marc P. Berger**
**Daniel Michael**
**Osman Nawaz**
**Alexander M. Vasilescu**
**Joseph P. Ceglio**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York  10281**
**(212) 336-5398 (Ceglio)**
**Email:  CeglioJ@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | 20 Civ. _____ (  ) |
| Plaintiff, | ECF CASE |
| - against - | COMPLAINT |
| **DANIEL B. KAMENSKY,** | JURY TRIAL DEMANDED |
| Defendant. | |

---

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against Defendant Daniel B. Kamensky ("Kamensky" or the "Defendant") alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1. This case involves Kamensky—founder of New York-based registered investment adviser, Marble Ridge Capital LP ("Marble Ridge"), which specialized in distressed investment opportunities—and his conduct in the offer of certain shares being disposed of as part of the Neiman Marcus Group Ltd. LLC ("Neiman") bankruptcy proceedings.  Kamensky used his position on the bankruptcy committee that facilitated the offering of securities for the bankruptcy estate to manipulate the offering so Kamensky's fund could purchase the securities at an artificially lower price.

2.      Specifically, on July 31, 2020, Kamensky, after learning that Jefferies Financial Group Inc. ("Jefferies") submitted a bid for the shares that was higher than his, contacted Jefferies to coerce it into withdrawing its bid.  Kamensky told Jefferies that he would use his position on the Official Committee of Unsecured Creditors ("UCC") to ensure that Jefferies' bid was rejected and that, if Jefferies nevertheless submitted a bid and drove the price up, Marble Ridge would cease doing business with Jefferies.  By doing so, Kamensky abused his position of trust as a member of the UCC by leveraging it to scuttle a competing bid that was in the interests of all unsecured creditors but not in his personal interests.

3.      Jefferies withdrew its bid in response to Kamensky's threat but reported the misconduct to the UCC.  When Kamensky learned of this, he again reached out to Jefferies to have it cover up that Kamensky tried to prevent Jefferies from participating in Neiman's offering of securities.  Kamensky candidly admitted to Jefferies that he could go to jail if Jefferies did not adopt a false version of their previous conversation.  Jefferies refused to cover up for Kamensky and his conduct was ultimately revealed.

## VIOLATIONS

4.      By virtue of the conduct alleged herein, the Defendant, directly or indirectly, violated and is otherwise liable for violations of the federal securities laws as follows:  Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)].

5.      The Defendant will continue to violate Section 17(a)(1) of the Securities Act unless restrained or enjoined by the Court.

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 [15 U.S.C. §§ 77t(b), and 77v(a)].

7.      This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(b), 20(d)(1), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v].  The Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a

national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District.  For example, during the relevant period, Marble Ridge maintained an office at 1250 Broadway Suite 2601, New York, New York 10001 and Kamensky resided in the District.  Jefferies also maintained an office at 520 Madison Avenue, New York, New York 10022.  Kamensky also exchanged instant messages, texts, emails, and placed phone calls with Jefferies employees in its New York City office who are assigned to, and work in, that office and were also physically present in the District during certain of these communications.

## DEFENDANT

8. **Kamensky**, age 47, resides in New York, New York.  Kamensky founded Marble Ridge Capital LP and serves as the Managing Partner and Portfolio Manager for the firm.  Kamensky previously served as a partner of a prominent advisor and hedge fund and started his career as a bankruptcy attorney.  Kamensky has no disciplinary history.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

9. **Neiman Marcus Group Ltd. LLC** is a Delaware limited liability company with its principal place of business in Texas that markets itself as a luxury, multi-branded retailer conducting integrated store and online operations under the Neiman Marcus, Bergdorf Goodman, Neiman Marcus Last Call, and Horchow brand names.  On May 7, 2020 Neiman announced that it entered into a Restructuring Support Agreement ("RSA") with a majority of its creditors to undergo a financial restructuring.  To implement the RSA, Neiman commenced voluntary Chapter 11 proceedings in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division.

10. **Marble Ridge Capital LP**, founded in 2015 by Kamensky, is a registered investment adviser to private funds, including the Marble Ridge Master Fund LP, with around $1 billion in assets under management.  Marble Ridge, with its principal place of business in New York, New York, specializes in distressed debt investments and restructuring of troubled issuers.

11. **Jefferies Financial Group, Inc.** is a diversified financial services company. Jefferies has been registered as a broker-dealer with the Commission since September 17, 1969. Jefferies is a member of Financial Industry Regulatory Authority. Its primary office is in New York, New York. The broker-dealer markets itself as a global investment bank that offers mutual funds, variable insurance products, stocks, bonds and options.

## FACTS

### A. Pre-Bankruptcy Background

12. Marble Ridge holds around $65 million of Neiman's unsecured debt in two series of bonds, as well as approximately a $9 million interest in an unsecured loan it made to Neiman. At a certain point, Marble Ridge believed that Neiman's bankruptcy was inevitable and that a 2018 transfer of Neiman's interests in MyTheresa, an e-commerce retailer, to Neiman's parent (the "MyTheresa Distribution") was actually a fraudulent conveyance to divert a valuable asset away from Neiman creditors.

13. Under Kamensky's management, Marble Ridge initiated two state court lawsuits challenging the MyTheresa Distribution.

14. In 2019, Neiman entered into a recapitalization agreement that essentially resolved potential claims arising out of the MyTheresa Distribution with many of its creditors—though not with Marble Ridge, which declined to participate in the exchange.

15. Those negotiations also created a "waterfall" that governed distribution of MyTheresa proceeds in the event of a sale or other monetization. Under that waterfall, the first $450 million of any sale would go to certain secured lenders and to the holders of Series A preferred stock in the holding company for the MyTheresa assets, while the next $250 million would go to the holders of Series B preferred stock (the "Series B Shares").

### B. Neiman Files a Voluntary Chapter 11 Bankruptcy Petition on May 7, 2020

16. Neiman filed a voluntary Bankruptcy Petition on May 7, 2020 in the U.S. Bankruptcy Court for Southern District of Texas. At the time the bankruptcy was filed, Marble Ridge held approximately 50% of Neiman's unsecured debt.

17. The same day Neiman filed its bankruptcy petition, the United States Trustee solicited interest in serving on the UCC and informed prospective members that they would be required to act as "fiduciaries who represent all unsecured creditors as a group."

18. On May 10, Marble Ridge expressed its interest and willingness to serve on the UCC. In its cover email, Marble Ridge stated that:

> If appointed to the Committee, Marble Ridge would be represented by Dan Kamensky. Mr. Kamensky has more than 20 years of bankruptcy and investing experience and fully understands the fiduciary responsibilities associated with membership on the Committee. Mr. Kamensky is committed to devote the time and energy necessary to earnestly represent all unsecured creditors.

19. On May 19, the United States Trustee appointed nine-members to the UCC, which included Marble Ridge. Marble Ridge, represented by Kamensky, subsequently was elected as one of the UCC's three co-chairs.[1]

20. As an experienced bankruptcy lawyer, Kamensky knew or was reckless in not knowing that his role on the UCC was that of a fiduciary and that he accordingly had an obligation to work to protect the claims of all unsecured creditors. Generally, this meant that members of the UCC would work to ensure that Neiman's assets were liquidated for as much money as possible so there would be a greater chance that Neiman's bankruptcy estate had sufficient funds to pay the claims of unsecured creditors.

---

[1] The dispute over the MyTheresa Distribution played a prominent role in many of the contested matters brought before the bankruptcy court in the first months of the case. Marble Ridge has been active in the bankruptcy proceedings. In May, Marble Ridge sought to have the court appoint an examiner to investigate the MyTheresa pre-bankruptcy transfer. Then, in July, Marble Ridge submitted an offer to buy MyTheresa-related litigation claims. In response to efforts to appoint an examiner, the bankruptcy judge remarked that "I came out today prepared to talk about whether or not Marble Ridge ought to continue on the [creditors] committee … [if a good faith requirement existed] I would find that the [examiner] motion was not filed in good faith [by Marble Ridge]." With respect to the offer to buy litigation claims in July, at the time of the offer, Marble Ridge was still on the UCC and in possession of confidential information about MyTheresa. When the UCC learned about the offer, Kamensky agreed to withdraw Marble Ridge's bid and not submit another one without prior UCC approval.

### C.     Kamensky Has Marble Ridge Bid for the Series B Shares

21.     By late July 2020, the major creditor constituencies and the debtors made progress towards the framework of a plan of reorganization that incorporated settlement of the MyTheresa disputes. Because any settlement would likely involve the transfer of 140 million of the Series B MyTheresa Shares to the bankruptcy estate, the UCC began to explore possible alternatives for a "cash out" option.

22.     On July 28, Kamensky, as part of his plan to maximize the value of Marble Ridge's Neiman holdings, emailed the outline of a Marble Ridge proposal to the UCC, including counsel for the UCC ("UCCP1"). Among other things, the proposal provided that Marble Ridge would guarantee, or "backstop," the purchase of 60 million Series B Shares at $0.20 per share from other unsecured creditors wishing to sell their shares.

23.     At a meeting held on July 29, the UCC voted to support the global settlement. The UCC then excused Marble Ridge from the meeting, and the members of the UCC discussed Kamensky's bid. The UCC agreed to continue negotiations with Marble Ridge.

24.     These negotiations were apparently time-sensitive, because any last-minute changes to an upcoming bankruptcy filing (the Disclosure Statement) would need to be presented to the court at a hearing set for August 3, in order to be included in the Disclosure Statement and then mailed to all creditors. The UCC also considered a potential auction of the securities.

### D.     The Events of July 31

#### 1.     Jefferies Proposes a Higher Bid

25.     JE1 is the global head of Jefferies Distressed and Special Situations Group, which trades on its own behalf and for clients, one of whom was Marble Ridge.

26.     On July 30, the subscription service, Reorg Research, disclosed the terms of a proposed settlement of the disputes within the Neiman bankruptcy estate and the assets that would be distributed in the bankruptcy case. Upon reviewing that and seeing that the proposed terms of a plan of reorganization that incorporated the settlement was also on the public docket of the Neiman bankruptcy case, JE1, based on his industry experience, understood that the

6

Series B Shares were being offered for sale at that point. He immediately began considering the terms of a bid by Jefferies.

27. At 8:10 AM ET on July 31, JE1 and another employee of Jefferies ("JE2") had a call with the Jefferies client. The client informed Jefferies that it wanted to purchase the Series B Shares.

28. Between 9:00 AM ET and 10:00 AM ET on July 31, JE2 called the UCC's financial adviser ("UCCP2"). JE2 told UCCP2 that Jefferies was interested in the Series B Shares for a price in "the thirties" range (between $0.30 and $0.40 per share). JE2 sent UCCP2 a follow up email at 10:22 AM ET confirming Jefferies' interest in submitting a firm bid to purchase the shares and its capacity to complete the transaction if the UCC chose to accept a bid from Jefferies. JE2's email requested that UCCP2 keep Jefferies' bid confidential from any member of the UCC that was interested in making its own cash out offer for the Series B Shares.

### 2. The UCC's Consideration of Bids

29. After speaking with JE2, UCCP2 contacted UCCP1. UCCP2 and UCCP1 discussed Jefferies' potential bid and that the bid could produce a higher return for unsecured creditors than the pending offer from Marble Ridge.

30. At 12:15 PM ET, UCCP2 and UCCP1 spoke with JE2 and JE1 at Jefferies. UCCP1 engaged in a solicitation of an offer to buy the Series B Shares. UCCP1 explained that while Jefferies could make a bid for the 140 million shares as a block, some unsecured creditors wanted to keep their shares, so UCCP1 invited a proposal that allowed creditors to opt in or out of the sale. JE2 and JE1 had no issue proceeding along those lines and confirmed a price in the "thirties."

31. UCCP1 and UCCP2 determined that the offering of the securities would continue and informed Kamensky that other bids were competing with Marble Ridge's bid. UCCP1 and UCCP2 decided they needed to inform Kamensky of this competing bid.

### 3. Kamensky Learns of Jefferies' Rival Bid and Works to Kill It

32. At 3:15 PM ET on July 31, 2020, UCCP1 and UCCP2 informed Kamensky that Jefferies was the other bidder and it was at $0.30 per share.

33. Unbeknownst to other members of the UCC, who understood that Kamensky had recused himself from the consideration of cash-out proposals for MyTheresa, Kamensky secretly called JE1 and pressured him to withdraw Jefferies's bid. At the time, Jefferies's bid was higher than Kamensky's bid and therefore clearly beneficial to the unsecured creditors of Neiman to whom Kamensky, as a member and co-chair of the UCC, owed a fiduciary duty.

34. Within minutes of learning that Jefferies was the competing bidder, Kamensky contacted Jefferies using Instant Bloomberg chat messages. Kamensky told JE1, among other things, to "Tell [JE2] to stand DOWN", asking, "Do I need to reach out to [JE2][?]", and "DO NOT SEND IN A BID" for the Series B Shares. Kamensky also contacted JE2 and asked to speak right away.

35. At approximately 3:45 PM ET, JE1 and JE2 spoke with Kamensky on the phone. Kamensky was very upset and told JE1 and JE2 to stand down and not put in a bid. Kamensky said he had been pursuing this matter for several years, amassed $3.5 million in legal fees to do so, and that his efforts had made the MyTheresa settlement possible. Kamensky said that he was determined to acquire the MyTheresa shares, so all that Jefferies' bid would accomplish was driving up his final price and cost him money.

36. Kamensky further said that as co-chair of the UCC, he would prevent Jefferies from buying the shares. Finally, Kamensky stated that he had been a good partner to JE1 and Jefferies, but if JE1 persisted in moving forward with its bid for the Series B Shares, then they would not be partners going forward. At the time, Jefferies was Marble Ridge's ninth largest trading partner, and provided valuable information capital as well as commissions.

37. Immediately after the call ended, JE1 spoke to JE2 about his unease and discomfort with the circumstances, including that Kamensky was abusing his position as a fiduciary in the Neiman's bankruptcy case and that Kamensky's ultimatum for Jefferies not to

bid might involve JE1 and Jefferies in unethical and even illegal conduct. At the same time, JE1 was concerned about his business relationship with Kamensky and Marble Ridge. JE1 immediately decided to speak with Jefferies' general counsel and called him at approximately 3:55 PM ET.

38. Following JE1's call with Jefferies' general counsel, JE1 and JE2 called Kamensky at approximately 4:07 PM ET. JE1 explained that Marble Ridge was an important business relationship for Jefferies so it would withdraw from making any bid for the Series B Shares. JE1 further explained that Jefferies would be transparent with its client who sought to purchase the shares and the UCC about why it was withdrawing its bid.

39. Kamensky responded by thanking JE1 and JE2 and saying he would always be grateful to them.

40. Shortly after their 4:07 PM ET call with Kamensky, JE1 and JE2 contacted their original client for the purchase of the Series B Shares and told him they were withdrawing from making a bid for the Series B Shares. They explained they were withdrawing because of pressure from another client.

41. Thus, within an hour of learning of a competing bid for the MyTheresa shares, Kamensky had undermined and manipulated the offering of those securities by calling JE1 and pressuring Jefferies to withdraw its bid with a series threats. Kamensky had given the UCC the false impression that he would act appropriately during the bidding process in light of his fiduciary duty but then used information he obtained from his role on the UCC to intimidate a competing bidder and artificially reduce the price of the securities for Marble Ridge's financial gain. Kamensky's conduct operated as a fraudulent device within the offering process – simultaneously giving the UCC the impression that he was acting ethically by being recused but then threatening Jefferies that he would use his role as co-chair of the UCC to reject their bid – that artificially deflated the price of the MyTheresa securities offered for Marble Ridge's benefit. This fraudulent conduct violated Kamensky's fiduciary obligations to the UCC.

### 4. The UCC Learns of Kamensky's Conduct

42. UCCP1 spoke with JE1 and JE2 at approximately 5:00 PM ET on July 31, 2020. JE2 explained that Jefferies was withdrawing from making a bid and UCCP1 asked why. JE2 explained that a significant client had asked it to do so. UCCP1 asked if the client was Kamensky. JE2 said yes. UCCP1 responded by saying, "I've got a big problem."

43. After the call ended, UCCP1 informed UCCP2 of Jefferies' withdrawal and its stated reasons for doing so. UCCP1 then set a 6:00 PM ET conference call for UCC professionals to decide on the necessary steps in reaction to Kamensky's reported actions.

44. At the 6:00 PM ET conference call, the UCC professionals decided to reach out to Marble Ridge's bankruptcy counsel to determine if Jefferies' report about Kamensky's conduct was accurate.

45. At approximately 7:00 PM ET, several UCC professionals spoke to Marble Ridge's bankruptcy counsel, who said that he knew nothing about the allegations and would call them back after contacting Kamensky.

46. In another attempt to subvert the UCC's offer of the Series B Shares, Kamensky then misled Marble Ridge's bankruptcy counsel regarding his communications with JE1 and JE2. After speaking with Kamensky, Marble Ridge's bankruptcy counsel spoke again with UCC professionals at approximately 7:30 PM ET. Marble Ridge's bankruptcy counsel reported that Kamensky did contact Jefferies about its potential bid, but there was a misunderstanding about his intention in doing so. Passing on what Kamensky had told him, Marble Ridge's bankruptcy counsel told the UCC that Kamensky had told Jefferies to bid, if it was serious. If Jefferies was not serious, then it should back off to avoid disruption to the Neiman bankruptcy.

### 5. Kamensky Tries to Recruit JE1 to Bolster A Cover-Up

47. To keep the UCC from learning the truth about his attempt to manipulate the MyTheresa offering, Kamensky asked JE1 to adopt his fabricated account of their earlier conversation.

48. Kamensky pecifically, at approximately 8:10 pm on July 31, 2020, Kamensky called JEI and said, "[T]his conversation never happened." Concerned by Kamensky's opening remark, JE1, unknown to Kamensky, began recording their phone call. Kamensky asked why JE1 had told the UCC professional that Kamensky had threatened JE1 and asked if JE1 knew this could cause Kamensky to go to jail. JE1 responded that Kamensky demanded Jefferies stand down to preserve their business relationship.

49. Kamensky repeated that he could go to jail and urged JE1 to agree that Kamensky asking Jefferies to stand down was just a big misunderstanding. After JE1 pushed back, which threatened not only Kamensky's attempted purchase of the Series B Shares at $0.20 per share but also Kamensky's ability to remain as a bidder for the shares at any price, Kamensky urged JE1 to now take part in the bidding process for the Series B Shares.

50. During his call with Kamensky, JE1 again pushed back against the plausibility of Kamensky's innocent "misunderstanding" explanation, reminding Kamensky that JE2 had also been on the call and heard what Kamensky actually said.

51. JE1 urged Kamensky to just recuse himself from the whole matter. Kamensky again responded with a plea for JE1 to adopt his "version" of their earlier conversation, stressing again the dire punitive consequences for Kamensky if JE1 did not. Kamensky admitted his efforts to manipulate the UCC's offering of securities:

> . . . [I]f you're going to continue to tell them what you just told me, I'm going to jail, okay? Because they're going to say that I abused my position as a fiduciary, which I probably did, right? Maybe I should go to jail. But I'm asking you not to put me in jail.

52. JE1 responded that there was no possibility of his lying for Kamensky. Kamensky denied wanting JE1 to lie, but kept urging JE1 to adopt his "version" of their earlier conversation.

53. Kamensky then pleaded with JE1, imploring him to agree that Kamensky said something he purportedly intended to say, but never actually did say—that Jefferies should bid,

if it was serious.  Kamensky closed out the conversation with JE1 by telling JE1 that adopting his (Kamensky's) position was necessary to preserve their business relationship:

> I apologize.  I apologize.  I apologize, okay, and I'm telling you that what I intended to say, okay, is if you're not real don't bid but if you're real then you should bid, and, [JE1], for the relationship I would tell you that's exactly what I said and I apologize if I was upset or if it appeared as a threat.

54.     As part of a preliminary investigation that commenced after Kamensky's conduct first came to light in the Neiman bankruptcy proceedings, the United States Trustee interviewed Kamensky concerning the above telephone call recorded by JE1.  Kamensky admitted he had made the call to JE1 and said it was a serious mistake, one of the worst of his life.

55.     Kamensky stated he made the call to JE1 out of fear and panic of the possible consequences of Jefferies' report to the UCC that he had pressured them to kill its bid.

56.     Kamensky denied wanting JE1 to lie, but said he was trying to "manage the message" by talking with JE1.

57.     Kamensky further acknowledged that:  (1) Jefferies' bid might jeopardize Marble Ridge reaching an agreement on a cash out proposal for the Series B Shares; and (2) Jefferies' higher price for the shares would hurt Marble Ridge's ability to profit from any Series B purchase.

58.     Kamensky nevertheless claimed that process concerns about endangering the agreement on a cash out provision were his primary motivation for contacting JE1 and JE2.

E.     **Kamensky's Uncovered Scheme Scuttles the Bidding Process**

59.     At 8:31 AM ET on August 1, still under Kamensky's management, Marble Ridge resigned from the UCC, advancing the "misunderstanding" explanation of Kamensky's conduct from the day before, and asserting that Kamensky had only contacted Jefferies to make sure it was truly committed to bidding, not discouraging a competing bid.  Marble Ridge asked the UCC members to assure Jefferies that it was strongly encouraged to submit a bid.

60.     Marble Ridge claimed it was resigning from the committee as a way to resolve the issue in the best interests of all concerned.  At 1:15 PM ET, Marble Ridge wrote to the United

States Trustee to offer Marble Ridge's resignation from the committee and again provided its "misunderstanding" explanation of Kamensky's July 31 conduct.

61. At a 2:00 PM ET emergency meeting, the UCC decided that it should promptly disclose Kamensky's conduct to the United States Trustee.

62. Also on August 1, Jefferies decided to renew its bid to purchase the Series B Shares. JE1 explained to the United States Trustee that, given the fallout following Jefferies' withdrawal, the business reasons behind the withdrawal were no longer present. JE1 emphasized that Jefferies' decision to resume its proposal was not in response to Kamensky's request during their phone call the prior evening that Jefferies bid to help Kamensky's cover story. Rather, the renewed bid was motivated by Jefferies' own financial interest in a profitable transaction involving the Series B Shares.

63. At their 2:00 PM ET emergency meeting that day, the UCC agreed to consider any renewed Jefferies' rival bid.

64. Both Jefferies and Marble Ridge submitted competing bid proposals to the UCC. On August 2, Jefferies submitted a Letter of Intent to the UCC. On August 3, Marble Ridge provided a letter proposal to the UCC, and then, a revised proposal on August 11. Each of the Jefferies and Marble Ridge proposals offered a higher price per share than the $0.20 of Marble Ridge's initial proposal. Marble Ridge's current proposal is at $0.40 per share.

65. At present, the MyTheresa Series B Shares have not been sold and, in fact, now may never be sold, but instead, placed in a liquidating trust.

66. Following reports of Kamensky's misconduct, Marble Ridge told investors that it "made the difficult decision to commence an orderly wind-down of the Marble Ridge funds."

67. Neiman has also sued Marble Ridge for millions of dollars in alleged damages as well as equitable subordination of Marble Ridge's claims in the bankruptcy proceedings.

## CLAIM FOR RELIEF
### Violations of Section 17(a)(1) of the Securities Act

68. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 67.

69. By engaging in the conduct described above, defendant Kamensky directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes and artifices to defraud. By virtue of the foregoing, defendant Kamensky violated and, unless restrained and enjoined, will continue violating, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Kamensky, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### II.

Ordering Kamensky to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

### III.

Granting such other and further relief as this Court deems just, equitable, and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
September 3, 2020

By:     s/ Marc Berger

Marc P. Berger
Daniel Michael
Osman Nawaz
Alexander M. Vasilescu
Joseph P. Ceglio
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
  COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-5398 (Ceglio)
Email: CeglioJ@sec.gov