# Exhibit F

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NEIMAN MARCUS GROUP LTD LLC, *et al.,* [1] | ) | Case No. 20-32519 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF FILING OF DISCLOSURE STATEMENT
## FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF
## REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on June 6, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 772] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Amended Disclosure Statement"), attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit B** is a redline of the Amended Disclosure Statement reflecting changes from the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases are available free of charge by visiting http://cases.stretto.com/NMG or by calling (877) 670-2127 (Toll Free) or (949) 504-4475 (International). You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996). The Debtors' service address is: One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

Houston, Texas
July 30, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:        mcavenaugh@jw.com
        jwertz@jw.com
        kpeguero@jw.com
        vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        anup.sathy@kirkland.com
        chad.husnick@kirkland.com

-and-

Matthew C. Fagen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:        matthew.fagen@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on July 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**Exhibit A**

**Amended Disclosure Statement**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) ) ) Chapter 11 |
| NEIMAN MARCUS GROUP LTD LLC, *et al.,*[1] | ) ) Case No. 20-32519 (DRJ) |
| Debtors. | ) ) ) (Jointly Administered) |

## DISCLOSURE STATEMENT
### FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF
### REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com

*Co-Counsel to the Debtors
and Debtors in Possession*

Anup Sathy, P.C. (admitted *pro hac* vice)
Chad J. Husnick, P.C. (admitted *pro hac* vice)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          anup.sathy@kirkland.com
                    chad.husnick@kirkland.com

-and-

Matthew C. Fagen (admitted *pro hac* vice)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996). The Debtors' service address is:  One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     matthew.fagen@kirkland.com

*Dated: July 30, 2020*

*Co-Counsel to the Debtors*
*and Debtors in Possession*

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN PARTIES IN INTEREST THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 99 PERCENT OF THE DEBTORS' FIRST LIEN TERM LOANS, 100 PERCENT OF THEIR SECOND LIEN NOTES, 70 PERCENT OF THEIR THIRD LIEN NOTES, AND 78 PERCENT OF THEIR DEBENTURES. [THE CREDITORS COMMITTEE SUPPORTS THE PLAN, SUBJECT TO CERTAIN CAVEATS AND/OR CONDITIONS THE COMMITTEE MAY ARTICULATE.][2]

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, HAS PROVIDED THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON

---

[2]  [The Debtors are awaiting confirmation of the support of the Creditors Committee and statements regarding support and conditionality are anticipated to be made on the record of the Disclosure Statement Hearing. The Disclosure Statement will be modified accordingly prior to solicitation.]

VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO MAY BE ELIGIBLE TO SUBMIT BALLOTS BUT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "SECURITIES ACT") OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND TO THE EXTENT THAT SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT, THE EXEMPTION SET FORTH IN SECTION 701 PROMULGATED UNDER THE SECURITIES ACT OR ANOTHER EXEMPTION THEREUNDER. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ....................................................................................................................1

II.     PRELIMINARY STATEMENT ..........................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE
        PLAN ......................................................................................................................................4

        A.     What is Chapter 11? ...............................................................................................4
        B.     Why are the Debtors sending this Disclosure Statement?......................................4
        C.     Am I entitled to vote on the Plan?..........................................................................4
        D.     What will I receive from the Debtors if the Plan is consummated?........................5
        E.     What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee
               Claim, DIP Facility Claim, Priority Tax Claim, or United States Trustee Statutory Fee Claim?
               ................................................................................................................................10
        F.     Are any regulatory approvals required to consummate the Plan?........................12
        G.     What happens to my recovery if the Plan is not confirmed or does not go effective?............12
        H.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan
               goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"
               ................................................................................................................................12
        I.     What will I receive from the Debtors if I hold a General Unsecured Claim?.......................12
        J.     Will there be releases and exculpation granted to parties in interest as part of the Plan?.......13
        K.     What impact does a potential Claims Bar Date have on my Claim? ......................................19
        L.     What is the deadline to vote on the Plan? .............................................................19
        M.     How do I vote for or against the Plan?..................................................................20
        N.     Who do I contact if I have additional questions with respect to this Disclosure Statement or
               the Plan? ................................................................................................................20
        O.     Do the Debtors recommend voting in favor of the Plan?......................................20
        P.     What is the effect of the Plan on the Debtors' ongoing business?........................21

IV.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT........................21

        A.     Additional Important Information. ........................................................................21

V.      OVERVIEW OF THE PLAN...............................................................................................23

        A.     The Restructuring Transactions. ...........................................................................23
        B.     Sources of Consideration for Plan Distributions...................................................24
        C.     Management Incentive Plan. ..................................................................................25
        D.     Releases. .................................................................................................................25
        E.     Directors and Officers of the Reorganized Debtors. ............................................25

VI.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..26

        A.     NMG's Corporate History......................................................................................26
        B.     NMG's Business Operations...................................................................................34
        C.     Critical Components of the Debtors' Cost Structure. ............................................36
        D.     Prepetition Capital Structure...................................................................................38

VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ...................................................43

        A.     The Unprecedented Spread Of COVID And Store Closures Results In Neiman Marcus
               Preparing for A Chapter 11 Filing..........................................................................43
        B.     Restructuring Support Agreement and DIP Financing, and Exit Facility.............44

VIII.     **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ..................................................................................................................**45**

      A.     Expected Timetable of the Chapter 11 Cases. ..................................................45
      B.     Corporate Structure upon Emergence. ...........................................................45
      C.     First/Second Day Relief. .................................................................................45
      D.     Approval of the DIP Facility. ..........................................................................46
      E.     Other Procedural and Administrative Motions. ..............................................46
      F.     Retention of the Debtors' Professionals. .........................................................47
      G.     Schedules of Assets and Liabilities and Statements of Financial Affairs. ............47
      H.     Establishment of a Claims Bar Date. ..............................................................47
      I.     Store Closing Process. .....................................................................................48
      J.     Appointment of the Creditors Committee. ....................................................48
      K.     The Debtors Appoint Disinterested Managers With Independent Advisors To Investigate Potential Estate Claims, And The Creditors Committee And The Disinterested Managers Proceed With Their Investigations ....................................................................48
      L.     Disinterested Manager Settlement ..................................................................49
      M.     Other Litigation Matters. ................................................................................50
      N.     Treatment of Executory Contracts and Unexpired Leases. ............................51
      O.     The Surety Bond Program. .............................................................................53

IX.       **PROJECTED FINANCIAL INFORMATION** ..............................................................**53**

X.        **RISK FACTORS** ...........................................................................................................**54**

      A.     Bankruptcy Law Considerations. ....................................................................54
      B.     Risks Related to Recoveries under the Plan. ...................................................57
      C.     Risks Related to the Debtors' and the Reorganized Debtors' Business. ................58

XI.       **SOLICITATION AND VOTING PROCEDURES** .......................................................**61**

      A.     Holders of Claims and Interests Entitled to Vote on the Plan. ......................61
      B.     Voting Record Date. .......................................................................................62
      C.     Voting on the Plan. .........................................................................................62
      D.     Ballots Not Counted. ......................................................................................63
      E.     Certain Voting Matters. ..................................................................................63

XII.      **CONFIRMATION OF THE PLAN** .............................................................................**64**

      A.     Confirmation Hearing. ....................................................................................64
      B.     Requirements for Confirmation of the Plan. .................................................64
      C.     Best Interests of Creditors/Liquidation Analysis. ..........................................64
      D.     Feasibility. ......................................................................................................65
      E.     Acceptance by Impaired Classes. ...................................................................65
      F.     No Unfair Discrimination. ..............................................................................66
      G.     Fair and Equitable Test. ..................................................................................66
      H.     Valuation of the Debtors. ...............................................................................66

XIII.     **CERTAIN SECURITIES LAW MATTERS** ...............................................................**66**

      A.     Plan Securities. ...............................................................................................66
      B.     Issuance and Resale of Securities Under the Plan. .........................................67

XIV.     **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN 69**

      A.     Introduction. ..................................................................................................69
      B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Neiman. ...............................................................................................................70

C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. .................................................................................................................73

D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.........................................................................................................................81

E.      Information Reporting and Back-Up Withholding. ................................................................86

**XV.**      **RECOMMENDATION**.....................................................................................................**87**

## <u>EXHIBITS</u>

**EXHIBIT A**     Plan of Reorganization

**EXHIBIT B**     Disclosure Statement Order

**EXHIBIT C**     Financial Projections

**EXHIBIT D**     Valuation Analysis

**EXHIBIT E**     Liquidation Analysis

**EXHIBIT F**     Organizational Structure Chart

**EXHIBIT G**     Lien Priorities

## I.  INTRODUCTION

Neiman Marcus Group LTD LLC ("<u>NMG LTD LLC</u>") and its debtor affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>" or "<u>NMG</u>"), submit this disclosure statement (as amended, modified, or supplemented, from time to time, the "<u>Disclosure Statement</u>") pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, or supplemented, from time to time, the "<u>Plan</u>").[3] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

> THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.  PRELIMINARY STATEMENT

For over 100 years, the Debtors have been the leader in retail luxury, innovation, and customer experiences.  Since opening in 1907 with just one store in Dallas, Texas, the Debtors have strategically grown to 67 stores across the United States, including their marquee luxury Neiman Marcus and Bergdorf Goodman locations, Horchow e-commerce website, and off-price Last Call stores.  Each Neiman Marcus and Bergdorf Goodman store offers a distinctive selection of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury and fashion designers.  Horchow offers luxury home furnishings and accessories, and Last Call provides a more affordable option for price-sensitive yet fashion-minded customers.  To complement its store footprint, NMG operates the largest luxury e-commerce platform in the world.  More than 30 percent of NMG's total annual revenue is from online sales.  The Debtors' non-Debtor affiliates own and operate a single store under the THERESA brand and an e-commerce platform under the MyTheresa brand.  As of the Petition Date, the Debtors have funded-debt obligations of approximately $5.5 billion.

In 2019, NMG de-stressed its capital structure in a comprehensive and highly consensual series of amend-and-extend transactions (the "<u>Recapitalization Transactions</u>") with holders of over 91 percent of the Unsecured Notes (as defined below) and holders of over 99 percent of 2013 Term Loans (as defined below).  This transaction afforded NMG meaningful runway and flexibility to meet its earnings targets and implement new cost-savings and business initiatives to address adverse macro trends in the retail industry, such as a general transition from brick-and-mortar to online retail channels, and a shift in consumer demographics.  Prior to February 2020, NMG was on track to meet all of its budget, earnings, and savings targets for the fiscal year ending in July 2020.  NMG also posted comparable store sales growth for seven of the ten previous quarters and significantly expanded gross margins during the last holiday season in line with its goal of profitable and sustainable growth.

---

[3]  Capitalized terms used but not immediately defined in this Disclosure Statement shall have the meanings assigned to them elsewhere in this Disclosure Statement, in the *Declaration of Mark Weinsten, Chief Restructuring Officer of Neiman Marcus Group LTD LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 86] (the "<u>First Day Declaration</u>"), the Plan, or the *Debtors' Motion For Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving The Solicitation and Notice Procedures With Respect to Confirmation of The Debtors' Proposed Joint Plan of Reorganization, (III) Approving The Forms of Ballots and Notices in Connection Therewith, (V) Scheduling Certain Dates With Respect Thereto, and (VI) Granting Related Relief* [Docket No. 773], as applicable.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Then, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. In response to COVID-19, national, state, and local governments in the United States and throughout the world imposed quarantines, social distancing protocols, and shelter-in-place orders. To protect the health and safety of NMG's customers and employees, on March 18, 2020, NMG voluntarily closed all of its stores and dramatically reduced supply chain operations.[4] These unprecedented events have severely impacted NMG's business and liquidity.

To navigate these market conditions, NMG knew it needed to proactively address its liquidity position and capital structure. NMG engaged Kirkland & Ellis LLP ("Kirkland") as restructuring counsel and Lazard Frères & Co. LLC ("Lazard") as investment banker to work with NMG and BRG to analyze financing needs and consider NMG's capital structure alternatives. NMG encouraged its term loan lenders and noteholders to organize and retain advisors. An ad hoc group of lenders who collectively hold approximately 78 percent of NMG's term loan debt and 78 percent of the Company's debentures (the "Term Loan Lender Group") quickly organized and retained Wachtell, Lipton, Rosen & Katz ("Wachtell") as counsel and Ducera Partners LLC ("Ducera") as investment banker to represent the Term Loan Lender Group in negotiations with NMG. Shortly thereafter, an ad hoc group of holders of approximately 99 percent of NMG's Second Lien Notes (as defined below) and approximately 70 percent of NMG's Third Lien Notes (as defined below) (collectively, the "Noteholder Group") also organized and retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as counsel and Houlihan Lokey, Inc. ("Houlihan") to represent the Noteholder Group in negotiations with NMG.

Following several weeks of extensive, arm's length negotiations, NMG and the Term Loan Lender Group were extremely close to reaching agreement on a comprehensive, pre-negotiated restructuring that would substantially deleverage the Debtors' balance sheet, a fully-backstopped $625 million postpetition financing facility, and a fully-backstopped $750 million exit facility (the "Exit Facility").

To further the Debtors' evaluation of their capital structure alternatives and negotiations with their stakeholders, on April 28, 2020, Mariposa Intermediate Holdings LLC ("Holdings"), the Debtor parent of NMG LTD LLC, appointed disinterested manager Anthony Horton to its Board of Managers, and NMG LTD LLC appointed disinterested managers Marc Beilinson and Scott Vogel to its Board of Managers. Holdings has retained Katten Muchin Rosenman LLP as legal counsel and Alix Partners LLP as financial advisor to advise Mr. Horton with respect to certain matters delegated to Mr. Horton, as described in more detail herein. At a status conference held before the Court on June 19, 2020, the Debtors reported that Mr. Beilinson had tendered his resignation as a disinterested manager of Neiman Marcus Group LTD LLC due to unforeseen health concerns. NMG LTD LLC has retained Willkie Farr & Gallagher LLP as legal counsel and Alvarez & Marsal North America, LLC as financial advisors to advise Mr. Vogel with respect to certain matters delegated to Mr. Vogel, as described in more detail herein. Around this time, NMG received a modified restructuring proposal from the Noteholder Group, including upsizing the postpetition financing facility to $675 million (the "DIP Facility"). NMG believed that further stakeholder support for its restructuring plans would provide significant additional value to its stakeholders and actively pursued a tri-party negotiation with the Term Loan Lender Group and Noteholder Group to achieve more consensus.

NMG's efforts to garner additional support for its restructuring process have borne fruit. NMG's proposed restructuring pursuant to its restructuring support agreement (the "Restructuring Support Agreement") and proposed Plan will substantially deleverage NMG's balance sheet and allow the Debtors to emerge from these cases as a stronger, better-capitalized enterprise positioned for sustained success. Pursuant to the Restructuring Support Agreement, the Plan has a remarkable level of support throughout the Debtors' capital structure: with the submission of joinders to the Restructuring Support Agreement following the Petition Date, holders of approximately 99 percent of the Debtors' Term Loans, 100 percent

---

[4]    Nearly all stores have since opened.

of their Second Lien Notes, 70 percent of their Third Lien Notes, and 78 percent of their 2028 Debentures (as defined below), and 100 percent of the direct equity ownership in the Debtors have committed to support the Debtors' restructuring.

The material terms of the Plan are as follows:

- each holder of 2019 Term Loans, 2028 Debentures, Second Lien Notes, and Third Lien Notes was eligible to participate in the DIP Facility pursuant to syndication procedures implemented following entry of the Interim DIP Order;

- holders of claims on account of the Asset-Based Revolving Credit Facility and FILO Facility will receive value, as of the effective date of the Plan, equal to the allowed amount of such claims, as applicable, in each case not to exceed the value of such holders' interests in the Debtors' interest in the property securing such claims;

- holders of 2019 Term Loan Claims shall receive their pro rata share of and interest in (a) 87.5 percent of the reorganized equity (subject to dilution) and (b) 87.5 percent of the rights to participate in the Exit Facility (the "Exit Rights"), subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;

- if the class of 2013 Term Loan Claims votes in favor of the Plan, holders of 2013 Term Loans shall receive their pro rata share of and interest in (a) 0.2 percent of the reorganized equity (subject to dilution) and (b) 0.2 percent of the Exit Rights, or, if the class of 2013 Term Loan Claims does not vote in favor of the Plan, holders of 2013 Term Loan Claims will receive value, as of the Effective Date of the Plan, equal to the allowed amount of such claims not to exceed the value of each holder's interest in the estate's interest in the property securing such claims;

- holders of 2028 Debentures Claims will receive their pro rata share of and interest in (a) 2.8 percent of the reorganized equity (subject to dilution) and (b) 2.8 percent of the Exit Rights, subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;

- holders of Second Lien Notes Claims shall receive their pro rata share of and interest in (a) 1.0 percent of the reorganized equity (subject to dilution), (b) 1.0 percent of the Exit Rights,

and (c) seven-year warrants (no Black-Scholes protection) to purchase up to 25.0 percent of the reorganized equity at an agreed-upon strike price;

- holders of Third Lien Notes Claims shall receive their pro rata share of and interest in (a) 8.5 percent of reorganized equity (subject to dilution) and (b) 8.5 percent of the Exit Rights;

- holders of Funded-Debt General Unsecured Claims shall receive their pro rata share (together with Holders of Allowed Non-Funded Debt General Unsecured Claims) of (A) 140,000,000 shares of MYT Series B Preferred Stock and (B) $10,000,000 of Cash;

- holders of Non-Funded Debt General Unsecured Claims shall receive their pro rata share (together with Holders of Allowed Funded-Debt General Unsecured Claims) of (A) 140,000,000 shares of MYT Series B Preferred Stock and (B) $10,000,000 of Cash; and

- stakeholders' economic and governance rights with respect to MyTheresa shall be consistent with such stakeholders' prepetition rights, claims, and controls.

The Restructuring Transactions embodied by the Plan and Restructuring Support Agreement are a significant achievement for the Debtors in the wake of a historically challenging operating environment. The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to maximize stakeholder recoveries and ensure that NMG can efficiently emerge from chapter 11 and continue to fulfill its promise as leaders in luxury, innovation, and customer experiences. For these reasons, the Debtors strongly recommend that Holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending this Disclosure Statement?

The Debtors are seeking to obtain Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure

statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim / Equity Interests | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | ABL Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | FILO Secured Claims | Impaired | Entitled to Vote |
| 5 | 2019 Term Loans Claims | Impaired | Entitled to Vote |
| 6 | 2013 Term Loans Claims | Impaired | Entitled to Vote |
| 7 | 2028 Debentures Claims | Impaired | Entitled to Vote |
| 8 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 9 | Third Lien Notes Claims | Impaired | Entitled to Vote |
| 10 | Funded Debt General Unsecured Claims | Impaired | Entitled to Vote |
| 11 | Non-Funded Debt General Unsecured Claims | Impaired | Entitled to Vote |
| 12 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 13 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 14 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.**

**PLEASE REFERENCE THE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.[5]**

---

[5]      The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions and the valuation of the consideration that may be provided to Holders of Claims and Interest, which is some instances are not currently knowable. "Allowed" shall

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the option of the Debtors, in consultation with the Required Consenting Term Loan Lenders and the Required Consenting Noteholders, either: (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) delivery of the collateral securing such Holder's Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Holder's Allowed Other Secured Claim; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100.0% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, at the option of the Debtors, either: (i) payment in full in Cash; (ii) Reinstatement of such Holder's Allowed Other Priority Claim; or (iii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100.0% |
| 3 | ABL Loan Secured Claims | Each Holder of an Allowed ABL Loan Secured Claim shall receive, in full and final satisfaction of such Claim, (i) payment in full in Cash, (ii) consensual refinancing or other consensual modification of the ABL Loans giving rise to such ABL Loan Secured Claims, or (iii) other treatment consistent with the Bankruptcy Code and the Disclosure Statement Order. | $749,000,000 | 100.0% |
| 4 | FILO Secured Claims | Each Holder of an Allowed FILO Secured Claim shall receive, in full and final satisfaction of such Claim, (i) payment in full in Cash, (ii) consensual refinancing or other consensual modification of the FILO Facility giving rise to such FILO Secured Claims, or (iii) other treatment consistent with the | $100,000,000 | 100.0% |

mean, as to a claim or an interest (each as defined in the Bankruptcy Code), a claim or an interest allowed under the Plan, under the Bankruptcy Code, or by a final order, as applicable.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| | | Bankruptcy Code and the Disclosure Statement Order. | | |
| 5 | 2019 Term Loans Claims | On the Effective Date, each Holder of an Allowed 2019 Term Loans Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 87.5% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants, and subject to upward adjustment if Class 6 does not vote in favor of the Plan; and (ii) 87.5% of the Exit Rights, subject to upward adjustment if Class 6 does not vote in favor of the Plan. | $2,254,942,973 | 32.99% |
| 6 | 2013 Term Loans Claims | On the Effective Date: (i) if Class 6 votes in favor of the Plan, each Holder of an Allowed 2013 Term Loans Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in (a) 0.2% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants, and (b) 0.2% of the Exit Rights; or (ii) if Class 6 votes to reject the Plan, each Holder of an Allowed 2013 Term Loans Claim shall receive, in full and final satisfaction of such Claim, value as of the Effective Date equal to the Allowed amount of such Claim, *provided* that such value shall not exceed the value of each Holder's interest in the estate's interest in the property securing such Claim. | $12,641,822 | 12.75% |
| 7 | 2028 Debentures Claims | On the Effective Date, each Holder of an Allowed 2028 Debentures Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 2.8% of the New Equity, subject to dilution by the Management Incentive Plan, Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of New Warrants and subject to upward adjustment if Class 6 does not vote in favor of the Plan; and (ii) 2.8% of the | $128,859,375 | 18.76% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| | | Exit Rights, subject to upward adjustment if Class 6 does not vote in favor of the Plan. | | |
| 8 | Second Lien Notes Claims | On the Effective Date, each Holder of an Allowed Second Lien Notes Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 1.0% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants; (ii) 1.0% of the Exit Rights; (iii) the New Warrants; and (iv) the 2L MyT Distribution. | $605,805,994 | 1.40% |
| 9 | Third Lien Notes Claims | On the Effective Date, each Holder of an Allowed Third Lien Notes Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 8.5% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants; (ii) 8.5% of the Exit Rights; and (iii) the 3L MyT Distribution. | $1,285,583,214 | 5.62% |
| 10 | Funded-Debt General Unsecured Claims | Each Holder of an Allowed Funded Debt General Unsecured Claim shall receive, in full and final satisfaction of such Claim, on or as reasonably practicable after the Effective Date, its Pro Rata share (determined based on all Allowed General Unsecured Claims, together with Holders of Allowed Non-Funded Debt General Unsecured Claims) of (A) the Sponsor Contribution and (B) $10,000,000 of Cash to be funded by the Debtors or Reorganized Debtors. | $137,300,000[6] | 1.7%[7]- 34.4%[8] |

---

[6] The projected amount of all Funded-Debt General Unsecured Claims and Non-Funded Debt General Unsecured Claims excludes approximately $3.20 billion to $3.67 billion of Deficiency Claims on account of 2019 Term Loan Deficiency Claims, 2028 Debentures Deficiency Claims, Second Lien Notes Deficiency Claims, and Third Lien Notes Deficiency Claims, which are effectively proposed to be waived as part of the Disinterested Manager Settlement.

[7] Low-end projection assumes the MYT Series B Preferred Stock is worth $0 in the aggregate.

[8] High-end projection assumes the MYT Series B Preferred Stock is worth $275 million in the aggregate.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim and Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| 11 | Non-Funded Debt General Unsecured Claim | Each Holder of an Allowed Non-Funded Debt General Unsecured Claim shall receive, in full and final satisfaction of such Claim, on or as reasonably practicable after the Effective Date, its Pro Rata share (determined based on all Allowed General Unsecured Claims, together with Holders of Allowed Funded-Debt General Unsecured Claims) of (A) the Sponsor Contribution and (B) $10,000,000 of Cash to be funded by the Debtors or Reorganized Debtors. | $339,700,000-$434,700,000[9] | 1.7%[10]-34.4%[11]; |
| 12 | Intercompany Claims | Intercompany Claims shall be, at the option of the Reorganized Debtors, in consultation with the Consenting Term Loan Lender Group and the Consenting Noteholder Group, either: (i) Reinstated; or (ii) cancelled, released, and extinguished without any distribution on account of such Claims. | N/A | 0% / 100% |
| 13 | Intercompany Interests | Intercompany Interests shall be, at the option of Reorganized Debtors, in consultation with the Consenting Term Loan Lender Group and the Consenting Noteholder Group, either: (i) Reinstated; or (ii) cancelled, released, and extinguished without any distribution on account of such Interests. | N/A | 0% / 100% |
| 14 | Existing Equity Interests | On the Effective Date, Existing Equity Interests will be cancelled, released, and extinguished without any distribution on account of such Existing Equity Interests. | N/A | 0% |

In the event the Debtors contemplate potentially providing any treatment to Holders of ABL Loan Secured Claims and/or FILO Secured Claims, other than payment in full in Cash or consensually refinancing the respective loans, the Debtors shall file detailed term sheets (the "ABL Treatment Term

---

[9] The projected amount of all Funded-Debt General Unsecured Claims and Non-Funded Debt General Unsecured Claims excludes approximately $3.20 billion to $3.67 billion of Deficiency Claims on account of 2019 Term Loan Deficiency Claims, 2028 Debentures Deficiency Claims, Second Lien Notes Deficiency Claims, and Third Lien Notes Deficiency Claims, which are effectively proposed to be waived as part of the Disinterested Manager Settlement.

[10] Low-end projection assumes the MYT Series B Preferred Stock is worth $0 in the aggregate.

[11] High-end projection assumes the MYT Series B Preferred Stock is worth $275 million in the aggregate.

Sheet" and "FILO Treatment Term Sheet", respectively) with respect to any such other treatment by July 31, 2020, which shall include the principal economic terms of any instrument proposed to be provided (including the tenor, rate, and amortization schedule), any material borrowing base or collateral mechanics, any material covenants or baskets, and any other material deviations from the existing ABL Credit Agreement. To the extent the Debtors contemplate potentially providing any treatment to Holders of ABL Loan Secured Claims and/or FILO Secured Claims, other than payment in full in Cash or consensually refinancing such loans by the filing of the initial Plan Supplement, the initial Plan Supplement shall include the credit agreements or other instruments relating to such treatment (the "ABL Treatment Instrument" and "FILO Treatment Instrument", respectively), which shall not deviate materially from the ABL Treatment Term Sheet and/or FILO Treatment Term Sheet, as applicable.

### E. What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, DIP Facility Claim, Priority Tax Claim, or United States Trustee Statutory Fee Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1. Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are DIP Facility Claims, Professional Fee Claims, or Cure Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

2.      **Professional Fee Claims.**

i.      Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

ii.     Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall, without duplication of any account or amount established for the benefit of Professionals pursuant to a DIP Order, establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

iii.    Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

iv.     Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      **DIP Facility Claims.**

The DIP Facility Claims shall be deemed to be Allowed for all purposes as fully Secured Claims in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) any and all accrued and unpaid fees,

expenses, and indemnification or other obligations of any kind payable under the DIP Credit Agreement Documents. Such DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenge under any applicable law or regulation by any Entity.

Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Facility Claim, on the Effective Date, each Holder thereof shall receive payment in full in Cash, other than the Aggregate DIP Equity Fees, which shall be payable in full in New Equity.

### 4.    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 5.    United States Trustee Statutory Fees.

The Debtors and the Reorganized Debtors, as applicable, shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or Reorganized Debtors' business (or such amount agreed to with the United States Trustee or ordered by the Bankruptcy Court), for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### F.    Are any regulatory approvals required to consummate the Plan?

No. There are no known regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative to the Plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis,"* which begins on page 66 of this Disclosure Statement, and the Liquidation Analysis attached as **Exhibit E**.

### H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective/is consummated—the "Effective Date"—or as soon as practicable thereafter, as specified in the

Plan. See "*Confirmation of the Plan,*" which begins on page 65 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

> **I.      What will I receive from the Debtors if I hold a General Unsecured Claim?**

140,000,000 shares of MYT Series B Preferred Stock and $10,000,000 of Cash will be available for distribution to Holders of Allowed General Unsecured Claims in accordance with the treatment set forth in the Plan for Classes 10 and 11.

> **J.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan (as reflected below) are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan. Nevertheless, the proposed releases are subject to the investigations of the Disinterested Managers (as defined below), and the Debtors reserve the right to modify the release provisions to the extent necessary to comport with the findings of the investigations.

As defined in the Plan, "Released Party" means each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Sponsors; (e) the Term Loan Lenders; (f) the 2028 Debentures Holders; (g) the Second Lien Noteholders; (h) the Third Lien Noteholders; (i) the Consenting Noteholder Group; (j) the Consenting Term Loan Lender Group; (k) the DIP Lenders; (l) each Agent and Trustee; (m) all Holders of Interests; (n) each current and former Affiliate of each Entity in clause (a) through the following clause (o); and (o) with respect to each of the foregoing Entities in clauses (a) through this clause (o), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, advisory board members, consultants, financial advisors, partners, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, and other professional advisors; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

As defined in the Plan, "Releasing Party" means each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Sponsors; (e) the Term Loan Lenders; (f) the 2028 Debentures Holders; (g) the Second Lien Noteholders; (h) the Third Lien Noteholders; (i) the Consenting Noteholder Group; (j) the Consenting Term Loan Lender Group; (k) the DIP Lenders; (l) each Agent and Trustee; (m) all Holders of Claims and Interests; (n) each current and former Affiliate of each Entity in clause (a) through the following clause (o); and (o) with respect to each of the foregoing Entities in clauses (a) through this clause (o), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, advisory board members, consultants, financial advisors, partners, attorneys (including any other attorneys or professionals retained by any current or former director or manger in his or her capacity as director or manager of an Entity), accountants, investment bankers, and other professional advisors; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

As defined in the Plan, "Exculpated Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (c) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors.

The Debtors believe that all of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes that abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan or timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  As set forth in Article VIII of the Plan, the releases (as well as the definitions of Released Parties and Releasing Parties) are subject to approval by the Court at the Confirmation Hearing.

### 1.      Discharge of Claims and Termination of Interests.

PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY DEBTOR INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED DEBTORS), INTERESTS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTORS BEFORE THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), OR 502(I) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT:  (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO

SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN. ANY DEFAULT OR "EVENT OF DEFAULT" BY THE DEBTORS OR AFFILIATES WITH RESPECT TO ANY CLAIM OR INTEREST THAT EXISTED IMMEDIATELY BEFORE OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED (AND NO LONGER CONTINUING) AS OF THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS SUBJECT TO THE EFFECTIVE DATE OCCURRING.

**2. Release of Liens.**

EXCEPT AS OTHERWISE PROVIDED IN THE EXIT FACILITY DOCUMENTS, THE PLAN, THE CONFIRMATION ORDER, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, EXCEPT FOR OTHER SECURED CLAIMS THAT THE DEBTORS ELECT TO REINSTATE IN ACCORDANCE WITH ARTICLE III.B OF THE PLAN, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED DEBTORS AND THEIR SUCCESSORS AND ASSIGNS. ANY HOLDER OF SUCH SECURED CLAIM (AND THE APPLICABLE AGENTS FOR SUCH HOLDER) SHALL BE AUTHORIZED AND DIRECTED, AT THE SOLE COST AND EXPENSE OF THE REORGANIZED DEBTORS, TO RELEASE ANY COLLATERAL OR OTHER PROPERTY OF ANY DEBTOR (INCLUDING ANY CASH COLLATERAL AND POSSESSORY COLLATERAL) HELD BY SUCH HOLDER (AND THE APPLICABLE AGENTS FOR SUCH HOLDER), AND TO TAKE SUCH ACTIONS AS MAY BE REASONABLY REQUESTED BY THE REORGANIZED DEBTORS TO EVIDENCE THE RELEASE OF SUCH LIEN, INCLUDING THE EXECUTION, DELIVERY, AND FILING OR RECORDING OF SUCH RELEASES. THE PRESENTATION OR FILING OF THE CONFIRMATION ORDER TO OR WITH ANY FEDERAL, STATE, PROVINCIAL, OR LOCAL AGENCY OR DEPARTMENT SHALL CONSTITUTE GOOD AND SUFFICIENT EVIDENCE OF, BUT SHALL NOT BE REQUIRED TO EFFECT, THE TERMINATION OF SUCH LIENS.

**3. Releases by the Debtors.**

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST, OR THAT ANY HOLDER OF ANY CLAIM OR INTEREST COULD HAVE ASSERTED ON BEHALF OF THE DEBTORS, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART:

A. THE DEBTORS, THE DEBTORS' RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE FORMULATION, PREPARATION, DISSEMINATION,

NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT;

B.   ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, OR THE PLAN;

C.   THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR

D.   ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND DO NOT RELEASE ANY AGREEMENTS UNDER THE TRANSACTION SUPPORT AGREEMENT OR ANY DOCUMENTS OR AGREEMENTS EXECUTED IN CONNECTION THEREWITH RELATED TO ANY PARTY'S RIGHTS, CLAIMS, AND CONTROLS WITH RESPECT TO MYTHERESA (INCLUDING BUT NOT LIMITED TO THE WATERFALL AND TURNOVER PROVISIONS SET FORTH IN THE EXISTING MYT TRANSACTION DOCUMENTS AND THE TRANSACTION SUPPORT AGREEMENT, AND THE EQUIVALENT TURNOVER AND WATERFALL PROVISIONS IN ANY OTHER PREPETITION DOCUMENTS AND AGREEMENTS, EXCEPT TO THE EXTENT EXPRESSLY WAIVED IN THE PLAN).

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS:  (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

4. **Releases by Holders of Claims and Interests.**

AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART:

A. THE DEBTORS, THE DEBTORS' RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT;

B. ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, OR THE PLAN;

C. THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR

D. ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND DO NOT RELEASE ANY AGREEMENTS UNDER THE TRANSACTION SUPPORT AGREEMENT OR ANY DOCUMENTS OR AGREEMENTS EXECUTED IN CONNECTION THEREWITH RELATED TO ANY PARTY'S RIGHTS, CLAIMS, AND CONTROLS WITH RESPECT TO MYTHERESA (INCLUDING BUT NOT LIMITED TO THE WATERFALL AND TURNOVER PROVISIONS SET FORTH IN THE EXISTING MYT TRANSACTION DOCUMENTS AND THE TRANSACTION SUPPORT AGREEMENT, AND THE EQUIVALENT TURNOVER AND WATERFALL PROVISIONS IN ANY OTHER PREPETITION DOCUMENTS AND AGREEMENTS, EXCEPT TO THE EXTENT EXPRESSLY WAIVED IN THE PLAN).

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-

PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

     **5.**     **Exculpation.**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES AND OTHER PARTIES SET FORTH ABOVE HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

     **6.**     **Injunction.**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION

ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN, SHALL BE DISCHARGED PURSUANT TO THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OF THE RELEASED PARTIES: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

### K. What impact does a potential Claims Bar Date have on my Claim?

On June 25, 2020, the Bankruptcy Court entered the *Order (I) Settling Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 1014] (the "Bar Date Order"), setting bar dates by which the following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date (including, without limitation, Class 10: General Unsecured Claims), must file proofs of claim (the "Bar Date"): (a) any entity whose claim against a Debtor is not listed in the applicable Debtor's Schedules or is listed as contingent, unliquidated, or disputed if such entity desires to participate in any of these Chapter 11 Cases or share in any distribution in any of these Chapter 11 Cases; (b) any entity that believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and that desires to have its claim allowed in a different classification or amount other than that identified in the Schedules; (c) any entity that believes that its prepetition claims as listed in the Schedules is not an obligation of the specific Debtor against which the claim is listed and that desires to have its claim allowed against a Debtor other than that identified in the Schedules; and (d) any entity that believes that its claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code.

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the applicable Bar Date: (a) such person or entity may be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (b) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (c) such person or entity may not

receive any distribution in the Chapter 11 Cases on account of that Claim; and (d) such person or entity may not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim. **Except in the cases of governmental units and certain other exceptions expressly set forth in the Bar Date Order, all proofs of claims of any person or entity that is required to file a proof of claim must have been filed so that they were actually received on or before July 20, 2020, at 5:00 p.m. (prevailing Central Time). All governmental units holding claims that arose prior to the Petition Date must file proofs of claims so they are actually received on or before November 3, 2020, at 5:00 p.m. (prevailing Central Time).**

**L.** **What is the deadline to vote on the Plan?**

The Voting Deadline is August 31, 2020, at 4:00 p.m. (prevailing Central Time). The Voting Deadline for any counterparty to an Unexpired Lease which is identified as rejected on a Schedules of Assumed and Rejected Contracts filed later than one Business Day prior to the Voting Deadline shall be extended to the date of the Confirmation Hearing.

**M.** **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims and Interests that are entitled to vote on the Plan. For your vote to be counted, your Ballot must be completed and signed so that it is *actually received* by August 31, 2020 at 4:00 p.m. (prevailing Central Time) at the following address:

---

Neiman Marcus Group LTD LLC Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, California 92602

---

For more detail on voting and solicitation procedures, *see* Article XI of this Disclosure Statement.

**N.** **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the notice and claims agent, Stretto (the "Notice and Claims Agent"):

| By regular, hand delivery, or overnight mail at: | By electronic mail at: | By telephone at: |
|---|---|---|
| Neiman Marcus Group LTD LLC c/o Stretto 410 Exchange, Suite 100 Irvine, California 92602 | NMGInquiries@stretto.com | 877-670-2127 (Toll-Free) 949-504-4475 (International) |

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and

solicitation agent at http://cases.stretto.com/NMG (free of charge) or the Court's website at https://ecf.txsb.uscourts.gov/ (for a fee).

**O.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan is in the best interest of all Holders of Claims and Interests and that other alternatives fail to realize or recognize the value inherent under the Plan.

**P.     What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are seeking to reorganize under chapter 11 of the Bankruptcy Code.  Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is a Business Day on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A of the Plan have been satisfied or waived (in accordance with Article IX.B of the Plan); and (c) the Plan is declared effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate or wind-down their businesses, as applicable, and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

## IV.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**A.     Additional Important Information.**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "Risk Factors" and the Plan before submitting your ballot to vote on the Plan.

*The Court's approval of this Disclosure Statement does not constitute a guarantee by the Court of the accuracy or completeness of the information contained herein or an endorsement by the Court of the merits of the Plan.*

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event

of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance upon the exemption set forth in (a) section 1145 of the Bankruptcy Code or (b) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws, if any. All securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about:

- the Debtors':

    o business strategy, plans, objectives, and expectations;

    o estimated future net reserves and present value thereof;

    o technology, supply chain and other operations;

    o brand partner and vendor relationships;

    o arrangements with brand partners, suppliers or other institutions as they relate to: (i) the manner in which goods are made available, (ii) the levels of merchandise made available and (iii) the pricing and payment terms with respect to such purchases;

    o financial condition, revenues, cash flows, and expenses;

    o levels of indebtedness and compliance with debt covenants;

    o financial strategy, budget, projections, and operating results;

    o amount, nature, and timing of capital expenditures;

    o access to capital and terms of such capital;

    o liquidity and cost savings as a result of the closing the Debtors' stores;

> o   capital resources and liquidity, including access to additional borrowing capacity under the DIP Facility and the Exit Facility, and ability to satisfy future cash obligations; and
>
> o   integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness.

- costs of developing the Debtors' properties and conducting other operations;

- general economic and business conditions;

- the outcome of pending and future litigation;

- the competitive nature of the luxury retail industry;

- uncertainty regarding the Debtors' future operating results;

- variations in the market demand for, and prices of, the Debtors' key product lines;

- the impact of regional or global pandemics or other public health issues; and

- the potential adoption of new governmental regulations that affect the Debtors' business.

Statements concerning the foregoing and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Plan; the Debtors' ability to reduce its overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' business during the Chapter 11 Cases; customer and vendor responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business and market conditions and the impact of the recent COVID-19 outbreak; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressure by customers; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## V.   OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce long-term debt and annual interest payments and preserve the Debtors' existing liquidity, resulting in a stronger, delivered balance sheet. Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion. The key terms of the Plan are as follows:

### A.   The Restructuring Transactions.

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transactions and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions (as agreed and in accordance with the Restructuring Support Agreement and subject to the

applicable consent and approval rights thereunder), including to establish Reorganized Neiman and, if applicable, to transfer assets of the Debtors to Reorganized Neiman or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, to the extent agreed in accordance with the consent rights in the Restructuring Support Agreement and provided herein, in the Description of Transaction Steps, or in the Definitive Documentation, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

On the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. To the extent provided in the Description of Transaction Steps, each Debtor, other than Reorganized Neiman, may be deemed dissolved in accordance with applicable law, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Reorganized Neiman shall be the issuer of New Equity to the applicable Holders of Claims and Interests as set forth herein.

The actions to implement the Restructuring Transactions may include, in each case if and as agreed in accordance with the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (4) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Neiman, which purchase, if applicable, may be structured as a taxable transaction for United States federal income tax purposes; and (5) all other actions that the applicable parties determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

## B. Sources of Consideration for Plan Distributions.

### 1. Exit Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, the terms of which will be set forth in the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date,

subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 2. New Equity.

On the Effective Date, upon cancellation of the Existing Equity Interests, Reorganized Neiman shall issue the New Equity directly or indirectly to Holders of Claims to the extent provided in the Plan. The issuance of the New Equity, including New Equity reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable.

All of the New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 3. New Warrants

On the Effective Date, Reorganized Neiman shall issue the New Warrants in accordance with the New Warrant Agreement and distribute them to the Holders of Claims in Class 8, in accordance with Article VI.D.2 of the Plan. All of the New Warrants issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non assessable.

### 4. General Unsecured Creditor Recovery

140,000,000 shares of MYT Series B Preferred Stock and $10,000,000 of Cash will be available for distribution to Holders of Allowed General Unsecured Claims in accordance with the treatment set forth in the Plan for Classes 10 and 11.

### C. Management Incentive Plan.

The New Board shall be authorized to implement the Management Incentive Plan on or after the Effective Date, the form of which shall be included in the Plan Supplement.

### D. Releases.

The Plan contains certain releases (as described more fully in Article III.J of this Disclosure Statement), including mutual releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders. Additionally, all Holders of Claims or Interests that do not to opt out of the releases contained in the Plan; or timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to its inclusion as a Releasing Party under the releases contained in the Plan that is not resolved before Confirmation will be deemed to have expressly, unconditionally, generally, individually, and collectively

consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties to the extent set forth in the Plan.

### E. Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the members for the initial term of the New Board shall be appointed. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing, pursuant to the terms of the Restructuring Support Agreement. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

The New Board shall consist of seven directors, or such other number as approved pursuant to the Governance Term Sheet and shall initially be comprised of (i) the then-serving Chief Executive Officer of the Reorganized Debtors; (ii) three directors designated by Pacific Investment Management Company LLC ("PIMCO"); (iii) one director designated by Davidson Kempner Capital Management LP; (iv) one director designated by Sixth Street Partners, LLC; and (v) one independent director designated by holders of New Equity (other than PIMCO) representing at least 50% of the New Equity to be outstanding as of the Effective Date (other than New Equity to be issued to PIMCO).

## VI. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. NMG's Corporate History.

#### 1. A Century of Luxury and Innovation

On September 10, 1907, the first Neiman Marcus store opened its doors at the corner of Elm and Murphy in Dallas with the goal of offering style, quality, and unparalleled service. NMG has always worked hard to provide more than "just" shopping and in the process created experiences and traditions over the decades. For example, NMG started the first weekly retail fashion show in the 1920s. It still sponsors fashion shows as charity events today. In the 1930s, NMG drew national attention as the first retailer outside of New York City to run national ad campaigns in *Vogue* and *Harper's Bazaar*. NMG has continued to reinvent the publishing of fashion with the now-traditional *Christmas Book* (1939), campaigns like the Art of Fashion (1994), and its fashion magazine *the book* (1996).

In the 1940s, NMG worked to bring the industry together to celebrate fashion talent with *The Neiman Marcus Award for Distinguished Service in the Field of Fashion*—the Oscar of the fashion industry—with famous winners such as Coco Chanel and Yves Saint Laurent. Beginning in the 1950s, NMG formalized its combination of art and style by starting the Neiman Marcus Art Collection, which includes thousands of pieces and often features local artists.

NMG has rebuilt itself from the ground up *twice* due to devastating fires at its flagship location (the first in 1913 and the second in 1964). In 1971, NMG expanded outside of Texas for the first time, building a store in Bal Harbour, Florida. Today, there are 43 Neiman Marcus brand stores nationwide, each of which offers a distinctive selection of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury and fashion designers.

In 1972, NMG acquired the famous Fifth Avenue landmark, Bergdorf Goodman. The acquisition gave NMG a foothold in New York City, the sole NMG location in the nation's fashion capital until the opening of Neiman Marcus's Hudson Yards location in spring 2019. In 1988, NMG deepened and expanded its product offerings with the acquisition of the Horchow Collection, a luxury décor and furniture brand. In 1999, NMG took its business online, launching NeimanMarcus.com. Since then, NMG's online

platform has grown into the largest luxury e-commerce platform in the world, accounting for over 30 percent of NMG's total revenue.

Presently, NMG also operates Last Call, an off-price fashion brand catering to price sensitive yet fashion-minded customers. As part of its go-forward business model, NMG will be focusing on its full-price stores and moving away from the Last Call segment.

### 2. 2013: Ares and CPPIB Acquire Neiman Marcus

Before 2005, Debtor The Neiman Marcus Group LLC ("<u>NMG LLC</u>") (f/k/a The Neiman Marcus Group, Inc.) was publicly traded on the New York Stock Exchange. In 2005, affiliates of TPG and Warburg Pincus took NMG LLC private through the entity that is now Debtor Neiman Marcus Group LTD LLC ("<u>NMG LTD LLC</u>") (f/k/a Neiman Marcus Group LTD Inc. and Neiman Marcus, Inc.).

In October 2013, affiliates of Ares and CPPIB (the "<u>Sponsors</u>") acquired NMG LTD LLC (the "<u>Acquisition</u>") through non-debtor parent Neiman Marcus Group, Inc. ("<u>NMG Inc.</u>") (f/k/a/ NM Mariposa Holdings, Inc.) and Debtor Mariposa Intermediate Holdings LLC ("<u>Mariposa Holdings</u>"). This resulted in the following core organizational structure:



In connection with the Acquisition, both NMG LLC and NMG LTD LLC were renamed and converted into Delaware limited liability companies. Consistent with the Delaware Limited Liability Company Act, each of NMG LLC, NMG LTD LLC, and Mariposa Holdings were member-managed limited liability companies with no board of directors or managers. The ultimate parent entity NMG Inc. has a board of directors.

NMG Inc. has never been an obligor or guarantor of any of the Debtors' debt. Instead, the Debtors' funded debt obligations have always been issued or guaranteed by Mariposa Holdings, NMG LTD LLC, NMG LLC, and certain of their guarantor subsidiaries. Following the Acquisition, the Debtors' funded debt consisted of (a) a $2.8 billion senior secured term loan facility maturing in October 2020 (the "<u>2013 Term Loan Facility</u>"), (b) a $900.0 million senior secured asset-based revolving credit facility (the "<u>Asset-Based Revolving Credit Facility</u>" or "<u>ABL Facility</u>"), (c) two series of Unsecured Notes, including $960.0 million in aggregate principal amount of 8.000% Senior Cash Pay Notes due 2021 (the "<u>Unsecured Cash Pay Notes</u>") and $600.0 million in aggregate principal amount of 8.750%/9.500% Senior PIK Toggle Notes

due 2021 (the "Unsecured PIK Toggle Notes" and, together with the Cash Pay Notes, the "Unsecured Notes"), and (d) $125.0 million in 7.125% Senior Debentures due 2028 (the "2028 Debentures").

The debt agreements governing these obligations included restrictive covenants limiting NMG LTD LLC and certain of its subsidiaries from paying dividends, making investments, disposing of assets or taking other actions. These restrictions did not apply to unrestricted subsidiaries, which were generally permitted to engage in transactions without being subject to the covenants. The debt agreements also contained exceptions to the covenants known as "baskets" that allowed NMG LTD LLC and its restricted subsidiaries to engage in certain transactions either without limitation or up to specified dollar amounts.

Neiman Marcus had significant flexibility afforded by the ability to designate entities as unrestricted subsidiaries and the very broad baskets under the debt agreements. This included the express right to distribute the equity of unrestricted subsidiaries.

### 3. 2014: Neiman Marcus Purchases MyTheresa and Designates It Unrestricted Under the Term Loan and ABL Credit Facilities

In late 2014, the Debtors acquired the online business of MyTheresa and its physical store in Munich. Since then, MyTheresa has operated on a standalone basis, with its own CEO, CFO and management team, as well as separate vendors, suppliers, and bank lenders. MyTheresa has never issued a dividend to the Debtors, NMG Inc. or the Sponsors. In fact, while MyTheresa has experienced growth in top-line sales and EBITDA since 2014, it has repeatedly generated negative free cash flow, including in the years leading up to the Distribution. Neiman Marcus has not relied on MyTheresa as a basis to fund its operations or debt expenses.

The Debtors paid approximately $196 million for MyTheresa in 2014, plus $57 million in two contingent earn-out payments to MyTheresa's prior owners in the following years. After the acquisition, the German entities that operate MyTheresa sat under a series of German and Luxembourg holding entities until the Recapitalization Transactions in 2019. The highest-level foreign holding entity was Mariposa Luxembourg I S.á.r.l., which in turn was wholly owned by the Debtors' former subsidiary, NMG International LLC (f/k/a NMG International, Inc.):



From late 2014 onwards, NMG International had no other assets besides the MyTheresa holding and operating entities.  As a result, under the Term Loan and ABL Credit Facilities, NMG International was not a guarantor, but was treated as a foreign subsidiary holding company and 65% of its equity interests were pledged (on a first-lien basis) in favor of the senior secured lenders.  The unsecured noteholders had no security interest in the equity interests of NMG International.  Despite the pledge of 65% NMG International's equity interests in favor of the senior secured lenders, no MyTheresa entity's equity was directly pledged in support of any of the Debtors' obligations at any point.

Simultaneously with the acquisition of the MyTheresa entities and the creation of the Luxembourg holding entities in late 2014, NMG LTD LLC designated all of the then-existing MyTheresa subsidiaries as unrestricted subsidiaries under both the Term Loan and ABL Credit Facilities.  In making these designations, NMG LTD LLC relied on specific baskets that it was permitted to use for this purpose.  NMG LTD LLC had several hundred million dollars of spare basket capacity under the Term Loan and ABL Credit Facilities after the designations.  As a result, from late 2014 onwards, the MyTheresa entities were unrestricted subsidiaries that could have been distributed by the Debtors under the Term Loan and ABL Credit Facilities.  NMG LTD LLC delivered notices of the designations to the agents under both the Term Loan and ABL Facilities.  In recurring quarterly officer's certificates provided to the agents, the MyTheresa entities were also listed as unrestricted subsidiaries.

### 4.    Early 2017:   Neiman Marcus Uses Agreed-Upon Baskets To Designate MyTheresa As Unrestricted and Create Unrestricted PropCo

In early 2017, the Debtors retained Lazard to explore potential liability management transactions, including asset sales, debt exchanges and other strategic transactions.  Neiman Marcus, its advisors and the Sponsors focused on two options: a potential transaction involving MyTheresa and a potential "PropCo" transaction.  Both transactions would involve designating MyTheresa as an unrestricted subsidiary under the Indentures and "PropCo" as an unrestricted subsidiary under all of the Debtors' debt agreements.  Once MyTheresa and PropCo—which would receive real properties from the Debtors valued in an amount

permitted under the debt agreements—were unrestricted subsidiaries and no longer subject to the restrictions under the debt agreements, they would provide the Debtors with flexibility to address their capital structure in the future.

Neiman Marcus' management worked with its financial and legal advisors to calculate available basket capacity. The company also obtained third-party valuations from Duff & Phelps of MyTheresa (approximately $282 million) and the three properties—stores in San Antonio, Texas and McLean, Virginia and a distribution center in Longview, Texas—that would be contributed to PropCo (approximately $73 million) to determine how much basket capacity was required. This analysis showed that the Debtors had several hundred million dollars of spare basket capacity available after the designations.

On March 10, 2017, the NMG Inc. board unanimously approved the designation of MyTheresa (the "Designation") and the designation of and contribution of three properties to PropCo (the "PropCo Transaction"). NMG LTD LLC publicly announced both transactions on March 14, 2017 with its quarterly earnings. Since then, no creditor has ever brought a claim alleging that the Designation or the PropCo Transaction violated any of Neiman Marcus' debt agreements, including the indentures governing the Unsecured Notes, or resulted in an event of default.

Before the Debtors completed the Designation and the PropCo Transaction in spring 2017, they also considered distributing MyTheresa, however, the Debtors did not proceed with the distribution at the time. In spring 2017, the Debtors were considering a sale of their U.S. operations, called Project Harry, to another luxury retailer. After that transaction terminated, the parties began negotiations on a different deal, called Project Einstein, during the first half of 2018 that would have resulted in the Debtors obtaining another luxury retailer's operations in exchange for the Debtors' real estate interests. Those discussions ended in late July 2018. Only then did the Debtors decide to distribute MyTheresa in connection with the amend-and-extend negotiations that led to the Recapitalization Transaction.

### 5. March 2017 - August 2018: Neiman Marcus Considers Various Strategic Transactions And Creditor Negotiations

Between March 2017 and August 2018, Neiman Marcus considered multiple strategic transactions including Project Harry and Project Einstein. Despite many months of negotiations and substantial expenditure of time and resources around these strategic transactions, Neiman Marcus ultimately chose not to proceed with those transactions.

Following the Designation and PropCo Transaction, Neiman Marcus also conducted on-and-off negotiations with its creditors' advisors on a "standalone" amend-and-extend (i.e., a transaction that did not involve a broader strategic transaction). In May 2017, the Debtors signed an NDA with counsel to an ad hoc group of term loan lenders (Wachtell). In August 2017, the Debtors signed NDAs with a financial advisor to the same ad hoc group of Term Loan Lenders (Ducera) and a financial advisor to an ad hoc group of Unsecured Noteholders (Houlihan). In September 2017, the Debtors signed an NDA with counsel to the ad hoc group of Unsecured Noteholders (Paul Weiss).

While under NDA, the Debtors provided these advisors with diligence materials concerning the Debtors, their business, and the Designation and PropCo Transaction. In November 2017, Neiman Marcus provided a proposed term sheet for potential circulation to these advisors' clients. The term sheet contemplated a potential amend-and-extend transaction and "a dividend of MyTheresa." The members of the ad hoc lender groups never entered into confidentiality agreements and standalone amend-and-extend discussions fell apart by early 2018 as the Debtors focused on Project Einstein.

6.       **September 2018: The Debtors Distribute MyTheresa To NMG Inc.**

After negotiations over Project Einstein ended in late July 2018, Neiman Marcus immediately focused on completing a "standalone" amend-and-extend transaction with its creditors in late 2018. The distribution of MyTheresa was a key component of the amend-and-extend transaction.

In early August 2018, the Debtors' advisors prepared an "Amendment and Extension Checklist" of steps necessary to achieve an extension of their debt maturities. The second step on the checklist after initial advisor diligence was the "MyTheresa Distribution." The Debtors planned to launch the amend-and-extend transaction simultaneously with the public announcement of the distribution and the release of earnings on September 14, 2018. At an NMG Inc. board meeting in August 2018 discussing the possibility of re-engaging with creditors, Lazard described the distribution of MyTheresa as a "core" part of any amend-and-extend transaction.

Neiman Marcus' debt agreements expressly permitted the distribution of ownership interests in unrestricted subsidiaries without limit. As the MyTheresa entities were all unrestricted subsidiaries in September 2018, there was no contractual prohibition on the distribution. No creditor has ever brought a claim alleging that the Distribution violated any of Neiman Marcus's debt agreements, including the Indentures, or resulted in an event of default.

The Debtors' management also conducted good faith efforts to evaluate the Debtors' solvency prior to any potential distribution. In fall 2018, the Debtors' business had significantly improved compared to early 2017 when the Debtors last discussed a potential distribution. The company was on the verge of completing its fourth consecutive quarter of positive sales, all of Neiman Marcus' stores were four-wall EBITDA positive, and Adjusted EBITDA had increased more than 16% as compared to the same quarter in 2017. The Debtors also had approximately $800 million in liquidity in fall 2018. Despite these results, testimony has indicated that the Debtors would not have been able to obtain a third-party solvency opinion because of their near-term maturities. Accordingly, the Debtors' Chief Financial Officer at the time, Adam Orvos, and other members of the Debtors' finance, accounting and legal teams assessed the Debtors' solvency.

On the balance sheet, the Debtors started with their ordinary course books and records, which are audited annually by Ernst & Young on a consolidated basis. The Debtors then used an annual valuation of the Debtors prepared by Duff & Phelps that the Debtors received the week before the distribution to adjust the book values of their assets to fair market values. The Debtors rely on these Duff & Phelps valuations each year to determine their equity value for stock option awards and for impairment analyses. Consistent with its typical practice, Duff & Phelps used a DCF and comparable companies analysis in September 2018 to determine the fair value of the Debtors as of April 30 2018. In part because of variability in the Debtors' projections, Duff & Phelps had increased the small stock premium beginning in 2017, which would in turn increase the weighted average cost of capital and reduce the valuation of the Debtors. Ernst & Young also audits the results of these annual valuations. After making the fair value adjustments, the Debtors then took a $100 million valuation "haircut" for conservatism and to ensure any potential changes in asset value between the "as of" date of the Duff & Phelps valuation (April 30, 2018) and the distribution were reflected. The analysis showed that following the distribution, the Debtors would be solvent by $327 million.

The Debtors then used their ordinary course projections for the cash flow and adequate capitalization tests. They stress tested their projections by assuming that revenues in fiscal year 2019 would decline by 5% rather than increase by 1.7% as projected. The Debtors selected this downside scenario based on the recent decline they had experienced when implementing NMG One. The Debtors then assumed that the $300 million decline in revenue would reduce Adjusted EBITDA by $180 million— another conservative assumption given the Debtors' historical margins and steps they would take to mitigate these losses in a downturn. Even assuming that the Debtors would need to borrow the $180 million under

31

their ABL Facility in a downside scenario, they still would have approximately $380-$695 million of availability under their $900 million ABL Facility.

The Debtors relied on Lazard for the final piece of the adequate capitalization test—whether they would be able to refinance their near-term debt maturities—as no one at the company had the necessary experience to determine the likelihood of a successful refinancing. Lazard told the Debtors and ultimately the NMG Inc. Board that they were highly confident that they would be able to complete a successful refinancing, especially following the distribution of MyTheresa.

The Debtors' the Chief Financial Officer, Mr. Orvos, prepared memoranda to each of the members of the Debtors attesting to their solvency before and after the distribution of MyTheresa. The memoranda concluded that both before and after a potential distribution, the Debtors would be solvent on a balance sheet basis and, for the following 12 months, Neiman Marcus would be able to pay its debts as they came due, would not have unreasonably small assets to conduct its business, and the distribution would not impair its ability to continue as a going concern. The memoranda made clear that the Debtors' projections assumed a refinancing of the Debtors' funded debt at maturity and noted Mr. Orvos' reliance on Lazard. All of the conclusions in Mr. Orvos' memoranda were proved correct.

Mr. Orvos presented his memoranda to the NMG Inc. board on September 14, 2018. The NMG Inc. board, including its independent members, unanimously approved the MyTheresa distribution. Mechanically, the distribution took the form of a chain of distributions from wholly owned subsidiaries to their sole parent entities. First NMG International LLC distributed its equity interests in Mariposa Luxembourg I to its parent NMG LLC, which in turn distributed the equity interests to NMG LTD LLC, which in turn distributed the equity interests to Mariposa Holdings, which in turn distributed the equity interests to the ultimate parent NMG Inc. (the "Distribution"). The Mariposa Luxembourg I shares were never distributed above NMG Inc. to the Sponsors. The Debtors publicly announced the Distribution on September 18, 2018.

> 7. **Fall 2018 - Spring 2019: Neiman Marcus and Creditors Holding Over 90% of Its Debt Negotiate A&E Transactions That Result In An Agreed-Upon Waterfall For A Potential MyTheresa Sale Or IPO**

Discussions with Neiman Marcus' creditors commenced immediately after the Distribution was announced. Members of the ad hoc groups agreed to become restricted in October 2018.

The first round of negotiations among Neiman Marcus and its lender groups did not result in an agreement. Term sheets were blown out on November 30, 2018 as the Debtors headed into the critical holiday period. The parties initially took diametrically opposed positions on MyTheresa. Neiman Marcus proposed that its creditors agree to the Distribution. The unsecured bondholders demanded that MyTheresa be returned, no longer be treated as unrestricted, and provide preferred equity in NMG International. The term loan lenders demanded a full guarantee from NMG Inc. and a first lien pledge on the equity interests of a MyTheresa Holding Company.

After the blowout, Marble Ridge filed a lawsuit in Dallas County challenging the Distribution as a fraudulent transfer. That suit was dismissed with prejudice on standing grounds in March 2019. Marble Ridge replaced the indenture trustee with UMB in August 2019, and directed UMB to file suit in New York Supreme Court, in August 2019. The parties fully briefed motions to dismiss when the Debtors filed for chapter 11. No other creditors ever brought suit concerning the Designation, PropCo Transaction, or the Distribution. No one—including Marble Ridge and UMB—has ever alleged in any lawsuit that the Debtors defaulted or otherwise violated any aspect of their debt agreements through the Designation, the PropCo Transaction or the Distribution.

After the holiday period, Neiman Marcus and its creditors re-engaged in amend-and-extend negotiations. Following arms'-length negotiations in January and February 2019, the parties reached an agreement in principle on a global amend-and-extend transaction that would also resolve any potential disputes over the Designation, Distribution, and PropCo Transaction. On March 1, 2019, Neiman Marcus publicly announced that agreement in principle with its creditors to restructure the company's debt obligations and extend its debt maturities by three years. This agreement was further documented in a Transaction Support Agreement dated March 25, 2019 (the "TSA"). Holders of approximately 99.5 percent of the aggregate principal amount of the Term Loans and 91.5 percent of the Unsecured Notes—which collectively represented over $4.2 billion of Neiman Marcus' debt—ultimately participated in the Recapitalization Transactions. The majority holder of the company's 2028 Debentures also consented to the Recapitalization Transactions. Marble Ridge and another unsecured noteholder were the only material holdouts.

The Recapitalization Transactions included Neiman Marcus providing significant economic interests in MyTheresa to participating creditors. The Recapitalization Transactions provided holders of Unsecured Notes with an opportunity to exchange their existing notes for two types of consideration that entitled them to distributions in the event of a future sale or IPO of MyTheresa.

First, participating Unsecured Noteholders received new Third Lien Notes that were secured by various interests in the Debtors' assets. The Third Lien Notes were also supported by an equity pledge from MYT Parent Co., a newly formed U.S. holding company of the MyTheresa entities which is wholly-owned by NMG Inc., and would be paid down at par with 50 percent of any MyTheresa monetization proceeds over approximately $700 million (with the hurdle increasing by at least $50 million per year due to a 10% dividend owed on $500 million of preferred stock ahead of the Third Lien Notes).

Second, exchanging holders of Unsecured Notes also received their pro rata share of $250.0 million in Series A preferred stock the ("MYT Series A Preferred Stock") of MYT Holding Co., a holding company of MyTheresa entities and direct subsidiary of MYT Parent Co., that entitled those holders to priority distributions of up to $250 million of proceeds plus a 10% annual dividend in the event of a sale or other monetization of MyTheresa.

The Sponsors and a group of Unsecured Noteholders also invested $550 million of new money into the company as consideration for new Second Lien Notes. The proceeds from the new money investment were used to pay down $526.9 million of Term Loans. The Second Lien Notes are guaranteed on a senior secured basis up to $200 million by three holding companies of MyTheresa, and are entitled to the first $200 million of proceeds from any sale or IPO of MyTheresa.

As part of the hard-fought amend-and-extend negotiations, these creditors agreed that the Sponsors could obtain two other indirect sources of recovery from any sale or IPO of MyTheresa. MYT Parent Co. obtained (i) 250,000,000 shares of Series B Preferred Stock (the "MYT Series B Preferred Stock") of MYT Holding Co. that would recover up to $250 million plus a 10% annual dividend only in the event of a monetization event that yielded over the $450 million (plus dividends) that was required to go to the Second Lien Notes and MYT Series A Preferred Stock; and (ii) common equity entitled to 50 percent of any MyTheresa monetization proceeds over approximately $700 million (subject to increase each year due to the preferred equity dividends), with the other 50 percent of those proceeds used to pay down the Third Lien Notes.

Collectively, these agreements among creditors created a waterfall (the "MYT Waterfall") that specified how all amounts from any potential MyTheresa sale or IPO would be distributed:

| | |
|---|---|
| **First (2L Notes)** | $200M to holders of the 2L Notes under a limited guarantee |
| **Second (Series A)** | $250M plus accrued dividends to the holders of Series A Preferred Stock (initially to 3L Noteholders) |
| **Third (Series B)** | $250M plus accrued dividends to the holders of Series B Preferred Stock (MYT Parent) |
| **Fourth (Common/ 3L Split)** | Remainder is split 50-50 between the holders of MYT common stock and 3L Notes for redemption. |

Accordingly, pursuant to the MYT Waterfall, any monetization of MyTheresa at $500 million or less would result in substantially all of the proceeds going to the former unsecured noteholders who participated in the Recapitalization Transactions.

The UCC has indicated that it does not intend to challenge the $200 million senior secured guarantee or the $250 million in Series A preferred equity or the associated dividends (of which $25 million has already accrued and which would continue to accrue at 10% per year until a monetization event).

8. **Summer 2019: The Recapitalization Transactions Close and An Extensive Sale Process For MyTheresa Generates Limited Interest**

The Recapitalization Transactions closed on June 7, 2019. To implement the Recapitalization Transactions, the Mariposa Luxembourg I shares that had been distributed to NMG Inc. were moved into a series of new MyTheresa holding entities that provided the agreed-upon guarantees, pledges, and preferred equity to participating creditors. Specifically, NMG, Inc. contributed its interests in Mariposa Luxembourg I S.a.r.l. ("Lux I") through a series of newly formed Delaware holding entities: MYT Parent Co., MYT Holding Co., and MYT Intermediate Holding Co.

On July 24, 2019, MYT Intermediate Holding Co. contributed its interests in Lux I into a newly-formed Dutch company, MYT Netherlands Parent B.V ("MYT Netherlands Parent"). In late summer 2019, another Luxembourg holding company, Mariposa Luxembourg II S.á.r.l., was merged into Lux I. Lux I was then merged into MYT Netherlands Parent, with MYT Netherlands Parent as the surviving entity

resulting in the following organizational structure and grants of interests for the MyTheresa entities:



Beginning in May 2019, Lazard commenced a multi-month sale process with respect to MyTheresa. Lazard sent out over 50 teasers and provided confidential information memoranda to more than two dozen potential bidders. Lazard's marketing materials highlighted the challenges with valuing online retailers, and touted MyTheresa's "impressive topline growth" of 28.5% between FY16 and FY18 and EBITDA margin of 5–7% between 2016 and 2018 but noted MyTheresa experienced near zero or negative free cash flow for this same time period.

Despite Lazard's extensive marketing efforts, the sale process ended in July 2019 because the highest and best non-binding indicative offer received was only for approximately $525 million. That was the last market-based indication of the value of MyTheresa.

### B.  NMG's Business Operations.

#### 1.  Customer Loyalty and Customer Service.

Neiman Marcus and Bergdorf Goodman have a longstanding heritage of providing the highest level of personalized, concierge-style service to its customers. While many retailers have suffered in recent years given the movement away from brick-and-mortar shopping, NMG is positioned to succeed in the digital era.

First, NMG has a history of rewarding loyalty. With the 1984 roll-out of InCircle, NMG's loyalty program, NMG became the first luxury retailer to offer a customer loyalty program. In turn, Neiman Marcus and Bergdorf Goodman customers have rewarded NMG with high levels of engagement and loyalty over the years. Approximately 45 percent of NMG's revenues come from status-holding InCircle rewards members. Further, Neiman Marcus and Bergdorf Goodman have multi-year relationships with true luxury customers, as illustrated by the fact that NMG makes 40 percent of its sales from Neiman Marcus and Bergdorf Goodman to customers who spend $10,000 or more annually, with an average annual spend from these customers of $50,000.

Second, Neiman Marcus and Bergdorf Goodman have always entailed more than shopping. While other brick-and-mortar stores have been ill-equipped to compete with online-only retailers, Neiman Marcus and Bergdorf Goodman stores offer a variety of in-person experiences that make every visit an immersive luxury event. Neiman Marcus and Bergdorf Goodman stores feature stunning architecture, beautiful art, and professional and well-trained sales associates to enhance the shopping experience. Additionally, Neiman Marcus and Bergdorf Goodman operate 46 restaurants, bars, and cafes, and also offer in store services and experiences such as spas with makeup, hair, nail, massage, and waxing treatments. Neiman Marcus and Bergdorf Goodman stores also host events, including private shopping events and charity events.

Third, NMG is well positioned for the digital age. When customers want a blend of convenient, quick, and high-service access to luxury brands, Neiman Marcus and Bergdorf Goodman provide an enhanced online experience that is superior to other luxury players. NMG operates online platforms that have 17 million visits per month and provide omni-channel services and shared inventory. In addition, Neiman Marcus launched 65 digital stylists more than a year ago that are personal shoppers for top online customers and equipped its 5,200 sales associates with clienteling tools that allow them to sell and close a transaction digitally without requiring in-store presence. The significant investments in IT tools and new roles to better integrate its bricks and mortar and online operations have resulted in a better customer omni-channel experience, thereby increasing sales and gross margins.

2.     **NMG's Brands.**

NMG offers brands to provide luxury in every aspect of its customers' lives.

*Neiman Marcus*.  The Neiman Marcus brand caters to affluent luxury customers.  Neiman Marcus operates 43 full-line stores in marquee retail locations in major U.S. markets and its global $1 billion e-commerce platform, neimanmarcus.com.  The Neiman Marcus stores are designed to provide a modern, luxurious ambiance by blending art, architecture, and technology.  Neiman Marcus offers distinctive luxury merchandise, including women's couture and designer apparel, contemporary sportswear, handbags, shoes, cosmetics, men's clothing and accessories, precious and designer jewelry, home, children's apparel, and gift items.

*Bergdorf Goodman*.  Bergdorf Goodman is the premier retailer of ultra-high end branded goods in the world.  Bergdorf Goodman operates primarily through its two full-line stores in landmark locations on Fifth Avenue in New York City and its global e-commerce platform, bergdorfgoodman.com and the Bergdorf Goodman App.  Bergdorf Goodman is known for its high-luxury women's couture and designer apparel, contemporary sportswear, handbags, shoes, cosmetics, men's clothing and accessories, precious and designer jewelry, home, children's apparel, and gift items.

*Horchow*.  Horchow is a leading online resource for luxury furniture, fine linens, and unique décor.  Horchow was founded by Roger Horchow in 1973 as the first luxury mail-order catalog without a brick-and-mortar store.  Today, Horchow conducts the majority of its business through its e-commerce platform, horchow.com.

*Last Call*.  Last Call is the off-price segment of NMG's fashion goods business.  Customers purchase merchandise through 22 Last Call stores and its online platform, lastcall.com.  Merchandise offered under the Last Call brand primarily includes end-of-season and post-season clearance goods sourced directly from the Neiman Marcus or lower price-point merchandise purchased directly from designers.  During fiscal year 2017, NMG began assessing its Last Call footprint and closed four of its Last Call stores.  In fiscal year 2020, NMG closed two more Last Call stores, and on March 11, 2020, prior to temporarily closing all of its stores, NMG announced that it would permanently close most of its 22 remaining Last Call stores to focus on NMG's core luxury business.

Under each of NMG's primary brands, NMG offers its customers a curated and compelling assortment of narrowly distributed merchandise from luxury and high-fashion designers. NMG is the retail partner of choice for luxury designers as it offers access to loyal and affluent customers and adheres to strict presentation, marketing, and promotional standards. Neiman Marcus and Bergdorf Goodman also have a long history of identifying, partnering with, and nurturing emerging designers with the potential for rapid growth. The combined offering from established and emerging designers ensures NMG's merchandise assortment remains unique, compelling, and relevant as fashion trends evolve.

### C. Critical Components of the Debtors' Cost Structure.

#### 1. Supply Chain.

NMG maintains an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to its brick-and-mortar locations and the fulfillment of orders from its e-commerce platform. A substantial majority of NMG's merchandise is delivered to NMG from various designers as finished goods and is manufactured in numerous locations, primarily in Europe, the United States, and, to a lesser extent, Asia. NMG's women's and men's apparel and fashion accessories merchandise categories are especially dependent upon NMG's relationships with designers. NMG monitors and evaluates the sales performance and profitability of each designer and adjusts future purchasing decisions based on this analysis. NMG has no guaranteed supply arrangements with its principal merchandising sources. In addition, NMG's designer base is diverse, with only two designers representing more than five percent of NMG's merchandise-sale revenues in fiscal year 2019. The breadth of NMG's sourcing helps mitigate risks associated with any single brand or designer.

NMG manages its inventory on an omni-channel basis, and its processes and facilities are designed to optimize merchandise productivity. For the last several years, NMG has utilized an integrated merchandising and distribution system, referred to as "NMG One." NMG One was designed to enable NMG to purchase, share, manage, and sell its inventories across its omni-channel operations and brands more efficiently.

The majority of NMG's merchandise is initially received at one of its centralized distribution facilities. NMG utilizes distribution facilities in Longview, Texas, the Dallas-Fort Worth area, Whittier, California, and Pittston, Pennsylvania, as well as two regional service centers in the United States. NMG's distribution facilities are linked electronically to its various merchandising teams to facilitate the distribution of goods to NMG's stores.

#### 2. Employee Compensation and Benefits.

NMG employs approximately 13,200 employees, including approximately 9,545 full-time employees and approximately 3,655 part-time employees. NMG offers its employees the ability to participate in a number of insurance and benefits programs, including health benefits, vision and dental coverage, prescription drug benefits programs, workers' compensation, life insurance, accidental death and dismemberment insurance, disability benefits, retirement plans, and other employee benefit plans.

In addition, Debtor The Neiman Marcus Group LLC sponsors The Neiman Marcus Group LLC Retirement Plan (the "Neiman Retirement Plan") for certain current and former employees, which is a qualified defined benefit pension plan under the Internal Revenue Code and covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Neiman Retirement Plan has been frozen since 2008, and benefit levels were frozen for all participants in 2010. The Neiman Retirement Plan provides current and future pension benefits to approximately 10,680 participants. As of August 2019, NMG had projected Neiman Retirement Plan obligations of approximately $659 million.

NMG pays annual premiums to the Pension Benefit Guaranty Corporation (the "PBGC") in connection with the Neiman Retirement Plan. The PBGC is a wholly-owned United States government corporation and agency created under Title IV of ERISA to administer the federal pension insurance program and to guarantee the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. The PBGC asserts that the other Debtors are each members of The Neiman Marcus Group LLC's controlled group, as defined in 29 U.S.C. § 1301(a)(14).

During the bankruptcy proceeding, the Neiman Retirement Plan may terminate under the distress termination provisions of 29 U.S.C. § 1341(c) or under the provisions for the PBGC initiation of termination under 29 U.S.C. § 1342(a). If the Neiman Retirement Plan terminates, the PBGC will assert a claim that the sponsor of the Neiman Retirement Plan and all members of its controlled group are jointly and severally liable for the unfunded benefit liabilities of the terminated Neiman Retirement Plan. The PBGC will file an estimated contingent claim, subject to termination of the Neiman Retirement Plan during the bankruptcy proceeding, against each of the Debtors for unfunded benefit liabilities in the amount of approximately $300,000,000. The PBGC will assert that this termination liability contingent claim is entitled to priority under 11 U.S.C. §§ 507(a)(2) and (a)(8) in unliquidated amounts. The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

The PBGC will assert that the sponsor of the Neiman Retirement Plan and all other members of its controlled group are obligated to pay the contributions necessary to satisfy the minimum funding standards under sections 412 and 430 of the Internal Revenue Code and sections 302 and 303 of ERISA. The PBGC will file an unliquidated claim against each of the Debtors for any unpaid required minimum contributions owed to the Neiman Retirement Plan. The PBGC will assert that the claim for required minimum contributions owed is entitled to priority under 11 U.S.C. §§ 507(a)(2) and (a)(5) in the amounts of the unpaid contributions. The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

The PBGC will assert that the sponsor of the Neiman Retirement Plan and all other members of its controlled group are jointly and severally liable to the PBGC for all premium obligations owed to the Neiman Retirement Plan. The PBGC will file a claim against each of the Debtors for unpaid statutory premiums, if any, owed to the PBGC on behalf of the Neiman Retirement Plan in an unliquidated amount. The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

If the Neiman Retirement Plan terminates in a distress or the PBGC-initiated termination during the course of the bankruptcy proceeding, the PBGC will assert that the sponsor of the Neiman Retirement Plan and its controlled group are liable to the PBGC for a termination premium at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7). The PBGC will assert that if the Neiman Retirement Plan is terminated prior to confirmation of the Plan, the obligation to the PBGC for termination premiums does not exist until after the Plan is confirmed and the Debtors have exited bankruptcy. The PBGC will assert that under these circumstances, termination premiums are not a dischargeable claim or debt within the meaning of the Bankruptcy Code. The PBGC estimates that the amount of the termination premium liability for the Neiman Retirement Plan would total approximately $39,210,000. The Debtors and Reorganized Debtors respectfully disagree with many of the PBGC's foregoing assertions and reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

On the Effective Date, The Neiman Marcus Group LLC shall continue the Neiman Retirement Plan in accordance with and subject to its terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all rights thereunder), and as a consequence the PBGC and the Debtors agree that all the PBGC claims will be deemed withdrawn as of the Effective Date

without incurring liability in the bankruptcy and without any further action of the Debtors or the Reorganized Debtors or the PBGC and without any further action, order, or approval of the Bankruptcy Court.

With respect to the Neiman Retirement Plan, no provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Reorganized Debtors from liabilities or requirements imposed under ERISA or the Internal Revenue Code with respect to the Neiman Retirement Plan solely as a result of the Debtors' reorganization proceedings or confirmation of the Plan. The PBGC and the Neiman Retirement Plan will not be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code with respect to the Neiman Retirement Plan as a result of the Debtors' reorganization proceedings, the Plan's provisions or the Plan's confirmation; *provided*, however, that nothing herein or in the Plan affects any of the Debtors' or the Reorganized Debtors' rights related thereto and all such rights are fully preserved.

### 3. Real Estate Portfolio.

While NMG has industry-leading e-commerce platforms, the full experience is enriched by a customer experience in one of NMG's stores. NMG's stores are located in prime locations and feature engaging, luxury shopping environments. NMG's stores are located within driving distance of 70 percent of high-net worth individuals in the United States. Several locations include restaurant offerings to allow for a relaxed and extended experience. From the beginning, NMG has focused on selling an experience. This remains true today. In addition to knowledgeable, professional, and well-trained sales associates, NMG's stores feature in-store events, including trunk shows by leading designers that feature the latest fashions, and exclusive shopping experiences curated for the most discerning luxury clientele.

In response to the COVID-19 crisis, NMG has closely monitored local government orders and, since March 18, 2020, closed all of its retail stores to in-person shopping until further notice. Where permitted, NMG is maintaining limited staff to fulfill online orders from store merchandise, and since the Petition Date, NMG opened approximately 12 stores for present appointment.

### D. Prepetition Capital Structure.[12]

As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $5.1 billion. As further described below, the Debtors' significant funded debt obligations include: (a) a $900.0 million Asset-Based Revolving Credit Facility, of which $749.0 million has been drawn; (b) a $100.0 million last-out term loan facility (the "FILO Facility"); (c) a $2,253.1 million senior secured term loan facility (the "Term Loan Facility"), which is comprised of $12.6 million outstanding of 2013 Term Loans with the original maturity date of October 25, 2020, $1,193.8 million outstanding of 2019 Term Loans with an extended maturity date of October 25, 2023, which pay interest entirely in cash, and $1,046.7 million outstanding of term loans with an extended maturity date of October 25, 2023, which pay interest partially in cash and partially in kind; (d) $561.7 million aggregate principal amount of 14.0% Second Lien Notes due 2024 (the "Second Lien Notes"); (e) $730.5 million aggregate principal amount of 8.000% Senior Secured Third Lien Notes due 2024 (the "8.000% Third Lien Notes"); (f) $497.8 million aggregate principal amount of 8.750% Senior Secured Third Lien Notes due 2024 (the "8.750% Third Lien Notes" and, together with the 8.000% Third Lien Notes, the "Third Lien Notes"); (g) $80.7 million aggregate principal amount of 8.000% Senior Cash Pay Notes due 2021 (the "Unsecured Cash Pay Notes"); (h) $56.6 million aggregate principal amount of 8.750%/9.500% Senior PIK Toggle Notes due 2021 (the "Unsecured PIK Toggle Notes" and, together with

---

[12]  In the event of any inconsistencies between the summaries set forth below and the provisions of the documents governing such prepetition debt, the provisions governing such prepetition debt, as applicable, shall control.

the Unsecured Cash Pay Notes, the "Unsecured Notes"); and (i) $125.0 million aggregate principal amount of 7.125% Senior Debentures due 2028. The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity Date | Interest Rate | Principal Amount Outstanding (in thousands) |
|---|---|---|---|
| Asset-Based Revolving Credit Facility | July 25, 2021 | variable | $749,000 |
| FILO Facility | July 25, 2021 | variable | $100,000 |
| Cash Pay 2019 Term Loans | October 25, 2023 | variable | $1,193,815 |
| Cash Pay/PIK 2019 Term Loans | October 25, 2023 | variable | $1,046,687 |
| 2013 Term Loans | October 25, 2020 | variable | $12,597 |
| 14.0% Second Lien Notes | April 25, 2024 | 8.0% cash / 6.0% PIK | $561,733 |
| 8.000% Third Lien Notes | October 25, 2024 | 8.000% | $730,534 |
| 8.750% Third Lien Notes | October 25, 2024 | 8.750% | $497,849 |
| 8.000% Cash Pay Notes | October 15, 2021 | 8.000% | $80,680 |
| 8.750%/9.500% Senior PIK Toggle Notes | October 15, 2021 | 8.750% | $56,584 |
| 7.125% Senior Debentures | June 1, 2028 | 7.125% | $125,000 |
| **Total** | | | **$5,154,479** |

A chart summarizing the relative priorities of various stakeholders to the collateral packages described below is attached as **Exhibit G**.

### 1.    The Asset-Based Revolving Credit Facility.

The Debtors are party to that certain Credit Agreement, dated as of October 25, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), by and among NMG, as borrower, certain of the Debtors as co-borrowers party thereto (together with NMG, the "ABL Borrowers"), Holdings, and certain of NMG's current and future, direct and indirect, wholly owned subsidiaries (the "ABL Subsidiary Guarantors"), as guarantors, the FILO Facility lenders, Deutsche Bank AG New York Branch, as administrative agent and as collateral agent, TPG Specialty Lending, Inc., as agent for the FILO Facility lenders, and the lenders from time to time party thereto. The Asset-Based Revolving Credit Facility has a maximum committed borrowing capacity of $900.0 million (subject to a borrowing base) and matures on July 25, 2021 (subject to the terms of the ABL Credit Agreement).

The obligations under the Asset Based Revolving Credit Facility are secured by substantially all of the assets of Holdings, the ABL Borrowers, and the ABL Subsidiary Guarantors, including a first priority security interest in personal property consisting of inventory and related accounts, cash, deposit accounts, all payments received by the ABL Borrowers or the ABL Subsidiary Guarantors from credit card clearing houses and processors or otherwise in respect of all credit card charges for sales of inventory by the ABL Borrowers and the ABL Subsidiary Guarantors, certain related assets and proceeds of the foregoing (together, the "ABL Priority Collateral").

In addition, the obligations under the Asset-Based Revolving Credit Facility are secured by certain other interests such as: (a) a fourth-priority pledge of 100 percent of NMG's capital stock held by Holdings, (b) a fourth-priority security interest on certain owned and leased real property and equipment, (c) a fourth-

priority security interest in Term Loan PropCo (as defined below), and (d) a fourth-priority security interest in the Notes Priority Collateral (as defined below).

As of the Petition Date, approximately $749.0 million in borrowings and approximately $9.3 million of letters of credit are outstanding under the Asset-Based Revolving Credit Facility, and there is approximately $141.7 million of unused commitments. As of the Petition Date, there was extremely limited availability under the Asset-Based Revolving Credit Facility.

## 2.     The FILO Facility.

The FILO Facility is governed by the ABL Credit Agreement and has a maximum committed borrowing capacity of $100.0 million, subject to a borrowing base. The FILO Facility matures concurrently with the Asset-Based Revolving Credit Facility on July 25, 2021 (subject to the terms of the ABL Credit Agreement).

As of the Petition Date, NMG had outstanding borrowings of $100.0 million under the FILO Facility. All obligations under the FILO Facility are guaranteed by the same entities that guarantee the Asset-Based Revolving Credit Facility and are secured by the same collateral as the Asset-Based Revolving Credit Facility, but will be last-out in payment as set forth in the FILO Credit Agreement.

## 3.     The Term Loan Facility.

The Debtors are party to that Credit Agreement, dated as of October 23, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among NMG, The Neiman Marcus Group LLC, and The NMG Subsidiary LLC, as borrowers (the "Term Loan Borrowers"), Holdings and certain of NMG's current and future subsidiaries, as guarantors (the "TL Subsidiary Guarantors"), Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and the lenders from time to time party thereto.

All obligations under the Term Loan Facility, and the guarantees of those obligations, are secured by substantially all of the assets of Holdings, the Term Loan Borrowers, and the TL Subsidiary Guarantors, including (a) a first-priority security interest in, and mortgages on, a significant portion of NMG's owned real property and equipment and substantially all other tangible and intangible assets of the Term Loan Borrowers, Holdings, and certain subsidiary guarantors (the "Original Term Loan Priority Collateral"); (b) a second priority security interest in the ABL Priority Collateral; and (c) solely with respect to the 2019 Term Loans, (i) a first priority security interest in certain future foreign assets, intercompany debt, and certain additional equity interests of new subsidiary guarantors, (ii) a first-priority security interest in, and mortgages on, certain of the borrowers' and any subsidiary guarantors' owned real estate interests, real estate leasehold interests, and other real property interests ("2019 Term Loan Priority Real Estate Collateral"), (iii) a first-priority security interest in the equity interests of NMG Term Loan PropCo LLC, a special purpose entity that is a subsidiary of NMG (the "Term Loan PropCo") formed solely to hold certain real estate leases that cannot be mortgaged directly to secure the 2019 Term Loans under the Term Loan Facility (the collateral described in the foregoing subclauses (i), (ii), and (iii), together with the Original Term Loan Priority Collateral, collectively, the "Term Loan Priority Collateral"), and (iv) a third-priority security interest in the Notes Priority Collateral.

As of the Petition Date, the outstanding balance under the Term Loan Facility was $2,253.1 million comprised of (a) $12.6 million outstanding of stub term loans with the original maturity date of October 25, 2020 (the "2013 Term Loans"), (b) $1,193.8 million outstanding of term loans with an extended maturity date of October 25, 2023 which pay interest entirely in cash (the "Cash Pay 2019 Term Loans"), and (c) $1,046.7 million outstanding of term loans with an extended maturity date of October 25, 2023 which pay interest partially in cash and partially in kind (the "Cash Pay/PIK 2019 Term Loans" and,

together with the Cash Pay 2019 Term Loans, the "2019 Term Loans," and together with the 2013 Term Loans, the "Term Loans").

### 4. The Second Lien Notes.

In connection with the Recapitalization Transactions (as defined below), NMG, The Neiman Marcus Group LLC, Mariposa Borrower, Inc., and The NMG Subsidiary LLC (collectively, the "Notes Issuers") issued $550.0 million aggregate principal amount of Second Lien Notes under the Indenture, dated June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with the Notes Issuers, as issuers, Ankura Trust Company, LLC, as trustee and notes collateral agent, and certain of the Debtors as guarantors.

The Second Lien Notes and related guarantees are secured by collateral that includes (a) a second-priority security interest in the Original Term Loan Priority Collateral and the Term Loan Priority Collateral, (b) a second priority interest in certain previously unencumbered real estate related to certain full line Neiman Marcus stores (the "Notes Priority Real Estate Collateral") mortgageable to the collateral agent, and the equity interests of a special purpose entity and subsidiary of NMG ("Notes PropCo") formed to hold certain real estate leases that cannot be mortgaged directly to the collateral agent (together, the "Notes Priority Collateral") (subject to a cap on recovery equal to $200.0 million less any amounts recovered against those assets by holders of the Third Lien Notes issued in connection with the Recapitalization Transactions (as defined below)), (c) a third-priority security interest in the ABL Priority Collateral, and (d) a senior secured guarantee of up to $200.0 million by three holding companies of the MyTheresa Operating Companies—non-debtors MYT Holding Co., MYT Intermediate Holding Co., and MYT Netherlands Parent B.V.—and a first priority pledge of the assets of such guarantors subject to customary exceptions (the "Limited Guarantee Collateral").

As of the Petition Date, $561.7 million in aggregate principal amount of Second Lien Notes remains outstanding. The Second Lien Notes mature on April 25, 2024 and require semiannual coupon payments of 8.0% cash interest and 6.0% PIK interest on April 15 and October 15. The Debtors did not pay the coupon payment due on April 15, 2020.

### 5. The Third Lien Notes.

In connection with the Recapitalization Transactions (as defined below), the Notes Issuers issued (a) approximately $730.5 million aggregate principal amount of 8.000% Third Lien Notes under the Indenture, dated June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with the Notes Issuers, as issuers, Wilmington Trust, National Association, as trustee and notes collateral agent, and certain of the Debtors as guarantors, and (b) approximately $497.8 million aggregate principal amount of 8.750% Third Lien Notes under the Indenture, dated June 7, 2019, with the Notes Issuers, as issuers, Wilmington Trust, National Association, as trustee and notes collateral agent, and certain of the Debtors as guarantors. Interest on the Third Lien Notes is payable semiannually in arrears on April 15 and October 15. The Third Lien Notes mature on October 25, 2024. The Debtors did not pay the coupon payment due on April 15, 2020.

The Third Lien Notes are secured by collateral that includes (a) a first-priority security interest in the Notes Priority Collateral (subject to a cap on recovery equal to $200.0 million), (b) a third-priority security interest in the Original Term Loan Priority Collateral and the Term Loan Priority Collateral, (c) a first priority pledge of 50 percent of the common equity interests of non-debtor MYT Holding Co., a holding company of the MyTheresa business, and (d) a fourth priority security interest in the ABL Priority Collateral. In addition, the Third Lien Notes are guaranteed, subject to certain exceptions, by each of NMG's current and future domestic subsidiaries and future foreign subsidiaries on a senior secured basis.

### 6. The Unsecured Notes.

On October 21, 2013, NMG and Mariposa Borrower, Inc. issued $960 million aggregate principal amount of Unsecured Cash Pay Notes under the Indenture, dated October 21, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with UMB Bank, N.A. (as successor to U.S. Bank, N.A. and Drivetrain Trust Company LLC), as trustee. As of the Petition Date, the outstanding balance under the Unsecured Cash Pay Notes was $80.7 million. Interest on the Unsecured Cash Pay Notes is payable semi-annually in arrears on each April 15 and October 15. The Unsecured Cash Pay Notes mature on October 15, 2021 and are guaranteed by the same entities that guarantee the Third Lien Notes. The Debtors did not pay the coupon payment due on April 15, 2020.

On October 21, 2013, NMG and Mariposa Borrower, Inc. issued $600 million aggregate principal amount of Unsecured PIK Toggle Notes under the Indenture, dated October 21, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with NMG as issuer, Mariposa Borrower, Inc., as co-issuer, certain Debtors, as guarantors, and UMB Bank, N.A. (as successor to U.S. Bank, N.A. and Drivetrain Trust Company LLC) as trustee. As of the Petition Date, the outstanding balance under the Unsecured PIK Toggle Notes was $56.6 million. Interest on the Unsecured PIK Toggle Notes is payable semi-annually in arrears on each April 15 and October 15. The Unsecured PIK Toggle Notes mature on October 15, 2021 and are guaranteed by the same entities that guarantee the Third Lien Notes. The Debtors did not pay the coupon payment due on April 15, 2020.

### 7. The 2028 Debentures.

On May 27, 1998, the Neiman Marcus Group LLC issued $125.0 million aggregate principal amount of 2028 Debentures under the Indenture, dated May 27, 1998 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with Wilmington Savings Fund Society, FSB (as successor to The Bank of New York Mellon Trust Company), as trustee. The 2028 Debentures mature on June 1, 2028.

The 2028 Debentures are secured by "equal and ratable" liens on certain owned real estate properties, real estate ground leases, and real estate operating leases of NMG and on shares of capital stock and indebtedness of certain NMG's subsidiaries, in each case pari passu with the 2019 Term Loans. The 2028 Debentures are guaranteed on a senior basis by NMG, Term Loan PropCo, and Notes PropCo. The guarantees are full and unconditional. The 2028 Debentures are not otherwise guaranteed by any of the Neiman Marcus Group LLC's subsidiaries.

### 8. Preferred Stock of Non-Debtor MyTheresa Holding Co.

In connection with the Recapitalization Transactions (as defined below), Parent formed three new Delaware subsidiaries (the "MyTheresa Holding Companies") and contributed the MyTheresa Operating Companies to the MyTheresa Holding Companies. Further, validly tendered Unsecured Notes were exchanged for aggregate consideration consisting of new Third Lien Notes and the MYT Series A Preferred Stock. In addition, MYT Holding Co. issued the MYT Series B Preferred Stock to its direct parent and a MyTheresa Holding Company, MYT Parent Co.

## VII. EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A. The Unprecedented Spread Of COVID And Store Closures Results In Neiman Marcus Preparing for A Chapter 11 Filing

Between the Distribution in September 2018 and March 2020, the Debtors made all of their regularly scheduled debt payments as they came due—a total of nearly $550 million—and were on track to meet or exceed all of their budget, earnings, and savings targets for the fiscal year ending in July 2020. The

Debtors also had posted comparable store sales growth for seven of the ten previous quarters and significantly expanded gross margins during the last holiday season in line with its goal of profitable and sustainable growth.

All of that progress came to a halt in March, as governments in the United States and throughout the world imposed quarantines, social distancing protocols, and shelter-in-place orders in response to COVID-19. On March 18, 2020, the Debtors voluntarily closed all of their stores to protect the health and safety of NMG's customers and employees and dramatically reduced supply chain operations.

With the unexpected temporary closure of all of NMG's brick-and-mortar locations, the Debtors experienced an immediate reduction in cash flow of approximately 65–75%. The Debtors implemented a number of strategies to address the capital structure and liquidity challenges, including furloughing 80–90% of their employees, eliminating or deferring most capital expense projects, limiting cash disbursements and new inventory, reducing employee salaries and wages company-wide, and seeking concessions from brand partners and landlords. Almost all stores have subsequently opened.

### 1. Landlord Engagement.

Strong relationships with the Debtors' landlords will be critical to the Debtors' success during these Chapter 11 Cases. Prior to the Petition Date, NMG engaged in fruitful rent relief negotiations with its landlords.

NMG and its advisors contacted nearly all of NMG's landlords to discuss potential postpetition rent concessions and other relief on a landlord-by-landlord basis. NMG's landlords were generally supportive and responsive, and NMG reached several agreements in principle, representing millions of dollars in rent deferrals in April, May, and June 2020. The Debtors have continued to discuss rent deferrals, rent concessions, and other forms of relief during these Chapter 11 Cases and will continue to do so.

### 2. Furlough Program.

Due to the unprecedented and unforeseen disruption to the Debtors' business caused by COVID-19, the Debtors made the incredibly difficult decision to implement temporary salary reductions and both partial and full furloughs that will affect nearly all of the Debtors' employees (the "Furlough Program"). While the Debtors initially maintained wages and salaries for their employees, effective April 5, 2020, the Debtors placed approximately 11,282 full- and part-time employees on temporary furlough (the "Furloughed Employees") and reduced the salaries of all non-furloughed exempt employees. The Debtors committed to a 60-day Furlough Program, although ongoing developments concerning COVID-19 and related governmental actions remain highly uncertain and may lead to extensions. During the duration of the Furlough Program, Furloughed Employees will remain on unpaid leave unless otherwise scheduled to work, but will remain eligible to participate in any health benefits programs in which such Furloughed Employees are currently enrolled. The Debtors will also maintain approximately 2,208 active employees to maintain the Debtors' limited business operations. The Debtors anticipate that the Furloughed Employees will return to work once the public health crisis subsides.

### B. Restructuring Support Agreement and DIP Financing, and Exit Facility.

### 1. Restructuring Support Agreement.

The Restructuring Support Agreement contemplates a comprehensive reorganization achieved through the Plan (as defined below) that will result in a substantial deleveraging of the Debtors' balance sheet by as much as $4 billion and provide the Debtors with $750 million of fully-committed new capital.

Pursuant to the Restructuring Support Agreement, the Plan is intended to minimize any potential adverse effects to the Debtors' businesses, customers, and trade partners as a result of the restructuring, and will position the Debtors for a timely emergence from bankruptcy.

### 2. DIP Financing.

In response to the outbreak of COVID-19, since March 2020, the Debtors, in consultation with their advisors, Lazard, BRG, and Kirkland, reviewed and evaluated potential financing alternatives and cash requirements necessary to operate their businesses as a going concern. The Debtors concluded that an out of court restructuring was not viable and that current cash was insufficient for the Debtors to operate during these Chapter 11 Cases. Given these conclusions, and the Debtors' work with their advisors, the Debtors determined that procuring sufficient financing at the start of these cases would be essential to fund its operating costs, its working capital needs, and these Chapter 11 Cases. The Debtors further determined that this financing was needed to pursue a value maximizing restructuring for the benefit of the Debtors' stakeholders. The Debtors' DIP budget forecasting also analyzes the effect of various COVID-19 scenarios impacting, among other things, (i) the timing of reopening stores, (ii) the potential shut down of the Debtors' e commerce operations, and (iii) various recovery trajectories. Based on those discussions, the Debtors, together with their advisors, determined that they require immediate access to DIP financing to fund the costs of administering these Chapter 11 Cases, near term working capital needs, and ongoing business operations.

The Debtors looked for financing from sources within their existing capital structure as well as third parties. No third-party lender provided the Debtors with a proposed out-of-court or postpetition financing facility that was executable. As early as March 25, 2020, the Term Loan Lender Group engaged with the Debtors regarding potential postpetition financing. In addition, after several rounds of hard fought negotiations, the Term Loan Lender Group and Noteholder Group reached an agreement that provided for an additional $50 million in liquidity under the DIP Facility and would allow the Noteholder Group to backstop a portion of the DIP Facility.

After extensive, arm's length negotiations with the Term Loan Lender Group and the Noteholder Group, and as noted in the Debtors' motion seeking authorization to enter into the DIP Facility on an interim and final basis [Docket No. 104], the Debtors were able to secure the proposed $675 million DIP Facility, open to all Prepetition Term Loan Lenders, and, after further negotiations, to the holders of the Second and Third Lien Notes, backstopped by the Term Loan Lender Group and the Noteholder Group. The DIP Facility is secured by a perfected first priming lien on substantially all of the Debtors' assets except for a second lien on the collateral of the lenders under the ABL Facility (the "ABL Lenders"). As such, the DIP Facility does not purport to prime the ABL Lenders' collateral. The Prepetition Term Loan Lenders and the holders of the Third Lien Notes, Second Lien Notes, and 2028 Debentures have consented to granting a priming lien on their collateral.

### 3. Committed Exit Facility.

Concurrently with the negotiations regarding the DIP Facility, the Debtors and their advisors engaged in good faith, arm's length negotiations with the same group of creditors that agreed to provide the DIP Facility, namely the Term Loan Lender Group and the Noteholder Group, on a $750 million Exit Facility, backstopped by the Term Loan Lender Group (excluding the holders of the 2028 Debentures) and the Noteholder Group, which is necessary to ensure the successful restructuring of the Debtors, especially since the long term implications of COVID-19 are still unknown.

## VIII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A. Expected Timetable of the Chapter 11 Cases.

The Restructuring Support Agreement contains certain milestones in relation to the Chapter 11 Cases that apply unless extended or waived in writing. The Debtors intend to move as quickly to comply with the remaining milestones, including:

- confirmation of a chapter 11 plan by September 4, 2020; and

- emergence from chapter 11 by December 3, 2020.

Should the Debtors' projected timelines prove accurate, and consistent with certain milestones set forth in the Restructuring Support Agreement, the Debtors could emerge from chapter 11 within 210 days of the Petition Date (which is December 3, 2020) and still maintain access to the DIP Facility. **No assurances can be made, however, that the Court will enter various orders on the timetable anticipated by the Debtors or that certain conditions precedent to the Effective Date will have occurred by the outside date under the Restructuring Support Agreement.**

### B. Corporate Structure upon Emergence.

Except as otherwise provided in the Plan or the Description of Transaction Steps, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### C. First/Second Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") requesting various types of relief which were approved by the Court. The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things: (a) an order authorizing the Debtors to obtain postpetition financing and use cash collateral during the Chapter 11 Cases, and granting certain adequate protection to certain secured parties; (b) an order authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions; (c) an order authorizing the Debtors to pay certain prepetition taxes and fees; (d) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business; (e) an order authorizing the Debtors to maintain the surety bond program, entering into and performing under any other agreements related to the surety bond program, and paying any prepetition or postpetition obligations related to the surety bond program, including any amounts owed on account of brokerage fees; (f) an order granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain

employee benefit programs; (f) an order authorizing the Debtors to make payment on account of prepetition Claims of certain critical vendors, lien claimants, customs and regulatory claimants, and 503(b)(9) claimants; (g) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance; (h) an order authorizing the Debtors to continue administer the customer programs and charity donation programs, and satisfy prepetition obligations related thereto; and (i) an order authorizing the Debtors to retain Stretto[13] as claims, noticing, and solicitation agent.

On June 2, 2020, the Debtors held their second day hearing before the Bankruptcy Court. At the second day hearing, the Bankruptcy Court granted certain of the relief requested under the First Day Motions on a final basis, including approving procedures for, among other things, determining adequate assurance for utility providers, authority for the Debtors to continue using their existing cash management system, authority to pay certain trade claimants, and authority to use cash collateral.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration, filed on the Petition Date. The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/NMG/.

**D.      Approval of the DIP Facility.**

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP Facility represents the best terms available, the Debtors filed a motion on the Petition Date seeking authorization to enter into the DIP Facility on an interim and final basis (the "DIP Motion"). On May 8 2020, the Court approved the DIP Motion on an interim basis [Docket No. 284]. On June 16, 2020, the Court approved the DIP Motion on a final basis [Docket No. 850].

**E.      Other Procedural and Administrative Motions.**

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On June 2, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 740] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On June 25, 2020, the Court approved the OCP Motion [Docket No. 1009].

- Interim Compensation Motion. On June 3, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 749] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of

---

13    "Stretto" is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

the Bankruptcy Code. On June 26, 2020, the Court approved the Interim Compensation Motion [Docket No. 1070].

**F.      Retention of the Debtors' Professionals.**

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, on June 3-4, 2020, the Debtors filed applications requesting that the Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327 and 328 of the Bankruptcy Code: (a) Kirkland & Ellis LLP as counsel to the Debtors [Docket No. 748]; (b) Jackson Walker LLP as co-counsel to the Debtors [Docket No. 750]; (c) Lazard Frères & Co. LLC, Inc. as investment banker to the Debtors [Docket No. 762]; (d) Berkeley Research Group, LLC to provide the Debtors a Chief Restructuring Officer and certain additional personnel [Docket No. 751]; (e) Katten Muchin Rosenman LLP as counsel to Holdings at the sole direction of Anthony Horton as disinterested manager of Holdings [Docket No. 765]; and (f) Willkie Farr & Gallagher LLP as counsel to NMG LTD LLC at the sole direction of Scott Vogel as the disinterested manager of NMG LTD LLC [Docket No. 763]. On June 26, 2020, the Debtors filed an application requesting that the Court authorize the Debtors to retain and employ Alvarez & Marsal North America, LLC, as financial advisors to NMG LTD LLC at the sole direction of Scott Vogel as the disinterested manager of NMG LTD LLC, pursuant to sections 327 and 328 of the Bankruptcy Code [Docket No. 1050]. On June 25-26, 2020, the Court approved the retention of the following advisors: (a) Kirkland & Ellis LLP [Docket No. 1071]; (b) Jackson Walker LLP [Docket No. 750]; and (c) Berkeley Research Group, LLC [Docket No. 1072]. On July 7-8, 2020, the Court approved the retention of the following advisors: (a) Katten Muchin Rosenman LLP [Docket No. 1156]; (b) Willkie Farr & Gallagher LLP [Docket No. 1132]; and (c) Alvarez & Marsal North America, LLC [Docket No. 1131]. On July 16, 2020, the Court approved the retention of Lazard Frères & Co. LLC [Docket No. 1224].

**G.      Schedules of Assets and Liabilities and Statements of Financial Affairs.**

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 10] seeking an extension of the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") until June 19, 2020 for a total of 44 days from the Petition Date, which the Court granted on May 8, 2020 [Docket No. 240]. The Debtors filed their Schedules on June 19, 2020.

**H.      Establishment of a Claims Bar Date.**

As described more fully in Article III.K of this Disclosure Statement, on June 25, 2020, the Bankruptcy Court entered the Bar Date Order setting the Bar Date by which the entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date (including, without limitation, Class 10: General Unsecured Claims) must file proofs of claim. The Bar Date Order establishes July 20, 2020 as the general claims bar date and November 3, 2020 as the governmental claims bar date. Any party required to file a proof of claim under the Bar Date Order that failed to do so before the applicable bar date will be forever barred, estopped, and enjoined from asserting such claim against the Debtors and the Debtors will be forever discharged from any indebtedness or liability relating to such claim. Such party will not be permitted to vote to accept or reject the Plan or receive any recovery under the Plan.

**I.      Store Closing Process.**

On July 3, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances, and (III) Granting Related Relief* [Docket No. 1115] (the "Store Closing Motion")

seeking to implement a key component of their restructuring strategy and optimize their operations by closing underperforming or geographically less desirable stores, or stores that no longer align with the Debtors' go-forward business plan.  The Store Closing Motion is scheduled to be heard before the Court on July 27, 2020.  Pursuant to the Store Closing Motion, the Debtors seek to conduct store closing procedures at seventeen (17) Last Call stores.  The Debtors also seek authority to conduct store closing procedures at additional stores after notice and, if necessary, a hearing.

The Debtors continue to evaluate their approximately 59 additional stores and leases to determine whether or not to assume or reject Unexpired Leases, continue store operations, or conduct real property sales.  The Debtors are in the middle of negotiations with many of their landlords regarding the terms of the Debtors' Unexpired Leases in an effort to procure favorable lease terms such that stores can continue to operate.  The Debtors believe that these negotiations have generally been successful, and the resulting savings will accrue to the benefit of the Debtors' estates and improve the profitability of the Debtors as a going-concern.

## J.    Appointment of the Creditors Committee.

On May 19, 2020, the United States Trustee for the Southern District of Texas (the "United States Trustee") filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 455] notifying parties in interest that the United States Trustee had appointed a statutory committee of unsecured creditors (the "Creditors Committee") in the Chapter 11 Cases.  The Creditors Committee is currently composed of the following members:  Wilmington Trust, National Association, Pension Benefit Guaranty Corporation, UMB Bank, N.A., Marble Ridge Capital LP, on behalf of Marble Ridge Master Fund LP, Simon Property Group, Inc., Chanel, Inc., Kering Americas, Inc., Estée Lauder Companies, and Ebates Performance Marketing, Inc.  The Creditors Committee has retained Pachulski Stang Ziehl & Jones as its legal counsel and MIII Partners, LLC as its financial advisor.

## K.    The Debtors Appoint Disinterested Managers With Independent Advisors To Investigate Potential Estate Claims, And The Creditors Committee And The Disinterested Managers Proceed With Their Investigations

Since 2013, the Debtors have conducted their businesses through member-managed LLCs as discussed above.  The top member of the Neiman Marcus organization is non-debtor NMG Inc., which has a board of directors.

In April 2020, in anticipation of a Chapter 11 filing, the NMG Inc. board unanimously agreed to modify the LLC agreements of Mariposa Holdings and NMG LTD LLC to create Boards of Managers at those entities that would control the Debtors' businesses, including making all decisions with respect to these chapter 11 cases.  Neiman Marcus' CEO, Geoffroy van Raemdonck, sits on both Boards of Managers along with one Disinterested Manager at Holdings (Anthony Horton) and one at NMG LTD LLC (Scott Vogel).  No representative of the Sponsors sits on either Board of Managers.

Each of the Boards of Managers executed a full delegation of authority to the Disinterested Managers to determine in their sole judgment whether a conflict exists with respect to any issue in connection with the Debtors' chapter 11 cases.  To the extent the Disinterested Managers determine there is a conflict, the Disinterested Managers have full authority to assess and act upon the conflict matter.  Since its appointment, the Creditors Committee also began its investigation of the Designation, PropCo Transaction, Distribution and Recapitalization Transactions.

Since the Disinterested Managers and the Creditors Committee began their investigations (each with their own legal counsel and financial advisors), the Debtors have produced more than 76,000 documents to the Disinterested Managers and the Creditors Committee.  The Sponsors, Lazard and Duff &

Phelps have produced more than 20,000 additional documents. To date, the Creditors Committee and the Disinterested Managers have deposed ten witnesses: four Debtor witnesses (three of whom were involved in preparing the solvency analysis and the Debtors' 30(b)(6) representative, its current Chief Financial Officer), two corporate representatives of Lazard, NMG Inc. independent board member Norman Axelrod, Ares' corporate representative and NMG Inc. board member Dennis Gies, the former chairman of the NMG Inc. board and Ares co-founder David Kaplan, and CPPIB's corporate representative and NMG Inc. board member Cesare Ruggiero. Additional depositions are scheduled in July and August.

### 1. Disinterested Manager Investigation.

Mr. Vogel has conducted his investigation (the "Disinterested Manager Investigation") with alacrity to ensure that the disputes related to the MyT Transactions do not delay the Debtors' ability to timely exit from these chapter 11 cases. Among other things, as part of the Disinterested Manager Investigation, Mr. Vogel (with his advisors at Willkie and A&M) has:

- reviewed over 80,000 documents from, among others, the Debtors and their advisors; the Sponsors; and Parent;

- in close coordination with counsel to the Committee, deposed ten representatives and financial advisors of those entities, with additional depositions scheduled to occur;

- analyzed financial issues relevant to the Disinterested Manager Investigation, including whether the Company was insolvent at the time of the Distribution; and

- analyzed legal issues relevant to the Disinterested Manager Investigation, including potential claims and related recoveries the estates might obtain through litigation.

Based on the work completed to date, Mr. Vogel concluded that there is a strong possibility that the Company was insolvent at the time of the Distribution, and therefore that the releases in favor of the Parent, directors and officers, and the Sponsors set forth in the Plan should only be granted to the extent substantial additional value is provided to the Debtors on account of the Distribution. As part of the Disinterested Manager Investigation, Mr. Vogel identified several potential claims belonging to the estate based on information obtained in the Disinterested Manager Investigation. Mr. Vogel's views on those claims, based on the substantial discovery taken to date, are described generally below.

**(a)** The Estate Likely Has a Viable Constructive Fraudulent Conveyance Claim Against NMG Inc.

A prepetition transaction dispensing of a debtor's assets may constitute a fraudulent conveyance if (a) the debtor received less than reasonably equivalent value in exchange for the asset, and (b) the debtor was insolvent at the time of such transfer or became insolvent as a result of the transfer. As noted above, the Distribution was structured as a dividend, and therefore the Debtors received no value in exchange for the MyT Interests. The issue of solvency is the primary dispute in these cases.

Based on analyses performed by A&M and the discovery obtained thus far as part of the Disinterested Manager Investigation, Mr. Vogel believes that a court of competent jurisdiction likely would conclude that the Company was insolvent at the time of the Distribution.

**(b)** Claims Against NMG Inc., its Directors and Officers, and the Sponsors

Mr. Vogel is continuing to investigate the viability of a substantial number of additional claims arising out of the MyT Transactions that could be asserted against NMG Inc., its directors and officers, the Sponsors, and the parties' respective representatives.

Potential claims against NMG Inc. include actual fraudulent conveyance, unjust enrichment, unlawful dividend, and aiding and abetting breach of fiduciary duty claims. With respect to the directors and officers of NMG Inc., potential claims against them include breach of fiduciary duty, unlawful dividends, and aiding and abetting breaches of fiduciary duty. Claims against the Sponsors could include aiding and abetting breach of fiduciary duty, civil conspiracy to breach fiduciary duty, civil conspiracy to defraud, civil conspiracy to commit fraudulent transfer, aiding and abetting fraudulent transfer, and unjust enrichment.

Mr. Vogel believes that the appropriate remedy for any and all of the MyT Claims should be measured in accordance with section 550 of the Bankruptcy Code. Section 550 provides that upon a finding of a successful fraudulent transfer claim, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). Accordingly, whether the estates pursue a constructive fraudulent conveyance action or a multitude of claims against a variety of defendants, Mr. Vogel does not believe the evidence adduced in discovery would support damages in excess of the value of the property transferred.

### 2. Committee Investigation

Since late May 2020, the Creditors Committee has conducted an investigation (the "Committee Investigation") regarding the estates' potential claims against NMG Inc., the Sponsors, and their respective non-Debtor affiliates, board members, and representatives (excluding officers running the business, the "Litigation Targets"). As part of the Committee Investigation, the Creditors Committee and its expert valuation consultant, The Michel-Shaked Group, have reviewed hundreds of thousands of pages of documents by the Litigation Targets and their professionals and conducted numerous depositions of relevant witnesses.

On July 17, 2020, the Creditors Committee filed with the Bankruptcy Court (i) the *Preliminary Report of the Official Committee of Unsecured Creditors Regarding the Bankruptcy Estates' Litigation Claims Against Neiman Marcus Group, Inc., the Sponsors and Directors of Neiman Marcus Group, Inc., and Other Parties* (the "Preliminary Report"); (ii) the *Appendix to the Preliminary Report of the Official Committee of Unsecured Creditors Regarding the Bankruptcy Estates' Litigation Claims Against Neiman Marcus Group, Inc., the Sponsors and Directors of Neiman Marcus Group, Inc., and Other Parties* (the "Appendix"); (iii) the *Initial Expert Report of The Michel-Shaked Group* (the "Expert Report"); and (iv) the *Executive Summary* to the Expert Report (the "Expert Summary," and, together with the Preliminary Report, Appendix, and Expert Report, the "Reports"). Based on the Committee Investigation to date and as outlined in detail in the Reports, the Creditors Committee has reached the conclusion that the Designation and/or Distribution of MyTheresa gave rise to, among other potential actionable claims, actionable claims for: (1) constructive fraudulent transfer claims, (2) intentional fraudulent transfer claims, and (3) breach of fiduciary duty claims against the Debtors' member-managers and the directors of the Parent.

### L. Disinterested Manager Settlement

The disinterested manager of NMG LTD, Mr. Vogel, with the assistance of counsel and advisors, has undertaken an investigation into potential conflict matters and potential estate claims, and causes of action. As a result of his investigation, Mr. Vogel determined that he could not support the releases of certain equityholders of the Debtors absent fair consideration on account of the release of estate claims and

causes of action with respect such parties. Mr. Vogel spent several weeks negotiating at arms' length with the Sponsors, the Creditors Committee, and the Term Loan Lenders. Mr. Horton, in connection with his ongoing investigation, has been kept apprised on a real-time basis of such settlement negotiations.

Ultimately, after several rounds of negotiation, Mr. Vogel, on behalf of the Debtors, the Consenting Sponsors, the Consenting Term Loan Lenders[, and the Creditors Committee][14] reached a settlement on account of the potential estate claims and causes of action against the Consenting Parent and the Sponsors (the "Disinterested Manager Settlement") that Mr. Vogel believes is fair, reasonable, and in the best interests of creditors. Pursuant to the Disinterested Manager Settlement, the Consenting Parent and the Consenting Sponsors will agree to return to the Debtors, for distribution to Holders of Allowed General Unsecured Claims in accordance with the treatment provided to Classes 10 and 11 in the Plan, 140 million shares (56% of the total shares) of MYT Series B Preferred Stock. Additionally, the Consenting Term Loan Lenders will agree that the Reorganized Debtors will contribute $10 million of Cash for distribution to Holders of General Unsecured Claims in accordance with the treatment provided to Classes 10 and 11 in the Plan. And the Plan has been modified to incorporate an effective waiver of the Deficiency Claims that may be asserted by Holders of 2019 Term Loan Claims, 2013 Term Loan Claims, 2028 Debenture Claims, Second Lien Notes Claims, and Third Lien Notes Claims, that would otherwise be significantly dilutive to recoveries of Holders of Allowed General Unsecured Claims.

In addition, notwithstanding anything to the contrary in the Plan, in connection with the Disinterested Manager Settlement, the Consenting Parent, the Consenting Sponsors, and any applicable creditors expressly waive any right they may have to enforce a turnover of any consideration provided pursuant to the Plan that might be enforceable against the Debtors or any of their creditors pursuant to the Existing MYT Transaction Documents and the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements; provided, that to the extent the Consenting 2L Parties and the Consenting 3L Parties do not agree to waive the Second Lien Notes Deficiency Claims and the Third Lien Notes Deficiency Claims, (i) the turnover and waterfall provisions concerning MyTheresa as set forth in the Existing MYT Transaction Documents and the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements, shall apply with respect to distributions in respect of such Claims and (ii) the Parent and Sponsors agree that any recovery received by Parent or Sponsors pursuant to turnover of distributions received on account of the Second Lien Notes Deficiency Claims and the Third Lien Notes Deficiency Claims shall be distributed to Holders of Allowed Funded-Debt General Unsecured Claims and Allowed Non-Funded Debt General Unsecured Claims. To the extent the Plan is not effectuated, all rights are reserved.

The Debtors and Mr. Vogel believe that the Disinterested Manager Settlement provides a fair and reasonable return to the Debtors, for the benefit of the Holders of Allowed General Unsecured Claims, for the release of any potential estate claims and causes of action against the Sponsors and related parties. The return of 56% of the MYT Series B Preferred Stock, $10,000,000 cash contribution effectively by the Consenting Term Loan Lenders, and modification of the Plan to ensure that Holders of Deficiency Claims on account of 2019 Term Loan Claims  2013 Term Loan Claims, 2028 Debenture Claims, Second Lien Note Claims, and Third Lien Note Claims do not share in the distribution to Holders of Allowed General Unsecured Claims, provides General Unsecured Creditors substantially more value than they would receive if the estate retained the claims and causes of action and succeeded in a claim to return all of the MYT Series B Preferred Stock held by the Sponsors.

---

[14]    [The Debtors are awaiting confirmation of the support of the Creditors Committee and statements regarding support and conditionality are anticipated to be made on the record of the Disclosure Statement Hearing. The Disclosure Statement will be modified accordingly prior to solicitation.]

**M.     Other Litigation Matters.**

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

**N.     Treatment of Executory Contracts and Unexpired Leases.**

**1.     Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease, including the Debtors' non-qualified compensation plans, (including those set forth as assumed in the Schedules of Assumed and Rejected Contracts) shall be deemed assumed as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) was previously assumed, assumed and assigned, or rejected by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is identified as rejected on the Schedules of Assumed and Rejected Contracts; or (4) is the subject of a motion to reject that is pending on the Effective Date.  On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease that is identified as rejected on the Schedules of Assumed and Rejected Contracts shall be deemed rejected as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, and the Schedules of Assumed and Rejected Contracts, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Unless otherwise specified in the Plan Supplement, the Schedules of Assumed and Rejected Contracts, or an applicable Court order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall re vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedules of Assumed and Rejected Contracts identified in Article V.A of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date; *provided*, *however*, that after the date of the Confirmation Hearing, the Debtors may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned on the Schedules of Assumed and Rejected Contracts absent the consent of the applicable lessor.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

## 2. Indemnification Obligation.

Upon the Effective Date and consummation of the Plan on the terms set forth in the Plan, all indemnification obligations in place as of the Effective Date under the Debtors' organizational documents (including in the by-laws, certificates of incorporation or formation, limited liability company agreements, and other organizational or formation documents,) for the current and former directors, officers, managers, and employees of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose; *provided*, *however*, that the foregoing shall not apply to any obligations to indemnify any person or entity (other than natural-person managers or officers in their capacities as such serving as of the Effective Date, including the disinterested managers of Mariposa Intermediate and NMG LTD, respectively) in connection with any claims or causes of action related to the designation of MyTheresa as an unrestricted subsidiary or the distribution of MyTheresa by or through certain Debtors to NMG, Inc. and related transactions.

## 3. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent and served on the Debtors or Reorganized Debtors, as applicable, no later than thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F. of the Plan, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim in accordance with Article III.C. of the Plan.

## 4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of

the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided* that the Reorganized Debtors may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity; *provided, further,* that notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any such dispute and approving the assumption of any such Executory Contract or Unexpired Lease, the Reorganized Debtors shall have the right to reject any such Executory Contract or Unexpired Lease that is subject to dispute, whether by amending the Schedules of Assumed and Rejected Contracts in accordance with Article V.A of the Plan or otherwise.

At least fourteen (14) days prior to the first day of the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment and proposed Cure amounts to be sent to applicable third parties, which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related Cure amount must be Filed, served, and actually received by the Debtors no later than seven days prior to the first day of the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.D of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

### O. The Surety Bond Program.

On the Effective Date, all of the Debtors' obligations and commitments to any surety providers as set forth in the *Order (I) Authorizing the Debtors to Continue Their Surety Bond Program and (II) Granting Related Relief* [Docket No. 244] shall be deemed reaffirmed by the Reorganized Debtors, including as applicable: (i) surety payment and indemnity agreements, setting forth the sureties' rights against the Debtors, and the Debtors' obligations to pay and indemnify the sureties from any loss, cost, or expense that the sureties may incur, in each case, on account of the issuance of any surety bonds on behalf of the Debtors; (ii) surety collateral agreements governing collateral, if any, in connection with the Debtors' surety bonds; and/or (iii) ordinary course premium payments to any surety for the Debtors' surety bonds.

## IX. PROJECTED FINANCIAL INFORMATION

A projected consolidated income statement is attached hereto as **Exhibit C**.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## X. RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A. Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

#### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

#### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

3. **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan of reorganization, subject to the terms of the Restructuring Support Agreement. There can be no assurance that the terms of any such alternative chapter 11 plan of reorganization would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

4. **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Even though certain creditors have agreed pursuant to the Restructuring Support Agreement to support the Plan, there can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims and Interests against them would ultimately receive on account of such Allowed Claims and Interests.

The effectiveness of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive on account of such Allowed Claims and Interests.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5. **Nonconsensual Confirmation.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in

57

accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk Upon Confirmation.

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their products, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Court terminates that right, however, or the exclusivity period expires, the Debtors' ability to achieve confirmation of the Plan and achieve the Debtors' stated goals may be adversely affected.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Additional financing, if required, may not be available on commercially reasonable terms, if at all.

### 7. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan, subject to the terms of the Restructuring Support Agreement. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9. **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

11. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to the approval of the parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

B. **Risks Related to Recoveries under the Plan.**

1. **The Debtors May Not Be Able to Achieve Their Financial Projections.**

The Financial Projections attached hereto as **Exhibit C** represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general and the retail industry, which has been particularly affected by the recent COVID-19 outbreak and actions taken in response thereto. While the Debtors believe that the Financial Projections attached hereto as **Exhibit C** are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, (a) the value of the New Equity may be negatively affected, and the recoveries by Holders of General Unsecured Claims that receive New Equity may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date and (c) the Debtors may be unable to service their debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. Reorganized Neiman's New Equity May Not Be Publicly Traded.

There can be no assurance that an active market for the New Equity will develop, nor can any assurance be given as to the prices at which such stock might be traded. The New Equity to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange. Further, the New Equity to be issued under the Plan has not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Equity may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws. As explained in more detail in Article XIII of this Disclosure Statement, most recipients of New Equity will be able to resell such securities without registration pursuant to the exemption from registration provided by section 1145 of the Bankruptcy Code, subject to any restrictions set forth in the certificate of incorporation and bylaws of Reorganized Neiman.

### 3. The Value of the MYT Series B Preferred Stock is Uncertain.

The Plan contemplates distribution of a portion of the MYT Series B Preferred Stock to Holders of Allowed General Unsecured Claims. The ultimate value of the MYT Series B Preferred Stock depends on the value of MyTheresa, which is uncertain.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Business.

### 1. The Debtors and the Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.

The Debtors' and the Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, including the DIP Facility and the Exit Facility, depends on the Debtors' and the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond their control (including the factors discussed in Article X.C of this Disclosure Statement). For example, if the Debtors are mandated or recommended to keep any currently-closed retail stores and/or distribution centers closed to contain the spread of the COVID-19 outbreak, or to close re-opened stores, cash flows may significantly be limited. The Debtors and the Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit them to pay the principal, premium, if any, and interest on their indebtedness, including the DIP Facility and the Exit Facility.

### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with brand partners, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with brand partners, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. In addition, the Debtors will need the prior approval of the Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

> **3.** **Recent Global Economic Trends, especially in Response to the COVID-19 Outbreak Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption of the Debtors' Retail Stores.**

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services. In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' business may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

The recent outbreak of COVID-19 has significantly disrupted financial markets. This outbreak and the actions taken by federal, state and local governments in response to the outbreak have significantly affected virtually all facets of the U.S. and global economies. Restrictions on and public concern regarding travel and public interaction have materially curtailed retail and hospitality activity. The COVID-19 outbreak resulted in the temporary closure of all of the Debtors' retail stores, almost all of which have since opened. A substantial majority of the Debtors' merchandise is manufactured in numerous locations, primarily in Europe, the United States, and, to a lesser extent, Asia. The timely delivery of merchandise to the Debtors' by their brand partners could be adversely affected by supply chain disruptions and travel restrictions which could, in turn, negatively impact the Debtors' ability to meet customers' demand.

Global financial markets have experienced significant volatility and losses as a result of the recent COVID-19 outbreak. Any resulting economic downturn could negatively impact customer demand and spending in the impacted regions and cause an oversupply of goods that could result in meaningful margin pressure. In response to anticipated liquidity pressures stemming from a potential downturn, many companies are exploring liquidity options, including drawing on revolving debt facilities. Subsequent to the end of the second quarter of fiscal year 2020, the Debtors' opted to draw down $225.0 million of additional borrowings under their Asset-Based Revolving Credit Facility to ensure that cash on-hand is adequate to address any potential disruptions related to the COVID-19 outbreak and the related response.

The Debtors are closely monitoring developments in connection with this outbreak. Restrictions on travel, quarantines and other measures imposed in response to the COVID-19 outbreak, as well as ongoing concern regarding the virus' potential impact, have had and will likely continue to have a negative effect on economies and financial markets, including supply chain shortages and other business disruptions. The Debtors expect the outbreak will materially affect results in the current and potentially future operating periods; however, the duration and extent of potential supply chain, demand and other disruptions is highly

uncertain and will depend on future developments with respect to the spread and severity of the virus. An extended period of further economic deterioration could exacerbate the other risks described herein.

Additional effects of the recent conditions in the global economy include higher rates of unemployment, consumer hesitancy, and limited availability of credit, each of which may constrict the Debtors' business operations. These have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline and the Debtors cannot reduce costs on a timely basis or at all, the Debtors' operating results may be materially and adversely affected.

>    **4.**    **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and brand partners will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection and operates in the luxury retail industry which has been dramatically affected by the recent COVID-19 outbreak.

>    **5.**    **Financial Results May Be Volatile and May Not Reflect Historical Trends.**

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. Moreover, there have been mandates from federal, state and local authorities requiring forced closures of non-essential retailers in response to the recent COVID-19 outbreak. The duration of such closures and the extent of the outbreak's effects on the Debtors' business is highly uncertain and will depend on future developments with respect to the spread and severity of COVID-19. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially

from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

      6.      **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become party to litigation. Any claims against the Debtors, whether meritorious or not, could be time-consuming, result in costly litigation, damage the Debtors' reputation, require significant amounts of management time and divert significant resources. If any of these legal proceedings were to be determined adversely to the Debtors, or the Debtors were to enter into a settlement arrangement, the Debtors could be exposed to monetary damages or limits on the Debtors' ability to operate their business, which could have an adverse effect on the Debtors' business, financial condition and results of operations. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

      7.      **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the retail industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

## XI.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order [Docket No. [●]].

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.** PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

      A.      **Holders of Claims and Interests Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement

provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10, and 11 (collectively, the "Voting Classes"). Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 12, 13, and 14. Additionally, the Disclosure Statement Order provides that certain Holders of Claims and Interests in the Voting Classes, such as those Holders whose Claims and Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B. **Voting Record Date.**

**The Voting Record Date is [●], 2020**. The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C. **Voting on the Plan.**

**The Voting Deadline is August 31, 2020, at 4:00 p.m.** prevailing Central Time. The Voting Deadline for any counterparty to an Unexpired Lease which is identified as rejected on a Schedules of Assumed and Rejected Contracts filed later than one Business Day prior to the Voting Deadline shall be extended to the date of the Confirmation Hearing. In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the Ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**NEIMAN MARCUS GROUP LTD LLC BALLOTS PROCESSING
C/O STRETTO
410 EXCHANGE, SUITE 100
IRVINE, CALIFORNIA 92602**


OR

ONLINE PORTAL AT https://balloting.stretto.com/

---

**PLEASE SELECT JUST ONE OPTION TO SUBMIT YOUR VOTE:
EITHER RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**


**OR**


**VOTE ELECTRONICALLY THROUGH THE CUSTOMIZED,**

**ONLINE BALLOTING PORTAL ON THE DEBTORS' CASE WEBSITE MAINTAINED BY STRETTO ("E-BALLOT")**

**Holders of claims or interests who cast a ballot via e-ballot should NOT also submit a paper ballot.**

**E-BALLOT SHALL BE THE EXCLUSIVE MEANS OF VOTING ELECTRONICALLY. STRETTO SHALL NOT ACCEPT VOTES SUBMITTED VIA E-MAIL, FACSIMILE, OR ANY ELECTRONIC METHODS OTHER THAN E-BALLOT; *PROVIDED* THAT STRETTO SHALL ACCEPT MASTER BALLOTS FROM NOMINEES SUBMITTED VIA E-MAIL TO STRETTO.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE STRETTO TOLL FREE AT 877-670-2127 (TOLL FREE) OR 949-504-4475 (INTERNATIONAL). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTORS.**

D. **Ballots Not Counted.**

<u>**No ballot will be counted toward Confirmation if, among other things**</u>: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile or other electronic means (other than the E-Ballot Portal); (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated or disputed for which the applicable Claims Bar Date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order and the solicitation procedures); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), an administrative agent (except as otherwise permitted by the Disclosure Statement Order), or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (vii) it lacks an original signature, with the understanding that the voting party's electronic signature through e-ballot will be deemed an original signature; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

E. **Certain Voting Matters**

It has recently come to the attention of the Debtors and the Second Lien Notes Trustee that the outstanding principal amount of the Second Lien Notes shown on DTC's books includes PIK interest of approximately $16,852,000 (the "PIK Amount") that was due on April 15, 2020. However, PIK interest was not in fact capitalized because, on that date, as the Debtors did not authorize or issue the PIK interest (nor did they pay the cash interest due and payable on that date). Thus, the outstanding principal balance of the Second Lien Notes on DTC's records on and after April 15, 2020 should be reduced by the PIK Amount.

Accordingly, the outstanding principal amount of the Second Lien Notes as of the Petition Date on DTC's records should be $561,733,333 (not $578,585,309), with the PIK Amount showing as accrued

but unpaid interest thereon. The Debtors or the Second Lien Notes Trustee may seek a court order in connection with Confirmation that will rectify the DTC records to reflect the correct outstanding principal amount of the Second Lien Notes as of the Petition Date ($561,733,333) for purposes of the Debtors making distributions to Holders of Second Lien Notes Claims under the Plan. The Debtors' use of the the principal amount currently stated on DTC's books ($578,585,309) for voting purposes is not expected to affect acceptance or rejection of the Plan by Class 8. However, such use shall not ratify the use of such amount for any other purpose in the Chapter 11 Cases.

## XII. CONFIRMATION OF THE PLAN

### A. Confirmation Hearing.

The Court has scheduled the Confirmation Hearing for [September 4], 2020 at [●] [a/p].m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than August 31, 2020, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit B** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in New York Times (national edition) and Dallas Morning News, to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

### B. Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Interests.

At the Confirmation Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### C. Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims and Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims and Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims and Interests under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### D. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their Financial Projections. Creditors and other interested parties should review Article X of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E. Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[15]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of

---

[15] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the Holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the Holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the Holder of such claim or equity interest.

allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code provides that a class of impaired interests has accepted a plan if the holders of at least two-third's in amount of the allowed interests of such class have voted to accept the plan.

Pursuant to Article III of the Plan, if a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

## F. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

## G. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class. The Debtors submit that if the Debtors were to "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it would not "discriminate unfairly" and would satisfy the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## H. Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the valuation analysis that is set forth in **Exhibit D** attached hereto and incorporated herein by reference (the "Valuation Analysis"). As set forth in the Valuation Analysis, the Debtors' going-concern value recoveries to creditors under the Plan are substantially higher than the recoveries such creditors would receive in a hypothetical liquidation of the Debtors' enterprise under chapter 7 of the Bankruptcy Code, as illustrated in the Liquidation Analysis. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

XIII.    CERTAIN SECURITIES LAW MATTERS

A.    Plan Securities.

The Plan provides for Reorganized Neiman to distribute, among other things, the New Equity, to certain Holders of Allowed Claims.  The Debtors believe that the New Equity will be "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and all applicable state securities laws.

B.    Issuance and Resale of Securities Under the Plan.

1.    Exemptions from Registration Requirements of the Securities Act and Applicable State Securities Laws.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.  In reliance upon these exemptions, as well as Section 4(a)(2) under the Securities Act, the Debtors believe that the offer, issuance and distribution under the Plan of (i) the New Equity to the Holders of Allowed Claims entitled to receive the New Equity under Article III of the Plan and the participants in the Management Incentive Plan, if any (collectively, the "New Equity Holders"), (ii) the New Warrants, and (iii) to the extent the 2L MyT Distribution, 3L MyT Distribution, and/or the Series B Preferred Stock takes the form of a distribution by a Debtor, the 2L MyT Distribution, 3L MyT Distribution and the distribution of Series B Preferred Stock, as applicable, following the filing of the Chapter 11 Cases may be made without registration under the Securities Act or any applicable state securities laws.

To the extent that the offer, issuance and distribution of the New Equity to the New Equity Holders following the filing of the Chapter 11 Cases is covered by section 1145 of the Bankruptcy Code, subject to compliance with the New Organizational Documents, such New Equity may be resold without registration under the Securities Act or other federal securities laws, unless such holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such New Equity governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state securities laws pursuant to various exemptions provided by the applicable states; however, the availability of such exemptions cannot be known unless applicable individual state securities laws are examined.

Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Bankruptcy Code, the Securities Act and any applicable state securities laws.

2.    Resale of Certain New Equity; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy

securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Equity issued to the New Equity Holders by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Equity who are deemed to be "underwriters" may be entitled to resell their New Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the required holding period has been met and if current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

Whether any particular person would be deemed to be an "underwriter" (including whether the person is a "Controlling Person") with respect to such New Equity would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to the New Equity issued to the New Equity Holders, and, in turn, whether any person may freely resell such New Equity. The Debtors recommend that potential recipients of New Equity consult their own counsel concerning their ability to freely trade such securities under applicable federal securities law and state securities laws.

### 3. Resale of New Equity Issued Pursuant to Section 4(a)(2) Under the Securities Act.

Any New Equity distributed pursuant to section 4(a)(2) under the Securities Act will be offered, issued and distributed without registration under the Securities Act and applicable state securities laws and in reliance upon the exemption set forth therein. Such issuances will not be exempt under section 1145 of the Bankruptcy Code because those securities are not being issued in exchange for an existing Claim against the Debtors. Therefore, such New Equity pursuant to section 4(a)(2) under the Securities Act will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws. Generally, Rule 144 of the Securities Act would permit the public sale of securities received

by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. The Debtors express no view as to whether any person may freely resell the New Equity issued pursuant to Section 4(a)(2) under the Securities Act. The Debtors recommend that potential recipients of the New Equity issued pursuant to section 4(a)(2) under the Securities Act consult their own counsel concerning their ability to freely trade such securities without registration under the federal securities laws and applicable state securities laws.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## XIV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, Reorganized Neiman, and to certain Holders. The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and Reorganized Neiman are or will be a party will be respected

for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

    **B.**    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Neiman.**

        **1.**    **Characterization of the Restructuring Transactions.**

The Restructuring Transactions are expected to be structured as a recapitalization of Reorganized Neiman (which is expected to be NMG LTD LLC) pursuant to which the New Equity (which is expected to constitute all of the stock of Reorganized Neiman), together with the other consideration distributed pursuant to the Plan, is issued to the applicable Holders in exchange for their applicable Claims and the Existing Equity Interests are cancelled, released, and extinguished without any distribution or other consideration on account thereof. Accordingly, because Reorganized Neiman and certain of the other Debtors are members of a consolidated group for U.S. federal income tax purposes the common parent of which is a non-Debtor entity, the issuance of the New Equity (and cancellation of the Existing Equity Interests) pursuant to the Plan is expected to cause Reorganized Neiman and its subsidiaries to cease to be members of such consolidated group and therefore cause certain members of such consolidated group (including certain of the Debtors) to recognize certain taxable deferred intercompany gains for U.S. federal (and applicable state and local) income tax purposes. However, as a result of such transactions, Holdings,

as the Debtor parent of Reorganized Neiman, is expected take a worthless stock deduction with respect to its tax basis in the Existing Equity Interests. The deferred intercompany gain recognized by the Debtors in connection with the Restructuring Transactions is expected to be fully offset by such worthless stock deduction and is therefore not expected to result in a cash tax payment obligation for the Debtors. As a result of such worthless stock deduction, Reorganized Neiman's carryforward of 163(j) Deductions (as defined below) is expected to be reduced in accordance with applicable Treasury Regulations.

### 2. Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied, over (b) the sum of (i) the issue price of new debt instruments, (ii) the fair market value of other non-cash consideration (including stock of the taxpayer or a party related to the taxpayer), and (iii) the amount of cash, in each case, given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income pursuant to section 108 of the IRC if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer must reduce its net operating losses and certain other tax attributes (collectively, "Tax Attributes") and aggregate tax basis in assets (including the stock of subsidiaries) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in Tax Attributes and aggregate tax basis occurs only after the tax for the year of the debt discharge has been determined. In general, Tax Attributes and aggregate tax basis will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. In the absence of contrary guidance, it appears to be the case that interest expense deductions allowable under section 163(j) of the Code (and carryforwards of any such deductions) ("163(j) Deductions") are not subject to reduction under these rules. Any excess COD Income over the amount of available items described in clauses (a) through (g), above, will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

The Debtors are expected to realize COD Income in connection with the Restructuring Transactions, with an attendant reduction in Tax Attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the Debtors' liabilities, as determined for these purposes, immediately after the Effective Date). The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of new debt instruments and the value of non-cash consideration (including the New Equity), neither of which can be determined until after the Plan is consummated.

### 3.    Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in Tax Attributes and aggregate tax basis pursuant to excluded COD Income and the worthless stock deduction (as described above), the ability of Reorganized Neiman and its subsidiaries to use any remaining Tax Attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.[16]

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change" as defined under section 382 of the IRC, the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but an ownership change is expected to occur as a result of the Restructuring Transactions. If such an ownership change occurs, the ability of Reorganized Neiman and its subsidiaries to use the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### (a)    General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation (or parent of the consolidated group) immediately before the "ownership change" (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 1.09 percent for June 2020). Under certain circumstances, the annual limitation may be increased to the extent that the corporation (or parent of the consolidated group) has an overall built-in gain in its assets at the time of the ownership change. If the corporation or consolidated group has such "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss, and deduction), any built-in gains recognized

---

[16]    The IRS issued proposed regulations in September 2019, that would revoke IRS Notice 2003-65 and make substantial changes to the way limitations under section 382 of the IRC are calculated. The changes would decrease the limitation set forth in section 382 of the IRC in most cases and potentially cause entities that would have had a net unrealized built-in gain under Notice 2003-65 to instead have a net unrealized built-in loss, which would result in additional limitations on the ability to deduct Pre-Change Losses. Additionally, the IRS issued further proposed regulations in January 2020, that would provide certain transition relief for the application of any finalized regulation. Under such transition relief, any finalized regulations would apply only to ownership changes occurring 31 days after the regulations are finalized and certain specified and identifiable transactions would be subject to a "grandfathering" rule that allows for application of the prior IRS Notice 2003-65 rules. Additionally, the "grandfathering" rule would also apply as long as a company files its chapter 11 case on or before the day that is 31 days following the issuance of final regulations, even where the applicable ownership change occurs more than 31 days after finalization of the regulations. Because the Debtors have already filed their chapter 11 cases any such finalized regulations would not be applicable and, accordingly, the remainder of this discussion assumes that IRS Notice 2003-65 will apply to the Reorganized Debtors.

(or, according to the currently effective IRS Notice 2003-65, treated as recognized) during the following five year period (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year of such recognition, such that the loss corporation or consolidated group would be permitted to use its pre-change losses against such built-in gain income in addition to its otherwise applicable annual limitation. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

**(b)**       **Special Bankruptcy Exceptions.**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and Reorganized Neiman undergo another "ownership change" within two years after the Effective Date, then Reorganized Neiman's Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period (and during the part of the taxable year prior to and including the effective date of the plan of reorganization), and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether Reorganized Neiman will elect out of its application. However, Reorganized Neiman and its subsidiaries do not expect to have significant NOL carryforwards after the completion of the Restructuring Transactions.

C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the Restructuring Transactions.

1.    Consequences to Holders of Class 5, Class 6, Class 7, Class 8, and Class 9 Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, (a) each U.S. Holder of an Allowed 2019 Term Loans Secured Claim, an Allowed 2013 Term Loans Secured Claim, or an Allowed 2028 Debentures Secured Claim shall receive its Pro Rata share of the New Equity and the Exit Rights (b) each U.S. Holder of an Allowed Second Lien Notes Secured Claim shall receive its Pro Rata share of the New Equity, the Exit Rights, the New Warrants, and the 2L MyT Distribution, and (c) each U.S. Holder of an Allowed Third Lien Notes Secured Claim shall receive its Pro Rata share of the New Equity, the Exit Rights, the New Warrants, and the 3L MyT Distribution.

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of Reorganized Neiman for U.S. federal income tax purposes.  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  As a general matter, unsecured trade claims entered into or incurred in the ordinary course of business do not constitute "securities."  The stated maturity of the Allowed 2013 Term Loans Secured Claims is seven years and due to prior restructuring transactions, the term to maturity of such Claims for U.S. federal income tax purposes is expected to be treated as no less than six and a half years.  Similarly, the Allowed 2019 Term Loans Secured Claims were issued as part of a modification of previously existing 2013 Term Loans in a transaction that was expected to be treated as a "recapitalization" for U.S. federal income tax purposes and are therefore expected to retain the same maturity as the Allowed 2013 Term Loans Secured Claims described in the foregoing sentence. The Allowed 2028 Debentures Secured Claims were originally issued with a term to maturity of ten years.  The Allowed Third Lien Notes Secured Claims were issued in a transaction expected to be treated as a tax-free "recapitalization" for U.S. federal income tax purposes in exchange for other debt instruments treated as "securities" for U.S. federal income tax purposes. The Allowed Second Lien Notes Secured Claims were originally issued for cash with a term to maturity of less than five years. Accordingly, although it is not free from doubt, the Debtors intend to take the position (and the following discussion assumes) that each of the Class 5, Class 6, Class 7, and Class 9 Claims constitute "securities" and that the Class 8 Claims do not constitute "securities."  U.S. Holders are urged to consult their own tax advisors regarding the potentially different tax treatment that could apply if their Claims were treated other than as described in the foregoing sentence.

Because the Class 5, Class 6, Class 7, and Class 9 Claims are expected to constitute "securities," a U.S. Holder of such a Claim is expected to be treated as receiving its distribution under the Plan in a

transaction treated as a "recapitalization" for U.S. federal income tax purposes. As discussed below, the Exit Rights are expected to be treated as options to acquire a portion of the Exit Facility for U.S. federal income tax purposes. Whether an option to acquire debt instrument is a "security" for U.S. federal income tax purposes is uncertain and the Debtors intend to take the position (and the remainder of this discussion assumes) that the Exit Rights are not "securities." U.S. Holders are urged to consult their own tax advisors regarding the potentially different tax treatment that could apply if the Exit Rights were treated as "securities." Additionally, the 3L MyT Distribution is expected to consist of one or more instruments issued by a different entity than the issuer of the Class 9 Claims. Accordingly, the Debtors intend to take the position that, although not free from doubt, the 3L MyT Distribution will be treated as "other property" received by holders of Class 9 Claims in such recapitalization transaction.

Accordingly, a U.S. Holder of a Class 5, Class 6, or Class 7, or Class 9 Claim is expected to recognize gain (but not loss) as a result of the Restructuring Transactions. Any gain recognized generally will equal the lesser of (a) the amount of gain realized on the exchange (computed as the difference, if any, between the amount realized on the exchange and the U.S. Holder's adjusted tax basis in its Claims) and (b) for U.S. Holders of Class 5, Class 6, or Class 7 Claims, the value of the Exit Rights received in the exchange (excluding any amounts attributable to accrued and unpaid interest on an existing Claim) or, for U.S. Holders of Class 9 Claims, the value of the Exit Rights and the 3L MyT Distribution received in the exchange (excluding any amounts attributable to accrued and unpaid interest on an existing Claim). In general, a U.S. Holder would obtain an initial tax basis in the New Equity and the New Warrants, as applicable, received in the exchange equal to its adjusted tax basis in its existing Claim surrendered, increased by any gain recognized on the exchange and decreased by the value of the Exit Rights received in the exchange (in the case of a U.S. Holder of a Class 5, Class 6, or Class 7 Claim) or the value of the Exit Rights and the 3L MyT Distribution received in the exchange (in the case of a U.S. Holder of a Class 9 Claim), if any (excluding any amounts attributable to accrued and unpaid interest on the applicable existing Claim). A U.S. Holder must allocate this aggregate tax basis between the New Equity and the New Warrants, as applicable, depending on their relative fair market values on the Effective Date. The U.S. Holder's holding period for the New Equity and the New Warrants, as applicable, received in the exchange (excluding any amounts attributable to accrued and unpaid interest on an existing Claim) will generally include its holding period for its existing Claims.

Because the Class 8 Claims are not expected to constitute "securities," each U.S. Holder of a Class 8 Claim will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of the New Equity, New Warrants, Exit Rights, and 2L MyT Distribution received in the exchange and (b) the U.S. Holder's adjusted tax basis in its Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The holding period for the New Equity, New Warrants, Exit Rights, and 2L MyT Distribution received in the exchange should begin on the day following the Effective Date and the U.S. Holder should obtain a tax basis in such New Equity, New Warrants, Exit Rights, and 2L MyT Distribution equal to the fair market value of such property.

U.S. Holders should consult their own tax advisers regarding the treatment of the Restructuring Transactions for U.S. federal income tax purposes.

2.      **Consequences to Holders of Class 3, Class 4, Class 10, and Class 11 Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, (a) each U.S. Holder of an Allowed ABL Loan Secured Claim or an Allowed FILO Secured Claim shall receive, in full and final satisfaction of such Claim, (i) payment in full in Cash, (ii) consensual refinancing or other consensual modification of the ABL Loans or the FILO Facility, as applicable, giving rise to such ABL Loan Secured Claims or FILO Secured Claims, as applicable, or (iii) other treatment consistent with the Bankruptcy Code and the Disclosure Statement Order, and (b) each U.S. Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of (i) MYT Series B Preferred Stock, and (ii) Cash, as applicable, and in accordance with the treatment for Class 10 and Class 11.

Each U.S. Holder of Class 3, Class 4, Class 10, and Class 11 Claims will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each such U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of (1) the Cash and (2) the fair market value (or issue price, in the case of debt instruments) of non-cash consideration (including the MYT Series B Preferred Stock) received, and (b) the U.S. Holder's adjusted tax basis in its Claim.

The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The holding period for any non-Cash consideration received (including, for the Holders of Class 10 and Class 11 Claims, the MYT Series B Preferred Stock received) should begin on the day following the Effective Date and the U.S. Holder should obtain a tax basis in such non-Cash consideration equal to the fair market value (or issue price, in the case of debt instruments) of such property.

3.      **Accrued Interest.**

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be

allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 4. Market Discount.

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim. Any such market discount is generally the excess of the "revised issue price" of such Claim over such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory *de minimis* amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Restructuring Transactions.

Although not necessarily free from doubt, the "market discount" provisions of the IRC are arguably inapplicable to the kind of General Unsecured Claims that constitute the Class 10 Claims. U.S. Holders holding Class 10 Claims should consult with their own tax advisors regarding the potential application of the "market discount" rules to their Claims.

### 5. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Equity.

#### (a) Dividends on New Equity.

Any distributions made on account of the New Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Neiman as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Equity. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

#### (b) Sale, Redemption, or Repurchase of New Equity.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Equity. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S.

Holder has held the New Equity for more than one year, taking into account the holding period rules described above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

> **6.** **U.S. Federal Income Tax Treatment, and Ownership, Exercise, and Disposition of, the Exit Rights and the New Warrants.**

Although such position is not free from doubt, the Debtors intend to treat the New Warrants as warrants for U.S. federal income tax purposes and intend to treat the issuance of the Exit Rights and their subsequent exercise for U.S. federal income tax purposes as an issuance and exercise of options to acquire a portion of the Exit Facility for U.S. federal income tax purposes.

A U.S. Holder that elects to exercise the New Warrants or its Exit Rights will generally be treated as purchasing, (a) in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the New Equity it is entitled to purchase pursuant to the New Warrants and (b) in exchange for its Exit Rights and the amount of cash funded by the U.S. Holder to exercise the Exit Rights, the Exit Facility it is entitled to purchase pursuant to the Exit Rights. In each case, such purchase will generally be treated as the exercise of an option under general tax principles and the U.S. Holder therefore should not recognize income, gain or loss for U.S. federal income tax purposes. A U.S. Holder's aggregate tax basis in the New Equity received upon exercise of a New Warrant or the Exit Facility received upon exercise of the Exit Rights will generally equal the sum of (a) the amount of cash paid by the U.S. Holder to exercise its New Warrants or Exit Rights, as applicable, plus (b) such U.S. Holder's tax basis in its New Warrants or Exit Rights, as applicable, immediately before such New Warrants or Exit Rights are exercised. A U.S. Holder's holding period in the New Equity or Exit Facility, as applicable, will begin on the day after the exercise date of the New Warrants or Exit Rights.

A U.S. Holder that elects not to exercise the New Warrants or its Exit Rights and instead allows the New Warrants or Exit Rights to lapse may be entitled to claim a capital loss upon expiration of the New Warrants or Exit Rights in an amount equal to the amount of tax basis allocated to the New Warrants or Exit Rights, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants or the Exit Rights. Additionally, in the event that a U.S. Holder sells its New Warrants or Exit Rights in a taxable transaction, the U.S. Holder will generally recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants or Exit Rights, as applicable. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Equity or Exit Facility to which the New Warrants or Exit Rights relate, respectively, would have had in the hands of the U.S. Holder if such New Equity or Exit Facility had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants or Exit Rights, as discussed above.

Each U.S. Holder should consult its own tax advisor regarding the proper characterization of the Exit Rights and the New Warrants for U.S. federal income tax purposes and the consequences to it of such treatment given its particular circumstances.

7.      **U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Exit Facility.**

The following discussion assumes that the "contingent payment debt instrument" rules do not apply to the Exit Facility.  U.S. Holders should consult their own tax advisors regarding the application of these rules.

(a)      **Payments of Qualified Stated Interest.**

Payments or accruals of "qualified stated interest" (as defined below) on the Exit Facility will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.  The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Exit Facility, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

(b)      **Original Issue Discount.**

A debt instrument, such as the Exit Facility, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount.  A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest."

Because payments other than payments of qualified stated interest will be required before maturity, for purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the Exit Facility multiplied by the weighted average maturity of the Exit Facility (as determined under applicable Treasury Regulations).  If the Exit Facility is treated as issued with OID (including as a result of an allocation due to the Exit Term Loan Participation Fee, as described below), a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Exit Facility, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the Exit Facility that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the Exit Facility is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the Exit Facility, and a pro rata amount of such *de minimis* OID must be included in income as principal payments are received on the Exit Facility.

Where U.S. Holders receive debt instruments and also receive other property in an exchange (such as in exchange for cash), the "investment unit" rules may apply to the determination of the "issue price" for any such debt instrument. Because the Exit Term Loan Participation Fee will be paid in New Equity, a U.S. Holder that purchases a portion of the Exit Facility pursuant to the exercise of its Exit Rights will be treated as receiving a debt instrument (the Exit Facility) as well as other property (i.e., New Equity in the form of the Exit Term Loan Participation Fee) in exchange for its cash exercise price. Accordingly, the "investment unit" rules are expected to apply to determine the "issue price" of the Exit Facility. The issue price of the Exit Facility will depend, in part, on the issue price of the "investment unit" (i.e., the Exit Facility and New Equity), and the respective fair market values of the elements of consideration that compose the investment unit. The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument. As a result, because the investment unit in this case is acquired for cash, the issue price of the investment unit will generally be equal to the first price at which a substantial amount of the

investment unit is sold for money (not including sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). Such issue price determined for the investment unit under the above rules is allocated among the elements of consideration making up the investment unit (i.e., the Exit Facility and the New Equity) based on their relative fair market values, with such allocation determining the issue price of the Exit Facility. Because, as discussed above, the value the New Equity cannot be determined until after the Plan is consummated, any such allocation will not be determinable until the consummation of the Plan.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit

Accordingly, as a result of some or all of the Exit Term Equity Fees (or other similar fees paid in New Equity), it is generally expected that the Exit Facility will be treated as issued with an amount of OID that is not *de minimis*.

### (c)    Acceleration of Income Recognition for Certain U.S. Holders.

Accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally will be required to include certain items of income such as OID no later than the time such amounts are reflected on such a financial statement. This could result in an acceleration of income recognition for income items differing from the above description, although proposed Treasury Regulations provide that OID and market discount on the Exit Facility would not be subject to acceleration under these rules.

### (d)    Sale, Taxable Exchange or other Taxable Disposition.

Upon the disposition of the Exit Facility by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (a) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (b) the U.S. Holder's adjusted tax basis in the Exit Facility, as applicable. The calculation of a U.S. Holder's adjusted tax basis in the Exit Facility is discussed above. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the Exit Facility for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### 8.    Limitations on Use of Capital Losses.

A U.S. Holder who recognizes capital losses will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses

for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 9. Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their own tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### D. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders is complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder.

### 1. Gain Recognition.

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Equity.

#### (a) Dividends on New Equity.

Any distributions made with respect to New Equity (other than certain distributions of stock of Reorganized Neiman) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Neiman, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, as

gain from the sale or exchange of such stock, as described below under "—Sale, Redemption, or Repurchase of New Equity"). Except as described below, dividends paid with respect to New Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Equity held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### (b) Sale, Redemption, or Repurchase of New Equity.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Equity unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such New Equity is or has been during a specified testing period a "U.S. real property holding corporation" (a "<u>USRPHC</u>") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). With respect to the third exception, the FIRPTA rules are discussed in greater detail below.

3. **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Ownership, Exercise, and Disposition, of the Exit Rights and the New Warrants.**

The U.S. federal income tax treatment of the New Warrants and Exit Rights to a Non-U.S. Holder are generally expected to be the same as those described above for U.S. Holders. However, in the event that a Non-U.S. Holder sells its New Warrants or Exit Rights in a taxable transaction, a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on such sale unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- with respect to a sale of the New Warrants, the issuer of such New Warrants is or has been during a specified testing period a USRPHC under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). With respect to the third exception the FIRPTA rules are discussed in greater detail below.

4. **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of the Exit Facility.**

The following discussion assumes that the "contingent payment debt instrument" rules do not apply to the Exit Facility. Non-U.S. Holders should consult their own tax advisors regarding the application of these rules.

(a) **Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest).**

Subject to the discussion of backup withholding and FATCA, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the voting power in Reorganized Neiman within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

85

- the Non-U.S. Holder is not a controlled foreign corporation related to Reorganized Neiman, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Reorganized Neiman or Reorganized Neiman's paying agent or other withholding agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a non-U.S. person.

If all of these conditions are not met, interest on the Exit Facility paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the Exit Facility or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement (generally a properly executed IRS Form W-8ECI or suitable substitute or successor form or such other form as the IRS may prescribe) is provided to Reorganized Neiman or Reorganized Neiman's paying agent or other withholding agent)    unless an applicable income tax treaty provides otherwise.  If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**(b)** **Sale, Taxable Exchange, or Other Disposition of the Exit Facility.**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the Exit Facility (other than any amount representing accrued but unpaid interest on the loan)  unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the Exit Facility under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

### 5. FIRPTA.

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as ECI that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to New Equity and New Warrants, rules with respect to USRPHCs may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute ECI. Further, the buyer of the New Equity or New Warrants may be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. The Debtors currently anticipate that Reorganized Neiman likely is, or that Reorganized Neiman is likely to be, a USRPHC, although no guarantees can be made in that regard.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5 percent or less of such stock (after taking into account certain attribution rules) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer. Whether and when the New Equity will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

The FIRPTA rules will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or

indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

### 6.  FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### E.  Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XV.     RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  July 30, 2020

Respectfully submitted,

Neiman Marcus Group LTD LLC,
on behalf of itself and each of the other Debtors

By:     */s/ Mark Weinsten*
Name:   Mark Weinsten
Title:  Chief Restructuring Officer
        Neiman Marcus Group LTD LLC

**Exhibit A**

**Plan of Reorganization**

**Exhibit B**

**Disclosure Statement Order**

**Exhibit C**

**Financial Projections**

**Exhibit D**

**Valuation Analysis**

**Exhibit E**

**Liquidation Analysis**

Case 20-32519   Document 1390   Filed in TXSB on 07/30/20   Page 109 of 226

## Exhibit F

### Organizational Structure Chart



**Exhibit G**

**Lien Priorities**

| | 2019 Term Loan Priority Real Estate Collateral | Original Term Loan Priority Collateral | ABL Priority Collateral | Notes Priority Real Estate Collateral and Notes PropCo Equity Interests | Term Loan PropCo Equity Interests | Limited Guarantee Collateral |
|---|---|---|---|---|---|---|
| **2019 Term Loans and 2013 Term Loans** | 1 | 1 | 2 | 3 | 1 | None |
| **2013 Term Loans** | None | 1 | 2 | None | None | None |
| **Asset-Based Revolving Credit Facility** | 4 | 4 | 1 | 4 | 4 | None |
| **Second Lien Notes** | 2 | 2 | 3 | 2[(i)] | 2 | 1 |
| **Third Lien Notes** | 3 | 3 | 4 | 1[(ii)] | 3 | None |
| **2028 Debentures** | 1[(iii)] | 1[(iii)] | None | 3[(iii)] | 1[(iii)] | None |

(i)      Recovery not to exceed $200.0 million, together with recovery for Second Lien Notes obligations.

(ii)      Recovery not to exceed $200.0 million, together with recovery for the Third Lien Notes obligations.

(iii)      Priority will be *pari passu* with the 2019 Term Loan liens (or if there are no 2019 Term Loan liens or 2013 Term Loan liens, the highest priority lien on the relevant asset) solely on assets if and to the extent required by the "equal and ratable clause" set forth in the indenture governing the 2028 Debentures and related documentation in effect as of the issue date thereof.

**Exhibit B**

**Redline**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NEIMAN MARCUS GROUP LTD LLC, *et al.*,[1] | ) | Case No. 20-32519 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT ~~FOR THE~~
## FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF ~~REORGANIZATION~~
## REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE[2]

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
Email:      mcavenaugh@jw.com

~~Proposed~~ Co-Counsel to the Debtors
*and Debtors in Possession*

Anup Sathy, P.C. (admitted *pro hac* vice)
Chad J. Husnick, P.C. (admitted *pro hac* vice)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       anup.sathy@kirkland.com
             chad.husnick@kirkland.com

-and-

Matthew C. Fagen (admitted *pro hac* vice)

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996). The Debtors' service address is: One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

[2] ~~Notwithstanding anything to the contrary in the Plan or Disclosure Statement or the fact of their filing, all rights of the Consenting Stakeholders regarding the Plan and Disclosure Statement and under the Restructuring Support Agreement are reserved, including all rights with respect to the 2L MyT Distribution, the 3L MyT Distribution and the treatment of other Claims and Interests under the Plan, and all such rights are preserved.~~

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    matthew.fagen@kirkland.com

Dated: ~~June 6~~ *July 30*, 2020

~~Proposed~~ *Co-Counsel to the Debtors*
*and Debtors in Possession*

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE ~~JOINT PLAN OF REORGANIZATION OF NEIMAN MARCUS GROUP LTD LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE~~DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE ~~IX~~ X HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN PARTIES IN INTEREST THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 99 PERCENT OF THE DEBTORS' FIRST LIEN TERM LOANS, 100 PERCENT OF THEIR SECOND LIEN NOTES, 70 PERCENT OF THEIR THIRD LIEN NOTES, AND 78 PERCENT OF THEIR DEBENTURES. [THE CREDITORS COMMITTEE SUPPORTS THE PLAN, SUBJECT TO CERTAIN CAVEATS AND/OR CONDITIONS THE COMMITTEE MAY ARTICULATE.][2]

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, HAS PROVIDED THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED

---

[2] [The Debtors are awaiting confirmation of the support of the Creditors Committee and statements regarding support and conditionality are anticipated to be made on the record of the Disclosure Statement Hearing. The Disclosure Statement will be modified accordingly prior to solicitation.]

HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO MAY BE ELIGIBLE TO SUBMIT BALLOTS BUT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT

ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "SECURITIES ACT") OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND TO THE EXTENT THAT SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT, THE EXEMPTION SET FORTH IN SECTION 701 PROMULGATED UNDER THE SECURITIES ACT OR ANOTHER EXEMPTION THEREUNDER. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................... 1

II.     PRELIMINARY STATEMENT ..................................................................................... 1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .......................................................................... 4

        A.      What is Chapter 11? ............................................................................................. 4
        B.      Why are the Debtors sending this Disclosure Statement? ................................... 4
        C.      Am I entitled to vote on the Plan? ....................................................................... 4
        D.      What will I receive from the Debtors if the Plan is consummated? ..................... 5
        E.      What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, DIP Facility Claim, Priority Tax Claim, or United States Trustee Statutory Fee Claim? ................................................................................................................... 910
        F.      Are any regulatory approvals required to consummate the Plan? ....................... 112
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ... 112
        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ................................................................................................. 112
        I.      What will I receive from the Debtors if I hold a General Unsecured Claim? ...... 112
        J.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ... 123
        K.      What impact does a potential Claims Bar Date have on my Claim? .................... 189
        L.      What is the deadline to vote on the Plan? ........................................................... 19
        M.      How do I vote for or against the Plan? ................................................................ 1920
        N.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ............................................................................................................. 1920
        O.      Do the Debtors recommend voting in favor of the Plan? .................................... 1920
        P.      What is the effect of the Plan on the Debtors' ongoing business? ...................... 219

IV.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT .......... 201

        A.      Additional Important Information. ...................................................................... 201

V.      OVERVIEW OF THE PLAN ......................................................................................... 223

        A.      The Restructuring Transactions. ......................................................................... 223
        B.      Sources of Consideration for Plan Distributions. ............................................... 234
        C.      Management Incentive Plan. ............................................................................... 245
        D.      Releases. .............................................................................................................. 245
        E.      Directors and Officers of the Reorganized Debtors. ........................................... 245

VI.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW .. 256

        A.      NMG's Corporate History. .................................................................................. 256
        B.      NMG's Business Operations. .............................................................................. 2534
        C.      Critical Components of the Debtors' Cost Structure. .......................................... 2736
        D.      The Designation and Distribution. ...................................................................... 29
        E.      The Recapitalization Transaction. ....................................................................... 30
        FD.     Prepetition Capital Structure. .............................................................................. 318

VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................................... 435

        A.      The Unprecedented Spread Of COVID And Store Closures Results In Neiman Marcus Preparing for A Chapter 11 Filing ...................................................................... 43
        A.      Macroeconomic Challenges and Prepetition Cost-Saving and Cash Conservation Initiatives. .. 35

B.      COVID-19.     36
CB.     Restructuring Support Agreement and DIP Financing, and Exit Facility.     3744

VIII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES     3945

    A.      Expected Timetable of the Chapter 11 Cases.     3945
    B.      Corporate Structure upon Emergence.     3945
    C.      First/Second Day Relief.     3945
    D.      Approval of the DIP Facility.     406
    E.      Other Procedural and Administrative Motions.     406
    F.      Retention of the Debtors' Professionals.     417
    G.      Schedules of Assets and Liabilities and Statements of Financial Affairs.     417
    H.      Establishment of a Claims Bar Date.     417
    I.       Appointment of the Disinterested Managers and Investigation Store Closing Process.     428
    J.      Appointment of the Official Creditors Committee.     428
    K.      The Debtors Appoint Disinterested Managers With Independent Advisors To Investigate Potential Estate Claims, And The Creditors Committee And The Disinterested Managers Proceed With Their Investigations     48
    L.      Disinterested Manager Settlement     49
    KM.    Other Litigation Matters.     4350
    AN.    Treatment of Executory Contracts and Unexpired Leases.     4351
    O.      The Surety Bond Program.     53

IX.    PROJECTED FINANCIAL INFORMATION     453

X.    RISK FACTORS     546

    A.      Bankruptcy Law Considerations.     546
    B.      Risks Related to Recoveries under the Plan.     4957
    C.      Risks Related to the Debtors' and the Reorganized Debtors' Business.     508

XI.    SOLICITATION AND VOTING PROCEDURES     5361

    A.      Holders of Claims and Interests Entitled to Vote on the Plan.     5361
    B.      Voting Record Date.     5362
    C.      Voting on the Plan.     5462
    D.      Ballots Not Counted.     5563
    E.      Certain Voting Matters     63

XII.    CONFIRMATION OF THE PLAN     5564

    A.      Confirmation Hearing.     5564
    B.      Requirements for Confirmation of the Plan.     5564
    C.      Best Interests of Creditors/Liquidation Analysis.     564
    D.      Feasibility.     656
    E.      Acceptance by Impaired Classes.     656
    F.      No Unfair Discrimination.     5766
    G.      Fair and Equitable Test.     5766
    H.      Valuation of the Debtors.     5866

XIII.    CERTAIN SECURITIES LAW MATTERS     5866

    A.      Plan Securities.     66
    B.      Issuance and Resale of Securities Under the Plan.     67

| | | | |
|---|---|---|---|
| XIV. | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **60~~9~~** |
| | A. | Introduction. | 60~~9~~ |
| | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Neiman. | 61~~70~~ |
| | C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 65~~73~~ |
| | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims. | ~~7~~81 |
| | E. | Information Reporting and Back-Up Withholding. | 86 |
| XV. | **RECOMMENDATION** | | **87~~8~~** |

# **EXHIBITS**[3]

**EXHIBIT A**    Plan of Reorganization

**EXHIBIT B**    Disclosure Statement Order

**EXHIBIT C**    Financial Projections

**EXHIBIT D**    Valuation Analysis

**EXHIBIT E**    Liquidation Analysis

**EXHIBIT F**    Organizational Structure Chart

**EXHIBIT G**    Lien Priorities

---

[3] The Debtors shall file **Exhibit C**, **Exhibit D**, and **Exhibit E** hereto in advance of the deadline to object to this Disclosure Statement.

# I.   INTRODUCTION

Neiman Marcus Group LTD LLC ("NMG LTD LLC") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "NMG"), submit this disclosure statement (as amended, modified, or supplemented, from time to time, the "Disclosure Statement") pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, or supplemented, from time to time, the "Plan").[43] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

> THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR
> COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND
> THAT YOU VOTE TO ACCEPT THE PLAN.

# II.   PRELIMINARY STATEMENT

For over 100 years, the Debtors have been the leader in retail luxury, innovation, and customer experiences.  Since opening in 1907 with just one store in Dallas, Texas, the Debtors have strategically grown to 67 stores across the United States, including their marquee luxury Neiman Marcus and Bergdorf Goodman locations, Horchow e-commerce website, and off-price Last Call stores.  Each Neiman Marcus and Bergdorf Goodman store offers a distinctive selection of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury and fashion designers.  Horchow offers luxury home furnishings and accessories, and Last Call provides a more affordable option for price-sensitive yet fashion-minded customers.  To complement its store footprint, NMG operates the largest luxury e-commerce platform in the world.  More than 30 percent of NMG's total annual revenue is from online sales.  The Debtors' non-Debtor affiliates own and operate a single store under the THERESA brand and an e-commerce platform under the MyTheresa brand.  As of the Petition Date, the Debtors have funded-debt obligations of approximately $5.5 billion.

In 2019, NMG de-stressed its capital structure in a comprehensive and highly consensual series of amend-and-extend transactions (the "Recapitalization Transactions") with holders of over 91 percent of former the Unsecured Notes (as defined below) and holders of over 99 percent of existing 2013 Term Loans (as defined below).  This transaction afforded NMG meaningful runway and flexibility to meet its earnings targets and implement new cost-savings and business initiatives to address adverse macro trends in the retail industry, such as a general transition from brick-and-mortar to online retail channels, and a shift in consumer demographics.  Prior to February 2020, NMG was on track to meet all of its budget, earnings, and savings targets for the fiscal year ending in July 2020.  NMG also posted comparable store sales growth for seven of the ten previous quarters and significantly expanded gross margins during the last holiday season in line with its goal of profitable and sustainable growth.

---

[43]  Capitalized terms used but not immediately defined in this Disclosure Statement shall have the meanings assigned to them elsewhere in this Disclosure Statement, in the *Declaration of Mark Weinsten, Chief Restructuring Officer of Neiman Marcus Group LTD LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 86] (the "First Day Declaration"), the Plan, or the *Debtors' Motion For Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving The Solicitation and Notice Procedures With Respect to Confirmation of The Debtors' Proposed Joint Plan of Reorganization, (III) Approving The Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, And and (VI) Granting Related Relief* [Docket No. 773], as applicable.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Then, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. In response to COVID-19, national, state, and local governments in the United States and throughout the world imposed quarantines, social distancing protocols, and shelter-in-place orders. To protect the health and safety of NMG's customers and employees, on March 18, 2020, NMG voluntarily closed all of its stores and dramatically reduced supply chain operations.[4] These unprecedented events have severely impacted NMG's business and liquidity.

To navigate these market conditions, NMG knew it needed to proactively address its liquidity position and capital structure. NMG engaged Kirkland & Ellis LLP ("Kirkland") as restructuring counsel and Lazard Frères & Co. LLC ("Lazard") as investment banker to work with NMG and BRG to analyze financing needs and consider NMG's capital structure alternatives. NMG encouraged its term loan lenders and noteholders to organize and retain advisors. An ad hoc group of lenders who collectively hold approximately 78 percent of NMG's term loan debt and 78 percent of the Company's debentures (the "Term Loan Lender Group") quickly organized and retained Wachtell, Lipton, Rosen & Katz ("Wachtell") as counsel and Ducera Partners LLC ("Ducera") as investment banker to represent the Term Loan Lender Group in negotiations with NMG. Shortly thereafter, an ad hoc group of holders of approximately 99 percent of NMG's Second Lien Notes (as defined below) and approximately 70 percent of NMG's Third Lien Notes (as defined below) (collectively, the "Noteholder Group") also organized and retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as counsel and Houlihan Lokey, Inc. ("Houlihan") to represent the Noteholder Group in negotiations with NMG.

Following several weeks of extensive, arm's length negotiations, NMG and the Term Loan Lender Group were extremely close to reaching agreement on a comprehensive, pre-negotiated restructuring that would substantially deleverage the Debtors' balance sheet, a fully-backstopped $625 million postpetition financing facility, and a fully-backstopped $750 million exit facility (the "Exit Facility").

To further the Debtors' evaluation of their capital structure alternatives and negotiations with their stakeholders, on April 28, 2020, Mariposa Intermediate Holdings LLC ("Holdings"), the Debtor parent of NMG LTD LLC, appointed disinterested manager Anthony Horton to its Board of Managers, and NMG LTD LLC appointed disinterested managers Marc Beilinson and Scott Vogel to its Board of Managers. Holdings has retained Katten Muchin Rosenman LLP as legal counsel and Alix Partners LLP as financial advisor to advise Mr. Horton with respect to certain matters delegated to Mr. Horton, as described in more detail herein. At a status conference held before the Court on June 19, 2020, the Debtors reported that Mr. Beilinson had tendered his resignation as a disinterested manager of Neiman Marcus Group LTD LLC due to unforeseen health concerns. NMG LTD LLC has retained Willkie Farr & Gallagher LLP as legal counsel and Perella Weinberg Partners Alvarez & Marsal North America, LLC as financial advisors to advise Mr. Beilinson and Mr. Vogel with respect to certain matters delegated to Mr. Beilinson and Mr. Vogel, as described in more detail herein. Around this time, NMG received a modified restructuring proposal from the Noteholder Group, including upsizing the postpetition financing facility to $675 million (the "DIP Facility"). NMG believed that further stakeholder support for its restructuring plans would provide significant additional value to its stakeholders and actively pursued a tri-party negotiation with the Term Loan Lender Group and Noteholder Group to achieve more consensus.

NMG's efforts to garner additional support for its restructuring process have borne fruit. NMG's proposed restructuring pursuant to its restructuring support agreement (the "Restructuring Support Agreement") and proposed Plan will substantially deleverage NMG's balance sheet and allow the

---

[4]  Nearly all stores have since opened.

Debtors to emerge from these cases as a stronger, better-capitalized enterprise positioned for sustained success. Pursuant to the Restructuring Support Agreement, the Plan has a remarkable level of support throughout the Debtors' capital structure: with the submission of joinders to the Restructuring Support Agreement following the Petition Date, holders of approximately 99 percent of the Debtors' ~~first lien~~ ~~t~~Term ~~l~~Loans, 100 percent of their ~~s~~Second ~~l~~Lien ~~n~~Notes, 70 percent of their ~~t~~Third ~~l~~Lien ~~n~~Notes, and 78 percent of their 2028 ~~d~~Debentures (as defined below), and 100 percent of the direct equity ownership in the Debtors have committed to support the Debtors' restructuring.

3

The material terms of the Plan ~~and Restructuring Support Agreement~~ are as follows:

- each holder of ~~Extended~~2019 Term Loans, 2028 Debentures, Second Lien Notes, and Third Lien Notes was eligible to participate in the DIP Facility pursuant to syndication procedures implemented following entry of the Interim DIP Order;

- holders of claims on account of the Asset-Based Revolving Credit Facility and FILO Facility will receive value, as of the effective date of the Plan, equal to the allowed amount of such claims, as applicable, in each case not to exceed the value of such holders' interests in the Debtors' interest in the property securing such claims;

- holders of 2019 Term Loan Claims shall receive their pro rata share of and interest in (a) 87.5 percent of the reorganized equity (subject to dilution) and (b) 87.5 percent of the rights to participate in the Exit Facility (the "Exit Rights"), subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;

- if the class of 2013 Term Loan Claims votes in favor of the Plan, holders of 2013 Term Loans shall receive their pro rata share of and interest in (a) 0.2 percent of the reorganized equity (subject to dilution) and (b) 0.2 percent of the Exit Rights, or, if the class of 2013 Term Loan Claims does not vote in favor of the Plan, holders of 2013 Term Loan Claims will receive value, as of the Effective Date of the Plan, equal to the allowed amount of such claims not to exceed the value of each holder's interest in the estate's interest in the property securing such claims;

- holders of 2028 Debentures Claims will receive their pro rata share of and interest in (a) 2.8 percent of the reorganized equity (subject to dilution) and (b) 2.8 percent of the Exit Rights, subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;

- holders of Second Lien Notes Claims shall receive their pro rata share of and interest in (a) 1.0 percent of the reorganized equity (subject to dilution), (b) 1.0 percent of the Exit Rights, and (c) seven-year warrants (no Black-Scholes protection) to purchase up to 25.0 percent of the reorganized equity at an agreed-upon strike price;

- holders of Third Lien Notes Claims shall receive their pro rata share of and interest in (a) 8.5 percent of reorganized equity (subject to dilution) and (b) 8.5 percent of the Exit Rights;

- ~~holders of general unsecured claims shall receive their pro rata share of a cash pool to be determined; and~~

- holders of Funded-Debt General Unsecured Claims shall receive their pro rata share (together with Holders of Allowed Non-Funded Debt General Unsecured Claims) of (A) 140,000,000 shares of MYT Series B Preferred Stock and (B) $10,000,000 of Cash;

- holders of Non-Funded Debt General Unsecured Claims shall receive their pro rata share (together with Holders of Allowed Funded-Debt General Unsecured Claims) of (A) 140,000,000 shares of MYT Series B Preferred Stock and (B) $10,000,000 of Cash; and

- stakeholders' economic and governance rights with respect to MyTheresa shall be consistent with such stakeholders' prepetition rights, claims, and controls.

The Restructuring Transactions embodied by the Plan and Restructuring Support Agreement are a significant achievement for the Debtors in the wake of a historically challenging operating environment. The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to maximize stakeholder recoveries and ensure that NMG can efficiently emerge from chapter 11 and continue to fulfill its promise as leaders in luxury, innovation, and customer experiences. For these reasons, the Debtors strongly recommend that Holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending this Disclosure Statement?

The Debtors are seeking to obtain Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim / Equity Interests | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to |

| | | | Accept) |
|---|---|---|---|
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | ABL Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | FILO Secured Claims | Impaired | Entitled to Vote |
| 5 | 2019 Term Loans ~~Secured~~ Claims | Impaired | Entitled to Vote |
| 6 | 2013 Term Loans ~~Secured~~ Claims | Impaired | Entitled to Vote |
| 7 | 2028 Debentures ~~Secured~~ Claims | Impaired | Entitled to Vote |
| 8 | Second Lien Notes ~~Secured~~ Claims | Impaired | Entitled to Vote |
| 9 | Third Lien Notes ~~Secured~~ Claims | Impaired | Entitled to Vote |
| 10 | Funded Debt General Unsecured Claims | Impaired | Entitled to Vote |
| 11 | Non-Funded Debt General Unsecured Claims | Impaired | Entitled to Vote |
| 1~~1~~2 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 1~~2~~3 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 1~~3~~4 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.**

**PLEASE REFERENCE THE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.[5]**

---

[5] The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions and the valuation of the consideration that may be provided to Holders of Claims and Interest, which is some instances are not currently knowable. "Allowed" shall mean, as to a claim or an interest (each as defined in the Bankruptcy Code), a claim or an interest allowed under the Plan, under the Bankruptcy Code, or by a final order, as applicable.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the option of the Debtors, in consultation with the Required Consenting Term Loan Lenders and the Required Consenting Noteholders, either: (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) delivery of the collateral securing such Holder's Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Holder's Allowed Other Secured Claim; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100.0% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, at the option of the Debtors, either: (i) payment in full in Cash; (ii) Reinstatement of such Holder's Allowed Other Priority Claim; or (iii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100.0% |
| 3 | ABL Loan Secured Claims | Each Holder of an Allowed ABL Loan Secured Claim shall receive, in full and final satisfaction of such Claim, ~~value as of the Effective Date equal to the Allowed amount of such ABL Loan Claim, *provided* that such value shall not exceed the value of such Holder's interest in the estate's interest in the property securing such Claim~~(i) payment in full in Cash, (ii) consensual refinancing or other consensual modification of the ABL Loans giving rise to such ABL Loan Secured Claims, or (iii) other treatment consistent with the Bankruptcy Code and the Disclosure Statement Order. | [●]$749,000,000 | [●]100.0% |
| 4 | FILO Secured Claims | Each Holder of an Allowed FILO Secured Claim shall receive, in full and final satisfaction of such Claim, ~~value as of the Effective Date equal to the~~ | [●]$100,000,000 | [●]100.0% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| | | ~~Allowed amount of such FILO Claim, *provided that such value shall not exceed the value of such Holder's interest in the estate's interest in the property securing such Claim after giving effect to the distributions in respect of Class 3~~(i) payment in full in Cash, (ii) consensual refinancing or other consensual modification of the FILO Facility giving rise to such FILO Secured Claims, or (iii) other treatment consistent with the Bankruptcy Code and the Disclosure Statement Order. | | |
| 5 | 2019 Term Loans ~~Secured~~ Claims | On the Effective Date, each Holder of an Allowed 2019 Term Loans ~~Secured~~ Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 87.5% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants, and subject to upward adjustment if Class 6 does not vote in favor of the Plan; and (ii) 87.5% of the Exit Rights, subject to upward adjustment if Class 6 does not vote in favor of the Plan. | $2,254,9~~51,484~~2,973 | [●]32.99% |
| 6 | 2013 Term Loans ~~Secured~~ Claims | On the Effective Date: (i) if Class 6 votes in favor of the Plan, each Holder of an Allowed 2013 Term Loans ~~Secured~~ Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in (a) 0.2% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants, and (b) 0.2% of the Exit Rights; or (ii) if Class 6 votes to reject the Plan, each Holder of an Allowed 2013 Term Loans ~~Secured~~ Claim shall receive, in full and final satisfaction of such Claim, value as of the Effective Date equal to the Allowed amount of such Claim, *provided* that such value shall not exceed the value of each Holder's interest in the estate's interest in the property securing such Claim. | $12,641,8~~4~~22 | [●]12.75% |
| 7 | 2028 | | | |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| | Debentures ~~Secured~~ Claims | On the Effective Date, each Holder of an Allowed 2028 Debentures ~~Secured~~ Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 2.8% of the New Equity, subject to dilution by the Management Incentive Plan, Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of New Warrants and subject to upward adjustment if Class 6 does not vote in favor of the Plan; and (ii) 2.8% of the Exit Rights, subject to upward adjustment if Class 6 does not vote in favor of the Plan. | $128,859,375 | [●]18.76% |
| 8 | Second Lien Notes ~~Secured~~ Claims | On the Effective Date, each Holder of an Allowed Second Lien Notes ~~Secured~~ Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 1.0% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants; (ii) 1.0% of the Exit Rights; ~~and~~ (iii) the New Warrants; and (iv) the 2L MyT Distribution. | $606,~~664,51~~,805,994 | [●]1.40% |
| 9 | Third Lien Notes ~~Secured~~ Claims | On the Effective Date, each Holder of an Allowed Third Lien Notes ~~Secured~~ Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in: (i) 8.5% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants; ~~and~~ (ii) 8.5% of the Exit Rights; and (iii) the 3L MyT Distribution. | $1,287,~~075~~,583~~0~~,214 | [●]5.62% |
| 10 | Funded-Debt General Unsecured Claims | Each Holder of an Allowed Funded Debt General Unsecured Claim shall receive, in full and final satisfaction of such Claim, on or as reasonably practicable after the Effective Date, its Pro Rata | $13~~297,33~~800,000[6] | [●]1.7%[7]- |

[6] The projected amount of all Funded-Debt General Unsecured Claims and Non-Funded Debt General Unsecured Claims excludes approximately $3.20 billion to $3.67 billion of Deficiency Claims on account of 2019 Term Loan Deficiency Claims, 2028 Debentures Deficiency Claims, Second Lien Notes Deficiency Claims, and Third Lien Notes Deficiency Claims, which are effectively proposed to be waived as part of the Disinterested Manager Settlement.

[7] Low-end projection assumes the MyT Series B Preferred Stock is worth $0 in the aggregate.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | **Classified Claims Against and Interests in the Debtors** | | |
| | | share ~~of the~~(determined based on all Allowed General Unsecured ~~Recovery Cash Pool~~Claims, together with Holders of Allowed Non-Funded Debt General Unsecured Claims) of (A) the Sponsor Contribution and (B) $10,000,000 of Cash to be funded by the Debtors or Reorganized Debtors. | | 34.4%[8] |
| 11 | Non-Funded Debt General Unsecured Claim | Each Holder of an Allowed Non-Funded Debt General Unsecured Claim shall receive, in full and final satisfaction of such Claim, on or as reasonably practicable after the Effective Date, its Pro Rata share (determined based on all Allowed General Unsecured Claims, together with Holders of Allowed Funded-Debt General Unsecured Claims) of (A) the Sponsor Contribution and (B) $10,000,000 of Cash to be funded by the Debtors or Reorganized Debtors. | $339,700,000-$434,700,000[9] | 1.7%[10]-34.4%[11]; |
| 1~~1~~2 | Intercompany Claims | Intercompany Claims shall be, at the option of the Reorganized Debtors, in consultation with the | N/A | ~~[●]~~0% / 100% |

---

[8]  High-end projection assumes the MYT Series B Preferred Stock is worth $275 million in the aggregate.

[9]  The projected amount of all Funded-Debt General Unsecured Claims and Non-Funded Debt General Unsecured Claims excludes approximately $3.20 billion to $3.67 billion of Deficiency Claims on account of 2019 Term Loan Deficiency Claims, 2028 Debentures Deficiency Claims, Second Lien Notes Deficiency Claims, and Third Lien Notes Deficiency Claims, which are effectively proposed to be waived as part of the Disinterested Manager Settlement.

[10]  Low-end projection assumes the MYT Series B Preferred Stock is worth $0 in the aggregate.

[11]  High-end projection assumes the MYT Series B Preferred Stock is worth $275 million in the aggregate.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Classified Claims Against and Interests in the Debtors | | |
| | | Consenting Term Loan Lender Group and the Consenting Noteholder Group, either: (i) Reinstated; or (ii) cancelled, released, and extinguished without any distribution on account of such Claims. | | |
| 123 | Intercompany Interests | Intercompany Interests shall be, at the option of Reorganized Debtors, in consultation with the Consenting Term Loan Lender Group and the Consenting Noteholder Group, either: (i) Reinstated; or (ii) cancelled, released, and extinguished without any distribution on account of such Interests. | N/A | [●]0% / 100% |
| 134 | Existing Equity Interests | On the Effective Date, Existing Equity Interests will be cancelled, released, and extinguished without any distribution on account of such Existing Equity Interests. | N/A | [●]0% |

In the event the Debtors contemplate potentially providing any treatment to Holders of ABL Loan Secured Claims and/or FILO Secured Claims, other than payment in full in Cash or consensually refinancing the respective loans, the Debtors shall file detailed term sheets (the "ABL Treatment Term Sheet" and "FILO Treatment Term Sheet", respectively) with respect to any such other treatment by July 31, 2020, which shall include the principal economic terms of any instrument proposed to be provided (including the tenor, rate, and amortization schedule), any material borrowing base or collateral mechanics, any material covenants or baskets, and any other material deviations from the existing ABL Credit Agreement.  To the extent the Debtors contemplate potentially providing any treatment to Holders of ABL Loan Secured Claims and/or FILO Secured Claims, other than payment in full in Cash or consensually refinancing such loans by the filing of the initial Plan Supplement, the initial Plan Supplement shall include the credit agreements or other instruments relating to such treatment (the "ABL Treatment Instrument" and "FILO Treatment Instrument", respectively), which shall not deviate materially from the ABL Treatment Term Sheet and/or FILO Treatment Term Sheet, as applicable.

E.      **What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, DIP Facility Claim, Priority Tax Claim, or United States Trustee Statutory Fee Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1. **Administrative Claims.**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are DIP Facility Claims, Professional Fee Claims, or Cure Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

2. **Professional Fee Claims.**

i. Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

ii. Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall, without duplication of any account or amount established for the benefit of Professionals pursuant to a DIP Order, establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all

such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

iii.        Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

iv.        Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. DIP Facility Claims.

The DIP Facility Claims shall be deemed to be Allowed for all purposes as fully Secured Claims in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the DIP Credit Agreement Documents. Such DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenge under any applicable law or regulation by any Entity.

Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Facility Claim, on the Effective Date, each Holder thereof shall receive payment in full in Cash, other than the Aggregate DIP Equity Fees, which shall be payable in full in New Equity.

### 4. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5. **United States Trustee Statutory Fees.**

The Debtors and the Reorganized Debtors, as applicable, shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or Reorganized Debtors' business (or such amount agreed to with the United States Trustee or ordered by the Bankruptcy Court), for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

F. **Are any regulatory approvals required to consummate the Plan?**

No. There are no known regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

G. **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative to the Plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis,"* which begins on page 55 74 of this Disclosure Statement, and the Liquidation Analysis attached as **Exhibit E**.

H. **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective/is consummated—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. See "*Confirmation of the Plan,*" which begins on page 55 73 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

I. **What will I receive from the Debtors if I hold a General Unsecured Claim?**

140,000,000 shares of MYT Series B Preferred Stock and $10,000,000 of Cash will be available for distribution to Holders of Allowed General Unsecured Claims in accordance with the treatment set forth in the Plan for Classes 10 and 11.

Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, on or as reasonably practicable after the Effective Date, its Pro Rata share of the General Unsecured Recovery Cash Pool.

**J.    Will there be releases and exculpation granted to parties in interest as part of the Plan?[6]**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan (as reflected below) are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan. Nevertheless, the proposed releases are subject to the investigations of the Disinterested Managers (as defined below), and the Debtors reserve the right to modify the release provisions to the extent necessary to comport with the findings of the investigations.

As defined in the Plan, "Released Party" means each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Sponsors; (e) the Term Loan Lenders; (f) the 2028 Debentures Holders; (g) the Second Lien Noteholders; (h) the Third Lien Noteholders; (i) the Consenting Noteholder Group; (j) the Consenting Term Loan Lender Group; (k) the DIP Lenders; (l) each Agent and Trustee; (m) all Holders of Interests; (n) each current and former Affiliate of each Entity in clause (a) through the following clause (o); and (o) with respect to each of the foregoing Entities in clauses (a) through this clause (o), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, advisory board members, consultants, financial advisors, partners, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, and other professional advisors; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

As defined in the Plan, "Releasing Party" means each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Sponsors; (e) the Term Loan Lenders; (f) the 2028 Debentures Holders; (g) the Second Lien Noteholders; (h) the Third Lien Noteholders; (i) the Consenting Noteholder Group; (j) the Consenting Term Loan Lender Group; (k) the DIP Lenders; (l) each Agent and Trustee; (m) all Holders of Claims and Interests; (n) each current and former Affiliate of each Entity in clause (a) through the following clause (o); and (o) with respect to each of the foregoing Entities in clauses (a) through this clause (o), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, advisory board members, consultants, financial advisors, partners, attorneys (including any other attorneys or professionals retained by any current or former director or manger in his or her capacity as director or manager of an Entity), accountants, investment bankers, and other professional advisors; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

As defined in the Plan, "Exculpated Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (c) with respect to each of the foregoing entities, each such Entity's current and

---

[6]   ~~The Disinterested Managers (as defined below), with the assistance of its counsel and advisors, are currently undertaking an investigation into Conflict Matters, Claims, and Causes of Action. The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, to comport with the findings of the investigation.~~

former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors.

The Debtors believe that all of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes that abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan or timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. As set forth in Article VIII of the Plan, the releases (as well as the definitions of Released Parties and Releasing Parties) are subject to approval by the Court at the Confirmation Hearing.

1.      **Discharge of Claims and Termination of Interests.**

PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY DEBTOR INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED DEBTORS), INTERESTS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTORS BEFORE THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), OR 502(I) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER

OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN. ANY DEFAULT OR "EVENT OF DEFAULT" BY THE DEBTORS OR AFFILIATES WITH RESPECT TO ANY CLAIM OR INTEREST THAT EXISTED IMMEDIATELY BEFORE OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED (AND NO LONGER CONTINUING) AS OF THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS SUBJECT TO THE EFFECTIVE DATE OCCURRING.

2. **Release of Liens.**

EXCEPT AS OTHERWISE PROVIDED IN THE EXIT FACILITY DOCUMENTS, THE PLAN, THE CONFIRMATION ORDER, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, EXCEPT FOR OTHER SECURED CLAIMS THAT THE DEBTORS ELECT TO REINSTATE IN ACCORDANCE WITH ARTICLE III.B.1 OF THE PLAN, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED DEBTORS AND THEIR SUCCESSORS AND ASSIGNS. ANY HOLDER OF SUCH SECURED CLAIM (AND THE APPLICABLE AGENTS FOR SUCH HOLDER) SHALL BE AUTHORIZED AND DIRECTED, AT THE SOLE COST AND EXPENSE OF THE REORGANIZED DEBTORS, TO RELEASE ANY COLLATERAL OR OTHER PROPERTY OF ANY DEBTOR (INCLUDING ANY CASH COLLATERAL AND POSSESSORY COLLATERAL) HELD BY SUCH HOLDER (AND THE APPLICABLE AGENTS FOR SUCH HOLDER), AND TO TAKE SUCH ACTIONS AS MAY BE REASONABLY REQUESTED BY THE REORGANIZED DEBTORS TO EVIDENCE THE RELEASE OF SUCH LIEN, INCLUDING THE EXECUTION, DELIVERY, AND FILING OR RECORDING OF SUCH RELEASES. THE PRESENTATION OR FILING OF THE CONFIRMATION ORDER TO OR WITH ANY FEDERAL, STATE, PROVINCIAL, OR LOCAL AGENCY OR DEPARTMENT SHALL CONSTITUTE GOOD AND SUFFICIENT EVIDENCE OF, BUT SHALL NOT BE REQUIRED TO EFFECT, THE TERMINATION OF SUCH LIENS.

3. **Releases by the Debtors.**[7]

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST, OR THAT ANY HOLDER OF ANY CLAIM OR INTEREST COULD HAVE ASSERTED ON BEHALF OF THE

---

[7] For the avoidance of doubt, the Debtor releases are subject to the outcome of the Disinterested Managers' Independent Investigations (as defined below).

DEBTORS, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART:

A. THE DEBTORS, THE DEBTORS' RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT;

B. ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, OR THE PLAN;

C. THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR

D. ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND DO NOT RELEASE ANY AGREEMENTS UNDER THE TRANSACTION SUPPORT AGREEMENT OR ANY DOCUMENTS OR AGREEMENTS EXECUTED IN CONNECTION THEREWITH RELATED TO ANY PARTY'S RIGHTS, CLAIMS, AND CONTROLS WITH RESPECT TO MYTHERESA (INCLUDING BUT NOT LIMITED TO THE WATERFALL AND TURNOVER PROVISIONS SET FORTH IN THE EXISTING MYT TRANSACTION DOCUMENTS AND THE TRANSACTION SUPPORT AGREEMENT, AND THE EQUIVALENT TURNOVER AND WATERFALL PROVISIONS IN ANY OTHER PREPETITION DOCUMENTS AND AGREEMENTS, EXCEPT TO THE EXTENT EXPRESSLY WAIVED IN THE PLAN).

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS,

THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.[8]

4.      **Releases by Holders of Claims and Interests.**

AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART:

A.  THE DEBTORS, THE DEBTORS' RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT;

B.  ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, OR THE PLAN;

C.  THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR

D.  ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN AND DO NOT RELEASE ANY AGREEMENTS UNDER THE TRANSACTION SUPPORT AGREEMENT OR ANY DOCUMENTS OR AGREEMENTS EXECUTED IN CONNECTION THEREWITH RELATED TO ANY PARTY'S RIGHTS, CLAIMS, AND CONTROLS WITH RESPECT TO MYTHERESA (INCLUDING BUT NOT LIMITED TO THE WATERFALL AND TURNOVER PROVISIONS SET FORTH IN THE EXISTING MYT TRANSACTION DOCUMENTS AND THE TRANSACTION SUPPORT AGREEMENT, AND THE EQUIVALENT TURNOVER AND WATERFALL PROVISIONS IN ANY OTHER PREPETITION DOCUMENTS AND AGREEMENTS, EXCEPT TO THE EXTENT EXPRESSLY WAIVED IN THE PLAN).

---

[8]  The Debtor releases in the Plan are subject to the investigation of the disinterested manager of Mariposa Intermediate, the Debtor parent of NMG LTD, and the disinterested managers of NMG LTD, and subject to revision pending the outcome of these investigations.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

5.      **Exculpation.**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES AND OTHER PARTIES SET FORTH ABOVE HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE

PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

### 6. Injunction.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN, SHALL BE DISCHARGED PURSUANT TO THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OF THE RELEASED PARTIES: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

### K. What impact does a potential Claims Bar Date have on my Claim?

On June 2~~5~~, 2020, the ~~Debtors filed the *Debtors' Motion for Entry of an*~~ Bankruptcy Court entered the *Order (I) Settling Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. ~~739~~1014] (the "Bar Date ~~Motion~~Order"), ~~proposing~~setting bar dates by which the following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date (including, without limitation, Class 10: General Unsecured Claims), must file proofs of claim (the "Bar Date"): (a) any entity whose claim against a Debtor is not listed in the applicable Debtor's Schedules or is listed as contingent, unliquidated, or disputed if such entity desires to participate in any of these Chapter 11 Cases or share in any distribution in any of these Chapter 11 Cases; (b) any entity that believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and that desires to have

its claim allowed in a different classification or amount other than that identified in the Schedules; (c) any entity that believes that its prepetition claims as listed in the Schedules is not an obligation of the specific Debtor against which the claim is listed and that desires to have its claim allowed against a Debtor other than that identified in the Schedules; and (d) any entity that believes that its claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code.

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the applicable Bar Date: (a) such person or entity may be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (b) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (c) such person or entity may not receive any distribution in the Chapter 11 Cases on account of that Claim; and (d) such person or entity may not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim. **Except in the cases of governmental units and certain other exceptions expressly set forth in the Bar Date ~~Motion, the Debtors have proposed that~~Order, all proofs of claims of any person or entity that is required to file a proof of claim must ~~be~~have been filed so that they ~~are~~were actually received on or before July 20, 2020, at 5:00 p.m. (prevailing Central Time). ~~The Debtors have proposed that all~~All governmental units holding claims that arose prior to the Petition Date must file proofs of claims so they are actually received on or before November 3, 2020, at 5:00 p.m. (prevailing Central Time).**

### L. What is the deadline to vote on the Plan?

The Voting Deadline is [●]August 31, 2020, at 4:00 p.m. (prevailing Central Time). The Voting Deadline for any counterparty to an Unexpired Lease which is identified as rejected on a Schedules of Assumed and Rejected Contracts filed later than one Business Day prior to the Voting Deadline shall be extended to the date of the Confirmation Hearing.

### M. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims and Interests that are entitled to vote on the Plan. For your vote to be counted, your Ballot must be completed and signed so that it is *actually received* by [●]August 31, 2020 at 4:00 p.m. (prevailing Central Time) at the following address:

> Neiman Marcus Group LTD LLC Ballot Processing
> c/o Stretto
> 410 Exchange, Suite 100
> Irvine, California 92602

For more detail on voting and solicitation procedures, *see* Article ~~X~~XI of this Disclosure Statement.

N.       **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the notice and claims agent, Stretto (the "Notice and Claims Agent"):

| By regular, hand delivery, or overnight mail at: | By electronic mail at: | By telephone at: |
|---|---|---|
| Neiman Marcus Group LTD LLC c/o Stretto 410 Exchange, Suite 100 Irvine, California 92602 | NMGInquiries@stretto.com | 877-670-2127 (Toll-Free) 949-504-4475 (International) |

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at http://cases.stretto.com/NMG (free of charge) or the Court's website at https://ecf.txsb.uscourts.gov/ (for a fee).

O.       **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan is in the best interest of all Holders of Claims and Interests and that other alternatives fail to realize or recognize the value inherent under the Plan.

P.       **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are seeking to reorganize under chapter 11 of the Bankruptcy Code.  Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is a Business Day on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A of the Plan have been satisfied or waived (in accordance with Article IX.B of the Plan); and (c) the Plan is declared effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate or wind-down their businesses, as applicable, and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

IV.       **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

A.       **Additional Important Information.**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "Risk Factors" and the Plan before submitting your ballot to vote on the Plan.

> ***The Court's approval of this Disclosure Statement does not constitute a guarantee by the Court of the accuracy or completeness of the information contained herein or an endorsement by the Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance upon the exemption set forth in (a) section 1145 of the Bankruptcy Code or (b) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws, if any. All securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about:

- the Debtors':
  - business strategy, plans, objectives, and expectations;
  - estimated future net reserves and present value thereof;
  - technology, supply chain and other operations;

24

- brand partner and vendor relationships;

- arrangements with brand partners, suppliers or other institutions as they relate to: (i) the manner in which goods are made available, (ii) the levels of merchandise made available and (iii) the pricing and payment terms with respect to such purchases;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- amount, nature, and timing of capital expenditures;

- access to capital and terms of such capital;

- liquidity and cost savings as a result of the closing the Debtors' stores;

- capital resources and liquidity, including access to additional borrowing capacity under the DIP Facility and the Exit Facility, and ability to satisfy future cash obligations; and

- integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness.

- costs of developing the Debtors' properties and conducting other operations;

- general economic and business conditions;

- the outcome of pending and future litigation;

- the competitive nature of the luxury retail industry;

- uncertainty regarding the Debtors' future operating results;

- variations in the market demand for, and prices of, the Debtors' key product lines;

- the impact of regional or global pandemics or other public health issues; and

- the potential adoption of new governmental regulations that affect the Debtors' business.

Statements concerning the foregoing and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Plan; the Debtors' ability to reduce its overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' business during the Chapter 11 Cases; customer and vendor responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business and market conditions and the impact of the recent COVID-19 outbreak; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to

competition or price pressure by customers; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## V.   OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce long-term debt and annual interest payments and preserve the Debtors' existing liquidity, resulting in a stronger, delivered balance sheet.  Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion.  The key terms of the Plan are as follows:

### A.   The Restructuring Transactions.

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transactions and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions (as agreed and in accordance with the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder), including to establish Reorganized Neiman and, if applicable, to transfer assets of the Debtors to Reorganized Neiman or a subsidiary thereof.  The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, to the extent agreed in accordance with the consent rights in the Restructuring Support Agreement and provided herein, in the Description of Transaction Steps, or in the Definitive Documentation, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

On the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  To the extent provided in the Description of Transaction Steps, each Debtor, other than Reorganized Neiman, may be deemed dissolved in accordance with applicable law, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Reorganized Neiman shall be the issuer of New Equity to the applicable Holders of Claims and Interests as set forth herein.

The actions to implement the Restructuring Transactions may include, in each case if and as agreed in accordance with the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (4) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Neiman, which purchase, if applicable, may be structured as a taxable transaction for United States federal income tax purposes; and (5) all other actions that the applicable parties

determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

**B.       Sources of Consideration for Plan Distributions.**

**1.       Exit Facility.**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, the terms of which will be set forth in the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**2.       New Equity.**

On the Effective Date, upon cancellation of the Existing Equity Interests, Reorganized Neiman shall issue the New Equity directly or indirectly to Holders of Claims to the extent provided in the Plan. The issuance of the New Equity, including New Equity reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable.

All of the New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**3.       New Warrants**

On the Effective Date, Reorganized Neiman shall issue the New Warrants ~~directly or indirectly~~ in accordance with the New Warrant Agreement and distribute them to the Holders of Claims in Class 8, in

accordance with ~~the New Warrant Agreement~~Article VI.D.2 of the Plan.  All of the New Warrants issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and <u>non</u> ~~non~~-assessable.

**4.    General Unsecured <u>Creditor</u> Recovery ~~Cash Pool~~**

~~On the Effective Date, each Holder of an~~140,000,000 shares of MYT Series B Preferred Stock and $10,000,000 of Cash will be available for distribution to Holders of Allowed General Unsecured Claims ~~will receive such Holder's Pro Rata share of the General Unsecured Recovery Cash Pool~~in accordance with the treatment set forth in the Plan for Classes 10 and 11.

### C.    Management Incentive Plan.

The New Board shall be authorized to implement the Management Incentive Plan on or after the Effective Date, the form of which shall be included in the Plan Supplement~~s and which shall contain the following terms:  [●]~~[9].

### D.    Releases.[10]

The Plan contains certain releases (as described more fully in Article ~~II.J~~III.J of this Disclosure Statement), including mutual releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders.  Additionally, all Holders of Claims or Interests that do not to opt out of the releases contained in the Plan; or timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to its inclusion as a Releasing Party under the releases contained in the Plan that is not resolved before Confirmation will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties to the extent set forth in the Plan.

### E.    Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the members for the initial term of the New Board shall be appointed.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing, pursuant to the terms of the Restructuring Support Agreement.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

The New Board shall consist of seven directors, or such other number as approved pursuant to the Governance Term Sheet and shall initially be comprised of (i) the then-serving Chief Executive Officer of the Reorganized Debtors; (ii) three directors designated by Pacific Investment Management Company LLC ("PIMCO"); (iii) one director designated by Davidson Kempner Capital Management LP; (iv) one director designated by Sixth Street Partners, LLC; and (v) one independent director designated by holders of New Equity (other than PIMCO) representing at least 50% of the New Equity to be outstanding as of the Effective Date (other than New Equity to be issued to PIMCO).

---

[9]    ~~To come.~~

[10]    ~~The Disinterested Managers (as defined below), with the assistance of its counsel and advisors, are currently undertaking an investigation into Conflict Matters, Claims and Causes of Action.  The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, to comport with the findings of the investigation.~~

VI.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

     A.     NMG's Corporate History.

          1.     A Century of Luxury and Innovation

     On September 10, 1907, the first Neiman Marcus store opened its doors at the corner of Elm and Murphy in Dallas with the goal of offering style, quality, and unparalleled service. NMG has always worked hard to provide more than "just" shopping and in the process created experiences and traditions over the decades. For example, NMG started the first weekly retail fashion show in the 1920s. It still sponsors fashion shows as charity events today. In the 1930s, NMG drew national attention as the first retailer outside of New York City to run national ad campaigns in *Vogue* and *Harper's Bazaar*. NMG has continued to reinvent the publishing of fashion with the now-traditional *Christmas Book* (1939), campaigns like the Art of Fashion (1994), and its fashion magazine *the book* (1996).

     In the 1940s, NMG worked to bring the industry together to celebrate fashion talent with *The Neiman Marcus Award for Distinguished Service in the Field of Fashion*—the Oscar of the fashion industry—with famous winners such as Coco Chanel and Yves Saint Laurent. Beginning in the 1950s, NMG formalized its combination of art and style by starting the Neiman Marcus Art Collection, which includes thousands of pieces and often features local artists.

     NMG has rebuilt itself from the ground up *twice* due to devastating fires at its flagship location (the first in 1913 and the second in 1964). In 1971, NMG expanded outside of Texas for the first time, building a store in Bal Harbour, Florida. Today, there are 43 Neiman Marcus brand stores nationwide, each of which offers a distinctive selection of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury and fashion designers.

     In 1972, NMG acquired the famous Fifth Avenue landmark, Bergdorf Goodman. The acquisition gave NMG a foothold in New York City, the sole NMG location in the nation's fashion capital until the opening of Neiman Marcus's Hudson Yards location in spring 2019. In 1988, NMG deepened and expanded its product offerings with the acquisition of the Horchow Collection, a luxury décor and furniture brand. In 1999, NMG took its business online, launching NeimanMarcus.com. Since then, NMG's online platform has grown into the largest luxury e-commerce platform in the world, accounting for over 30 percent of NMG's total revenue.

     Presently, NMG also operates Last Call, an off-price fashion brand catering to price sensitive yet fashion-minded customers. As part of its go-forward business model, NMG will be focusing on its full-price stores and moving away from the Last Call segment.

          2.     2013: Ares and CPPIB Acquire Neiman Marcus

     Before 2005, Debtor The Neiman Marcus Group LLC ("NMG LLC") (f/k/a The Neiman Marcus Group, Inc.) was publicly traded on the New York Stock Exchange. In 2005, affiliates of TPG and Warburg Pincus took NMG LLC private through the entity that is now Debtor Neiman Marcus Group LTD LLC ("NMG LTD LLC") (f/k/a Neiman Marcus Group LTD Inc. and Neiman Marcus, Inc.).

     In October 2013, affiliates of Ares and CPPIB (the "Sponsors") acquired NMG LTD LLC (the "Acquisition") through non-debtor parent Neiman Marcus Group, Inc. ("NMG Inc.") (f/k/a/ NM Mariposa Holdings, Inc.) and Debtor Mariposa Intermediate Holdings LLC ("Mariposa Holdings"). This resulted in the following core organizational structure:



In connection with the Acquisition, both NMG LLC and NMG LTD LLC were renamed and converted into Delaware limited liability companies. Consistent with the Delaware Limited Liability Company Act, each of NMG LLC, NMG LTD LLC, and Mariposa Holdings were member-managed limited liability companies with no board of directors or managers. The ultimate parent entity NMG Inc. has a board of directors.

NMG Inc. has never been an obligor or guarantor of any of the Debtors' debt. Instead, the Debtors' funded debt obligations have always been issued or guaranteed by Mariposa Holdings, NMG LTD LLC, NMG LLC, and certain of their guarantor subsidiaries. Following the Acquisition, the Debtors' funded debt consisted of (a) a $2.8 billion senior secured term loan facility maturing in October 2020 (the "2013 Term Loan Facility"), (b) a $900.0 million senior secured asset-based revolving credit facility (the "Asset-Based Revolving Credit Facility" or "ABL Facility"), (c) two series of Unsecured Notes, including $960.0 million in aggregate principal amount of 8.000% Senior Cash Pay Notes due 2021 (the "Unsecured Cash Pay Notes") and $600.0 million in aggregate principal amount of 8.750%/9.500% Senior PIK Toggle Notes due 2021 (the "Unsecured PIK Toggle Notes" and, together with the Cash Pay Notes, the "Unsecured Notes"), and (d) $125.0 million in 7.125% Senior Debentures due 2028 (the "2028 Debentures").

The debt agreements governing these obligations included restrictive covenants limiting NMG LTD LLC and certain of its subsidiaries from paying dividends, making investments, disposing of assets or taking other actions. These restrictions did not apply to unrestricted subsidiaries, which were generally permitted to engage in transactions without being subject to the covenants. The debt agreements also contained exceptions to the covenants known as "baskets" that allowed NMG LTD LLC and its restricted subsidiaries to engage in certain transactions either without limitation or up to specified dollar amounts.

Neiman Marcus had significant flexibility afforded by the ability to designate entities as unrestricted subsidiaries and the very broad baskets under the debt agreements. This included the express right to distribute the equity of unrestricted subsidiaries.

30

**3.      2014:   Neiman   Marcus   Purchases   MyTheresa   and   Designates   It Unrestricted Under the Term Loan and ABL Credit Facilities**

In late 2014, the Debtors acquired the online business of MyTheresa and its physical store in Munich.  Since then, MyTheresa has operated on a standalone basis, with its own CEO, CFO and management team, as well as separate vendors, suppliers, and bank lenders.  MyTheresa has never issued a dividend to the Debtors, NMG Inc. or the Sponsors.  In fact, while MyTheresa has experienced growth in top-line sales and EBITDA since 2014, it has repeatedly generated negative free cash flow, including in the years leading up to the Distribution.  Neiman Marcus has not relied on MyTheresa as a basis to fund its operations or debt expenses.

The Debtors paid approximately $196 million for MyTheresa in 2014, plus $57 million in two contingent earn-out payments to MyTheresa's prior owners in the following years.  After the acquisition, the German entities that operate MyTheresa sat under a series of German and Luxembourg holding entities until the Recapitalization Transactions in 2019.  The highest-level foreign holding entity was Mariposa Luxembourg I S.á.r.l., which in turn was wholly owned by the Debtors' former subsidiary, NMG International LLC (f/k/a NMG International, Inc.):



From late 2014 onwards, NMG International had no other assets besides the MyTheresa holding and operating entities.  As a result, under the Term Loan and ABL Credit Facilities, NMG International was not a guarantor, but was treated as a foreign subsidiary holding company and 65% of its equity interests were pledged (on a first-lien basis) in favor of the senior secured lenders.  The unsecured noteholders had no security interest in the equity interests of NMG International.  Despite the pledge of 65% NMG International's equity interests in favor of the senior secured lenders, no MyTheresa entity's equity was directly pledged in support of any of the Debtors' obligations at any point.

Simultaneously with the acquisition of the MyTheresa entities and the creation of the Luxembourg holding entities in late 2014, NMG LTD LLC designated all of the then-existing

MyTheresa subsidiaries as unrestricted subsidiaries under both the Term Loan and ABL Credit Facilities. In making these designations, NMG LTD LLC relied on specific baskets that it was permitted to use for this purpose. NMG LTD LLC had several hundred million dollars of spare basket capacity under the Term Loan and ABL Credit Facilities after the designations. As a result, from late 2014 onwards, the MyTheresa entities were unrestricted subsidiaries that could have been distributed by the Debtors under the Term Loan and ABL Credit Facilities. NMG LTD LLC delivered notices of the designations to the agents under both the Term Loan and ABL Facilities. In recurring quarterly officer's certificates provided to the agents, the MyTheresa entities were also listed as unrestricted subsidiaries.

    **4.**      **Early 2017: Neiman Marcus Uses Agreed-Upon Baskets To Designate MyTheresa As Unrestricted and Create Unrestricted PropCo**

    In early 2017, the Debtors retained Lazard to explore potential liability management transactions, including asset sales, debt exchanges and other strategic transactions. Neiman Marcus, its advisors and the Sponsors focused on two options: a potential transaction involving MyTheresa and a potential "PropCo" transaction. Both transactions would involve designating MyTheresa as an unrestricted subsidiary under the Indentures and "PropCo" as an unrestricted subsidiary under all of the Debtors' debt agreements. Once MyTheresa and PropCo—which would receive real properties from the Debtors valued in an amount permitted under the debt agreements—were unrestricted subsidiaries and no longer subject to the restrictions under the debt agreements, they would provide the Debtors with flexibility to address their capital structure in the future.

    Neiman Marcus' management worked with its financial and legal advisors to calculate available basket capacity. The company also obtained third-party valuations from Duff & Phelps of MyTheresa (approximately $282 million) and the three properties—stores in San Antonio, Texas and McLean, Virginia and a distribution center in Longview, Texas—that would be contributed to PropCo (approximately $73 million) to determine how much basket capacity was required. This analysis showed that the Debtors had several hundred million dollars of spare basket capacity available after the designations.

    On March 10, 2017, the NMG Inc. board unanimously approved the designation of MyTheresa (the "Designation") and the designation of and contribution of three properties to PropCo (the "PropCo Transaction"). NMG LTD LLC publicly announced both transactions on March 14, 2017 with its quarterly earnings. Since then, no creditor has ever brought a claim alleging that the Designation or the PropCo Transaction violated any of Neiman Marcus' debt agreements, including the indentures governing the Unsecured Notes, or resulted in an event of default.

    Before the Debtors completed the Designation and the PropCo Transaction in spring 2017, they also considered distributing MyTheresa, however, the Debtors did not proceed with the distribution at the time. In spring 2017, the Debtors were considering a sale of their U.S. operations, called Project Harry, to another luxury retailer. After that transaction terminated, the parties began negotiations on a different deal, called Project Einstein, during the first half of 2018 that would have resulted in the Debtors obtaining another luxury retailer's operations in exchange for the Debtors' real estate interests. Those discussions ended in late July 2018. Only then did the Debtors decide to distribute MyTheresa in connection with the amend-and-extend negotiations that led to the Recapitalization Transaction.

    **5.**      **March 2017 - August 2018: Neiman Marcus Considers Various Strategic Transactions And Creditor Negotiations**

    Between March 2017 and August 2018, Neiman Marcus considered multiple strategic transactions including Project Harry and Project Einstein. Despite many months of negotiations and

substantial expenditure of time and resources around these strategic transactions, Neiman Marcus ultimately chose not to proceed with those transactions.

Following the Designation and PropCo Transaction, Neiman Marcus also conducted on-and-off negotiations with its creditors' advisors on a "standalone" amend-and-extend (i.e., a transaction that did not involve a broader strategic transaction). In May 2017, the Debtors signed an NDA with counsel to an ad hoc group of term loan lenders (Wachtell). In August 2017, the Debtors signed NDAs with a financial advisor to the same ad hoc group of Term Loan Lenders (Ducera) and a financial advisor to an ad hoc group of Unsecured Noteholders (Houlihan). In September 2017, the Debtors signed an NDA with counsel to the ad hoc group of Unsecured Noteholders (Paul Weiss).

While under NDA, the Debtors provided these advisors with diligence materials concerning the Debtors, their business, and the Designation and PropCo Transaction. In November 2017, Neiman Marcus provided a proposed term sheet for potential circulation to these advisors' clients. The term sheet contemplated a potential amend-and-extend transaction and "a dividend of MyTheresa." The members of the ad hoc lender groups never entered into confidentiality agreements and standalone amend-and-extend discussions fell apart by early 2018 as the Debtors focused on Project Einstein.

### 6. September 2018: The Debtors Distribute MyTheresa To NMG Inc.

After negotiations over Project Einstein ended in late July 2018, Neiman Marcus immediately focused on completing a "standalone" amend-and-extend transaction with its creditors in late 2018. The distribution of MyTheresa was a key component of the amend-and-extend transaction.

In early August 2018, the Debtors' advisors prepared an "Amendment and Extension Checklist" of steps necessary to achieve an extension of their debt maturities. The second step on the checklist after initial advisor diligence was the "MyTheresa Distribution." The Debtors planned to launch the amend-and-extend transaction simultaneously with the public announcement of the distribution and the release of earnings on September 14, 2018. At an NMG Inc. board meeting in August 2018 discussing the possibility of re-engaging with creditors, Lazard described the distribution of MyTheresa as a "core" part of any amend-and-extend transaction.

Neiman Marcus' debt agreements expressly permitted the distribution of ownership interests in unrestricted subsidiaries without limit. As the MyTheresa entities were all unrestricted subsidiaries in September 2018, there was no contractual prohibition on the distribution. No creditor has ever brought a claim alleging that the Distribution violated any of Neiman Marcus's debt agreements, including the Indentures, or resulted in an event of default.

The Debtors' management also conducted good faith efforts to evaluate the Debtors' solvency prior to any potential distribution. In fall 2018, the Debtors' business had significantly improved compared to early 2017 when the Debtors last discussed a potential distribution. The company was on the verge of completing its fourth consecutive quarter of positive sales, all of Neiman Marcus' stores were four-wall EBITDA positive, and Adjusted EBITDA had increased more than 16% as compared to the same quarter in 2017. The Debtors also had approximately $800 million in liquidity in fall 2018. Despite these results, testimony has indicated that the Debtors would not have been able to obtain a third-party solvency opinion because of their near-term maturities. Accordingly, the Debtors' Chief Financial Officer at the time, Adam Orvos, and other members of the Debtors' finance, accounting and legal teams assessed the Debtors' solvency.

On the balance sheet, the Debtors started with their ordinary course books and records, which are audited annually by Ernst & Young on a consolidated basis. The Debtors then used an annual valuation of the Debtors prepared by Duff & Phelps that the Debtors received the week before the distribution to

adjust the book values of their assets to fair market values. The Debtors rely on these Duff & Phelps valuations each year to determine their equity value for stock option awards and for impairment analyses. Consistent with its typical practice, Duff & Phelps used a DCF and comparable companies analysis in September 2018 to determine the fair value of the Debtors as of April 30 2018. In part because of variability in the Debtors' projections, Duff & Phelps had increased the small stock premium beginning in 2017, which would in turn increase the weighted average cost of capital and reduce the valuation of the Debtors. Ernst & Young also audits the results of these annual valuations. After making the fair value adjustments, the Debtors then took a $100 million valuation "haircut" for conservatism and to ensure any potential changes in asset value between the "as of" date of the Duff & Phelps valuation (April 30, 2018) and the distribution were reflected. The analysis showed that following the distribution, the Debtors would be solvent by $327 million.

The Debtors then used their ordinary course projections for the cash flow and adequate capitalization tests. They stress tested their projections by assuming that revenues in fiscal year 2019 would decline by 5% rather than increase by 1.7% as projected. The Debtors selected this downside scenario based on the recent decline they had experienced when implementing NMG One. The Debtors then assumed that the $300 million decline in revenue would reduce Adjusted EBITDA by $180 million—another conservative assumption given the Debtors' historical margins and steps they would take to mitigate these losses in a downturn. Even assuming that the Debtors would need to borrow the $180 million under their ABL Facility in a downside scenario, they still would have approximately $380-$695 million of availability under their $900 million ABL Facility.

The Debtors relied on Lazard for the final piece of the adequate capitalization test—whether they would be able to refinance their near-term debt maturities—as no one at the company had the necessary experience to determine the likelihood of a successful refinancing. Lazard told the Debtors and ultimately the NMG Inc. Board that they were highly confident that they would be able to complete a successful refinancing, especially following the distribution of MyTheresa.

The Debtors' the Chief Financial Officer, Mr. Orvos, prepared memoranda to each of the members of the Debtors attesting to their solvency before and after the distribution of MyTheresa. The memoranda concluded that both before and after a potential distribution, the Debtors would be solvent on a balance sheet basis and, for the following 12 months, Neiman Marcus would be able to pay its debts as they came due, would not have unreasonably small assets to conduct its business, and the distribution would not impair its ability to continue as a going concern. The memoranda made clear that the Debtors' projections assumed a refinancing of the Debtors' funded debt at maturity and noted Mr. Orvos' reliance on Lazard. All of the conclusions in Mr. Orvos' memoranda were proved correct.

Mr. Orvos presented his memoranda to the NMG Inc. board on September 14, 2018. The NMG Inc. board, including its independent members, unanimously approved the MyTheresa distribution. Mechanically, the distribution took the form of a chain of distributions from wholly owned subsidiaries to their sole parent entities. First NMG International LLC distributed its equity interests in Mariposa Luxembourg I to its parent NMG LLC, which in turn distributed the equity interests to NMG LTD LLC, which in turn distributed the equity interests to Mariposa Holdings, which in turn distributed the equity interests to the ultimate parent NMG Inc. (the "Distribution"). The Mariposa Luxembourg I shares were never distributed above NMG Inc. to the Sponsors. The Debtors publicly announced the Distribution on September 18, 2018.

7. **Fall 2018 - Spring 2019: Neiman Marcus and Creditors Holding Over 90% of Its Debt Negotiate A&E Transactions That Result In An Agreed-Upon Waterfall For A Potential MyTheresa Sale Or IPO**

Discussions with Neiman Marcus' creditors commenced immediately after the Distribution was announced. Members of the ad hoc groups agreed to become restricted in October 2018.

The first round of negotiations among Neiman Marcus and its lender groups did not result in an agreement. Term sheets were blown out on November 30, 2018 as the Debtors headed into the critical holiday period. The parties initially took diametrically opposed positions on MyTheresa. Neiman Marcus proposed that its creditors agree to the Distribution. The unsecured bondholders demanded that MyTheresa be returned, no longer be treated as unrestricted, and provide preferred equity in NMG International. The term loan lenders demanded a full guarantee from NMG Inc. and a first lien pledge on the equity interests of a MyTheresa Holding Company.

After the blowout, Marble Ridge filed a lawsuit in Dallas County challenging the Distribution as a fraudulent transfer. That suit was dismissed with prejudice on standing grounds in March 2019. Marble Ridge replaced the indenture trustee with UMB in August 2019, and directed UMB to file suit in New York Supreme Court, in August 2019. The parties fully briefed motions to dismiss when the Debtors filed for chapter 11. No other creditors ever brought suit concerning the Designation, PropCo Transaction, or the Distribution. No one—including Marble Ridge and UMB—has ever alleged in any lawsuit that the Debtors defaulted or otherwise violated any aspect of their debt agreements through the Designation, the PropCo Transaction or the Distribution.

After the holiday period, Neiman Marcus and its creditors re-engaged in amend-and-extend negotiations. Following arms'-length negotiations in January and February 2019, the parties reached an agreement in principle on a global amend-and-extend transaction that would also resolve any potential disputes over the Designation, Distribution, and PropCo Transaction. On March 1, 2019, Neiman Marcus publicly announced that agreement in principle with its creditors to restructure the company's debt obligations and extend its debt maturities by three years. This agreement was further documented in a Transaction Support Agreement dated March 25, 2019 (the "TSA"). Holders of approximately 99.5 percent of the aggregate principal amount of the Term Loans and 91.5 percent of the Unsecured Notes—which collectively represented over $4.2 billion of Neiman Marcus' debt—ultimately participated in the Recapitalization Transactions. The majority holder of the company's 2028 Debentures also consented to the Recapitalization Transactions. Marble Ridge and another unsecured noteholder were the only material holdouts.

The Recapitalization Transactions included Neiman Marcus providing significant economic interests in MyTheresa to participating creditors. The Recapitalization Transactions provided holders of Unsecured Notes with an opportunity to exchange their existing notes for two types of consideration that entitled them to distributions in the event of a future sale or IPO of MyTheresa.

First, participating Unsecured Noteholders received new Third Lien Notes that were secured by various interests in the Debtors' assets. The Third Lien Notes were also supported by an equity pledge from MYT Parent Co., a newly formed U.S. holding company of the MyTheresa entities which is wholly-owned by NMG Inc., and would be paid down at par with 50 percent of any MyTheresa monetization proceeds over approximately $700 million (with the hurdle increasing by at least $50 million per year due to a 10% dividend owed on $500 million of preferred stock ahead of the Third Lien Notes).

Second, exchanging holders of Unsecured Notes also received their pro rata share of $250.0 million in Series A preferred stock the ("MYT Series A Preferred Stock") of MYT Holding Co., a holding company of MyTheresa entities and direct subsidiary of MYT Parent Co., that entitled those

holders to priority distributions of up to $250 million of proceeds plus a 10% annual dividend in the event of a sale or other monetization of MyTheresa.

The Sponsors and a group of Unsecured Noteholders also invested $550 million of new money into the company as consideration for new Second Lien Notes. The proceeds from the new money investment were used to pay down $526.9 million of Term Loans. The Second Lien Notes are guaranteed on a senior secured basis up to $200 million by three holding companies of MyTheresa, and are entitled to the first $200 million of proceeds from any sale or IPO of MyTheresa.

As part of the hard-fought amend-and-extend negotiations, these creditors agreed that the Sponsors could obtain two other indirect sources of recovery from any sale or IPO of MyTheresa. MYT Parent Co. obtained (i) 250,000,000 shares of Series B Preferred Stock (the "MYT Series B Preferred Stock") of MYT Holding Co. that would recover up to $250 million plus a 10% annual dividend only in the event of a monetization event that yielded over the $450 million (plus dividends) that was required to go to the Second Lien Notes and MYT Series A Preferred Stock; and (ii) common equity entitled to 50 percent of any MyTheresa monetization proceeds over approximately $700 million (subject to increase each year due to the preferred equity dividends), with the other 50 percent of those proceeds used to pay down the Third Lien Notes.

Collectively, these agreements among creditors created a waterfall (the "MYT Waterfall") that specified how all amounts from any potential MyTheresa sale or IPO would be distributed:

(Added)

| First (2L Notes) | $200M to holders of the 2L Notes under a limited guarantee |
|---|---|
| Second (Series A) | $250M plus accrued dividends to the holders of Series A Preferred Stock (initially to 3L Noteholders) |
| Third (Series B) | $250M plus accrued dividends to the holders of Series B Preferred Stock (MYT Parent) |
| Fourth (Common/ 3L Split) | Remainder is split 50-50 between the holders of MYT common stock and 3L Notes for redemption. |

Accordingly, pursuant to the MYT Waterfall, any monetization of MyTheresa at $500 million or less would result in substantially all of the proceeds going to the former unsecured noteholders who participated in the Recapitalization Transactions.

The UCC has indicated that it does not intend to challenge the $200 million senior secured guarantee or the $250 million in Series A preferred equity or the associated dividends (of which $25 million has already accrued and which would continue to accrue at 10% per year until a monetization event).

### 8. Summer 2019: The Recapitalization Transactions Close and An Extensive Sale Process For MyTheresa Generates Limited Interest

The Recapitalization Transactions closed on June 7, 2019. To implement the Recapitalization Transactions, the Mariposa Luxembourg I shares that had been distributed to NMG Inc. were moved into a series of new MyTheresa holding entities that provided the agreed-upon guarantees, pledges, and preferred equity to participating creditors. Specifically, NMG, Inc. contributed its interests in Mariposa

Luxembourg I S.a.r.l. ("Lux I") through a series of newly formed Delaware holding entities: MYT Parent Co., MYT Holding Co., and MYT Intermediate Holding Co.

On July 24, 2019, MYT Intermediate Holding Co. contributed its interests in Lux I into a newly-formed Dutch company, MYT Netherlands Parent B.V ("MYT Netherlands Parent"). In late summer 2019, another Luxembourg holding company, Mariposa Luxembourg II S.á.r.l., was merged into Lux I. Lux I was then merged into MYT Netherlands Parent, with MYT Netherlands Parent as the surviving entity resulting in the following organizational structure and grants of interests for the MyTheresa entities:



Beginning in May 2019, Lazard commenced a multi-month sale process with respect to MyTheresa. Lazard sent out over 50 teasers and provided confidential information memoranda to more than two dozen potential bidders. Lazard's marketing materials highlighted the challenges with valuing online retailers, and touted MyTheresa's "impressive topline growth" of 28.5% between FY16 and FY18 and EBITDA margin of 5–7% between 2016 and 2018 but noted MyTheresa experienced near zero or negative free cash flow for this same time period.

Despite Lazard's extensive marketing efforts, the sale process ended in July 2019 because the highest and best non-binding indicative offer received was only for approximately $525 million. That was the last market-based indication of the value of MyTheresa.

**B. NMG's Business Operations.**

**1. Customer Loyalty and Customer Service.**

Neiman Marcus and Bergdorf Goodman have a longstanding heritage of providing the highest level of personalized, concierge-style service to its customers. While many retailers have suffered in recent years given the movement away from brick-and-mortar shopping, NMG is positioned to succeed in the digital era.

First, NMG has a history of rewarding loyalty. With the 1984 roll-out of InCircle, NMG's loyalty program, NMG became the first luxury retailer to offer a customer loyalty program. In turn, Neiman Marcus and Bergdorf Goodman customers have rewarded NMG with high levels of engagement and loyalty over the years. Approximately ~~3~~45 percent of NMG's revenues come from status-holding InCircle rewards members. Further, Neiman Marcus and Bergdorf Goodman have multi-year relationships with true luxury customers, as illustrated by the fact that NMG makes 40 percent of its sales from Neiman Marcus and Bergdorf Goodman to customers who spend $10,000 or more annually, with an average annual spend from these customers of $50,000.

Second, Neiman Marcus and Bergdorf Goodman have always entailed more than shopping. While other brick-and-mortar stores have been ill-equipped to compete with online-only retailers, Neiman Marcus and Bergdorf Goodman stores offer a variety of in-person experiences that make every visit an immersive luxury event. Neiman Marcus and Bergdorf Goodman stores feature stunning architecture, beautiful art, and professional and well-trained sales associates to enhance the shopping experience. Additionally, ~~NMG's newest location, its Hudson Yards store, includes several restaurants and bars with rich views—including the Vessel and the Statue of Liberty—as well as a kitchen with cooking and mixology demonstrations and a chocolate bar that serves wine and beer. Other locations feature~~ Neiman Marcus and Bergdorf Goodman operate 46 restaurants, bars, and cafes, and also offer in store services and experiences such as spas with makeup, hair, nail, massage, and waxing treatments. Neiman Marcus and Bergdorf Goodman stores also host events, including private shopping events and charity events.

Third, NMG is well positioned for the digital age. When customers want a blend of convenient, quick, and high-service access to luxury brands, Neiman Marcus and Bergdorf Goodman provide an enhanced online experience that is superior to other luxury players. NMG operates online platforms that have 17 million visits per month and provide omni-channel services and shared inventory. In addition, Neiman Marcus launched 65 digital stylists more than a year ago that are personal shoppers for top online customers and equipped its 5,200 sales associates with clienteling tools that allow them to sell and close a transaction digitally without requiring in-store presence. The significant investments in IT tools and new roles to better integrate its bricks and mortar and online operations have resulted in a better customer omni-channel experience, thereby increasing sales and gross margins.

## 2.  NMG's Brands.

NMG offers brands to provide luxury in every aspect of its customers' lives.

*Neiman Marcus*. The Neiman Marcus brand caters to affluent luxury customers. Neiman Marcus operates 43 full-line stores in marquee retail locations in major U.S. markets and its global $1 billion e-commerce platform, neimanmarcus.com. The Neiman Marcus stores are designed to provide a modern, luxurious ambiance by blending art, architecture, and technology. Neiman Marcus offers distinctive luxury merchandise, including women's couture and designer apparel, contemporary sportswear, handbags, shoes, cosmetics, men's clothing and accessories, precious and designer jewelry, home, children's apparel, and gift items.

*Bergdorf Goodman*. Bergdorf Goodman is the premier retailer of ultra-high end branded goods in the world. Bergdorf Goodman operates primarily through its two full-line stores in landmark locations on Fifth Avenue in New York City and its global e-commerce platform, bergdorfgoodman.com and the Bergdorf Goodman App. Bergdorf Goodman is known for its high-luxury women's couture and designer apparel, contemporary sportswear, handbags, shoes, cosmetics, men's clothing and accessories, precious and designer jewelry, home, children's apparel, and gift items.

*Horchow*.  Horchow is a leading online resource for luxury furniture, fine linens, and unique décor.  Horchow was founded by Roger Horchow in 1973 as the first luxury mail-order catalog without a brick-and-mortar store.  Today, Horchow conducts the majority of its business through its e-commerce platform, horchow.com.

*Last Call*.  Last Call is the off-price segment of NMG's fashion goods business.  Customers purchase merchandise through 22 Last Call stores and its online platform, lastcall.com.  Merchandise offered under the Last Call brand primarily includes end-of-season and post-season clearance goods sourced directly from the Neiman Marcus or lower price-point merchandise purchased directly from designers.  During fiscal year 2017, NMG began assessing its Last Call footprint and closed four of its Last Call stores.  In fiscal year 2020, NMG closed two more Last Call stores, and on March 11, 2020, prior to temporarily closing all of its stores, NMG announced that it would permanently close most of its 22 remaining Last Call stores to focus on NMG's core luxury business.

Under each of NMG's primary brands, NMG offers its customers a curated and compelling assortment of narrowly distributed merchandise from luxury and high-fashion designers.  NMG is the retail partner of choice for luxury designers as it offers access to loyal and affluent customers and adheres to strict presentation, marketing, and promotional standards.  Neiman Marcus and Bergdorf Goodman also have a long history of identifying, partnering with, and nurturing emerging designers with the potential for rapid growth.  The combined offering from established and emerging designers ensures NMG's merchandise assortment remains unique, compelling, and relevant as fashion trends evolve.

### C.    Critical Components of the Debtors' Cost Structure.

#### 1.    Supply Chain.

NMG maintains an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to its brick-and-mortar locations and the fulfillment of orders from its e-commerce platform.  A substantial majority of NMG's merchandise is delivered to NMG from various designers as finished goods and is manufactured in numerous locations, primarily in Europe, the United States, and, to a lesser extent, Asia.  NMG's women's and men's apparel and fashion accessories merchandise categories are especially dependent upon NMG's relationships with designers.  NMG monitors and evaluates the sales performance and profitability of each designer and adjusts future purchasing decisions based on this analysis.  NMG has no guaranteed supply arrangements with its principal merchandising sources.  In addition, NMG's designer base is diverse, with only two designers representing more than five percent of NMG's merchandise-sale revenues in fiscal year 2019.  The breadth of NMG's sourcing helps mitigate risks associated with any single brand or designer.

NMG manages its inventory on an omni-channel basis, and its processes and facilities are designed to optimize merchandise productivity.  For the last several years, NMG has utilized an integrated merchandising and distribution system, referred to as "NMG One."  NMG One was designed to enable NMG to purchase, share, manage, and sell its inventories across its omni-channel operations and brands more efficiently.

The majority of NMG's merchandise is initially received at one of its centralized distribution facilities.  NMG utilizes distribution facilities in Longview, Texas, the Dallas-Fort Worth area, Whittier, California, and Pittston, Pennsylvania, as well as two regional service centers in the United States.  NMG's distribution facilities are linked electronically to its various merchandising teams to facilitate the distribution of goods to NMG's stores.

## 2.    Employee Compensation and Benefits.

NMG employs approximately 13,200 employees, including approximately 9,545 full-time employees and approximately 3,655 part-time employees. NMG offers its employees the ability to participate in a number of insurance and benefits programs, including health benefits, vision and dental coverage, prescription drug benefits programs, workers' compensation, life insurance, accidental death and dismemberment insurance, disability benefits, retirement plans, and other employee benefit plans.

In addition, Debtor The Neiman Marcus Group LLC sponsors The Neiman Marcus Group LLC Retirement Plan (the "Neiman Retirement Plan") for certain current and former employees, which is a qualified defined benefit pension plan under the Internal Revenue Code and covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Neiman Retirement Plan has been frozen since 2008, and benefit levels were frozen for all participants in 2010. The Neiman Retirement Plan provides current and future pension benefits to approximately 10,680 participants. As of August 2019, NMG had projected Neiman Retirement Plan obligations of approximately $659 million.

NMG pays annual premiums to the Pension Benefit Guaranty Corporation (the "PBGC") in connection with the Neiman Retirement Plan. The PBGC is a wholly-owned United States government corporation and agency created under Title IV of ERISA to administer the federal pension insurance program and to guarantee the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. The PBGC asserts that the other Debtors are each members of The Neiman Marcus Group LLC's controlled group, as defined in 29 U.S.C. § 1301(a)(14).

During the bankruptcy proceeding, the Neiman Retirement Plan may terminate under the distress termination provisions of 29 U.S.C. § 1341(c) or under the provisions for the PBGC initiation of termination under 29 U.S.C. § 1342(a). If the Neiman Retirement Plan terminates, the PBGC will assert a claim that the sponsor of the Neiman Retirement Plan and all members of its controlled group are jointly and severally liable for the unfunded benefit liabilities of the terminated Neiman Retirement Plan. The PBGC will file an estimated contingent claim, subject to termination of the Neiman Retirement Plan during the bankruptcy proceeding, against each of the Debtors for unfunded benefit liabilities in the amount of approximately $300,000,000. The PBGC will assert that this termination liability contingent claim is entitled to priority under 11 U.S.C. §§ 507(a)(2) and (a)(8) in unliquidated amounts. The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

The PBGC will assert that the sponsor of the Neiman Retirement Plan and all other members of its controlled group are obligated to pay the contributions necessary to satisfy the minimum funding standards under sections 412 and 430 of the Internal Revenue Code and sections 302 and 303 of ERISA. The PBGC will file an unliquidated claim against each of the Debtors for any unpaid required minimum contributions owed to the Neiman Retirement Plan. The PBGC will assert that the claim for required minimum contributions owed is entitled to priority under 11 U.S.C. §§ 507(a)(2) and(a)(5) in the amounts of the unpaid contributions. The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

The PBGC will assert that the sponsor of the Neiman Retirement Plan and all other members of its controlled group are jointly and severally liable to the PBGC for all premium obligations owed to the Neiman Retirement Plan. The PBGC will file a claim against each of the Debtors for unpaid statutory premiums, if any, owed to the PBGC on behalf of the Neiman Retirement Plan in an unliquidated amount. The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

If the Neiman Retirement Plan terminates in a distress or the PBGC-initiated termination during the course of the bankruptcy proceeding, the PBGC will assert that the sponsor of the Neiman Retirement Plan and its controlled group are liable to the PBGC for a termination premium at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7). The PBGC will assert that if the Neiman Retirement Plan is terminated prior to confirmation of the Plan, the obligation to the PBGC for termination premiums does not exist until after the Plan is confirmed and the Debtors have exited bankruptcy. The PBGC will assert that under these circumstances, termination premiums are not a dischargeable claim or debt within the meaning of the Bankruptcy Code. The PBGC estimates that the amount of the termination premium liability for the Neiman Retirement Plan would total approximately $39,210,000. The Debtors and Reorganized Debtors respectfully disagree with many of the PBGC's foregoing assertions and reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any such claims.

On the Effective Date, The Neiman Marcus Group LLC shall continue the Neiman Retirement Plan in accordance with and subject to its terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all rights thereunder), and as a consequence the PBGC and the Debtors agree that all the PBGC claims will be deemed withdrawn as of the Effective Date without incurring liability in the bankruptcy and without any further action of the Debtors or the Reorganized Debtors or the PBGC and without any further action, order, or approval of the Bankruptcy Court.

With respect to the Neiman Retirement Plan, no provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Reorganized Debtors from liabilities or requirements imposed under ERISA or the Internal Revenue Code with respect to the Neiman Retirement Plan solely as a result of the Debtors' reorganization proceedings or confirmation of the Plan. The PBGC and the Neiman Retirement Plan will not be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code with respect to the Neiman Retirement Plan as a result of the Debtors' reorganization proceedings, the Plan's provisions or the Plan's confirmation; *provided*, *however, that nothing herein or in the Plan affects any of the Debtors' or the Reorganized Debtors' rights related thereto and all such rights are fully preserved*.

### 3. Real Estate Portfolio.

While NMG has industry-leading e-commerce platforms, the full experience is enriched by a customer experience in one of NMG's stores. NMG's stores are located in prime locations and feature engaging, luxury shopping environments. NMG's stores are located within driving distance of 70 percent of high-net worth individuals in the United States. Several locations include restaurant offerings to allow for a relaxed and extended experience. From the beginning, NMG has focused on selling an experience. This remains true today. In addition to knowledgeable, professional, and well-trained sales associates, NMG's stores feature in-store events, including trunk shows by leading designers that feature the latest fashions, and exclusive shopping experiences curated for the most discerning luxury clientele.

In response to the COVID-19 crisis, NMG has closely monitored local government orders and, since March 18, 2020, closed all of its retail stores to in-person shopping until further notice. Where permitted, NMG is maintaining limited staff to fulfill online orders from store merchandise, and since the Petition Date, NMG opened approximately 12 stores for present appointment.

**D. The Designation and Distribution.**

In October 2014, NMG acquired MyTheresa, a luxury retailer headquartered in Munich, Germany ("MyTheresa"). The MyTheresa brand appeals to younger, fashion-forward, luxury customers, primarily from Europe, Asia, and the Middle East.

The operations of MyTheresa have always been independent of NMG and are primarily conducted through the THERESA flagship store in Munich and the mytheresa.com website and mobile app. The entities that operate the MyTheresa business (the "MyTheresa Operating Companies") have always been non-guarantors under NMG's debt. They were designated as "unrestricted subsidiaries" under NMG's credit facilities in 2014 and under the indentures governing the Unsecured Notes (as defined below) in 2017 (the "Designation"). In September 2018, the MyTheresa Operating Companies were distributed to Neiman Marcus Group, Inc., the non-debtor parent of NMG ("Parent") (the "Distribution"). Kirkland advised on the Designation in 2017 and Distribution in 2018. Upon completion of the Distribution, the MyTheresa Operating Companies were subsidiaries of Parent.

In December 2018, a single purported holder of Unsecured Notes, Marble Ridge, filed suit in the District Court for Dallas County against certain Debtors and Parent alleging that the Distribution was a fraudulent transfer. That lawsuit was dismissed with prejudice at the pleadings stage in March 2019. Certain Debtors and Parent filed counterclaims for defamation and business disparagement against Marble Ridge. Marble Ridge's motion to dismiss the counterclaims was denied and that decision is currently on appeal.

In August 2019, following the successful consummation of the Recapitalization Transactions, Marble Ridge and another purported holder of Unsecured Notes replaced the indenture trustee for the Unsecured Notes. The replacement indenture trustee immediately filed fraudulent transfer claims based on the Distribution against certain Debtors, Parent, and non-debtors MYT Parent Co. and MYT Holding Co. in New York Supreme Court. The replacement indenture trustee also filed a tortious interference claim against certain Ares entities based on the Recapitalization Transactions. Motions to dismiss all of those claims in their entirety were fully briefed as of the Petition Date.

**E. The Recapitalization Transaction.**

To better position the Debtors to handle these trends, address upcoming maturities, and allow the Debtors to execute on their business plan, the Debtors negotiated and, in June 2019, executed a multi-step amend and extend transaction (such steps collectively, the "Recapitalization Transactions"). As part of the Recapitalization Transactions, among other things, (a) approximately $1.48 billion aggregate principal amount of validly tendered Unsecured Notes were exchanged for a combination of new Third Lien Notes and shares of MYT Series A Preferred Stock, (b) all but 0.5% of the aggregate principal amount of 2013 Term Loans (or $12.7 million) were exchanged for Extended Term Loans, and (c) the Second Lien Notes were issued in exchange for $550.0 million of new money (the proceeds of which were used to pay-down $526.9 million of Extended Term Loans).

The Recapitalization Transactions were overwhelmingly supported by NMG's creditor constituents and reflected a robust and comprehensive negotiation process. Holders of approximately 99.5 percent of the aggregate principal amount of the 2013 Term Loans and approximately 91.5 percent of the aggregate principal amount of the Unsecured Notes then outstanding consented to the Recapitalization Transactions, which extended the maturities of such obligations from 2020 and 2021 to 2023 and 2024, respectively. The participants that consented to the Recapitalization Transactions collectively represented over $4.2 billion of outstanding 2013 Term Loans and Unsecured Notes. The majority holder of the 2028 Debentures also consented to the Recapitalization Transactions.

In addition, the participants in the Recapitalization Transactions agreed to release NMG from any and all claims relating to, among other things, the Recapitalization Transactions, the Designation, and the Distribution. The participants also agreed to turnover provisions requiring the indenture trustees and agents, NMG, and the releasing parties, in the event that they (or their successors and assignees) receive any funds, property, or value on account of the Designation or the Distribution, to turnover any such funds, property, or value to Parent. Parent is then required to distribute those recoveries in accordance with a contractual waterfall applicable to the instruments issued by the newly formed MyTheresa Holding Companies (the "MYT Waterfall").

The MYT Waterfall was a fundamental component of the Recapitalization Transactions. Under the waterfall, the first $200 million of value is allocated to the holders of Second Lien Notes in respect of their limited guarantee; the next $250 million (plus accrued dividends) of value is allocated to holders of MYT Series A Preferred Stock, which was issued to former holders of Unsecured Notes in connection with the Recapitalization Transactions; the next $250 million (plus accrued dividends) of value is allocated to the holder (MYT Parent Co. and, indirectly, Parent and its equity sponsors) of MYT Series B Preferred Stock; and the remaining value is to be split equally between the holders of the Third Lien Notes (via the pledge of MYT Holding Co.'s common stock) and MYT Parent Co. The MyTheresa Operating Companies are not contractually obligated under, and do not provide any direct credit support to, the Debtors' debt arrangements. A key consideration in the design of the MYT Waterfall was the preservation of value and separateness of the MyTheresa business. Kirkland advised on the Recapitalization Transactions.

In September 2019, certain Debtors entered into an amendment to the credit agreement governing the Asset-Based Revolving Credit Facility to provide for the FILO Facility. Subsequent to and as a result of the Debtors' borrowing under the FILO Facility, the Debtors had no further capacity to enter into incremental facilities under the Asset-Based Revolving Credit Facility.

The Recapitalization Transactions successfully extended the maturities of participating debt by three years, and provided NMG with significantly more runway to implement its transformation plan. Indeed, prior to the COVID-19 outbreak, NMG was on track to meet all of its budget, earnings, and savings targets for the year and had posted comparable store sales growth for seven of the ten previous quarters.

### D. ~~F.~~ Prepetition Capital Structure.[11][12]

As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $5.1 billion. As further described below, the Debtors' significant funded debt obligations include: (a) a $900.0 million ~~senior secured asset-based revolving credit facility (the "~~Asset-Based Revolving Credit Facility~~")~~, of which $749.0 million has been drawn; (b) a $100.0 million last-out term loan facility (the "FILO Facility"); (c) a $2,253.1 million senior secured term loan facility (the "Term Loan Facility"), which is comprised of $12.6 million outstanding of ~~stub~~2013 ~~t~~Term ~~l~~Loans with the original maturity date of October 25, 2020, $1,193.8 million outstanding of 2019 ~~t~~Term ~~l~~Loans with an extended maturity date of October 25, 2023, which pay interest entirely in cash, and $1,046.7 million outstanding of term loans with an extended maturity date of October 25, 2023, which pay interest partially in cash and partially in kind; (d) $561.7 million aggregate principal amount of 14.0~~00~~% Second Lien Notes due 2024 (the "Second Lien Notes"); (e) $730.5 million aggregate principal amount of 8.000% Senior Secured Third Lien Notes due 2024 (the "8.000% Third Lien Notes"); (f) $497.8 million aggregate principal amount of 8.750% Senior Secured Third Lien Notes due

---

[12]~~11~~[12]   In the event of any inconsistencies between the summaries set forth below and the provisions of the documents governing such prepetition debt, the provisions governing such prepetition debt, as applicable, shall control.

2024 (the "8.750% Third Lien Notes" and, together with the 8.000% Third Lien Notes, the "Third Lien Notes"); (g) $80.7 million aggregate principal amount of 8.000% Senior Cash Pay Notes due 2021 (the "Unsecured Cash Pay Notes"); (h) $56.6 million aggregate principal amount of 8.750%/9.500% Senior PIK Toggle Notes due 2021 (the "Unsecured PIK Toggle Notes" and, together with the Unsecured Cash Pay Notes, the "Unsecured Notes"); and (i) $125.0 million aggregate principal amount of 7.125% Senior Debentures due 2028. The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity Date | Interest Rate | Principal Amount Outstanding (in thousands) |
|---|---|---|---|
| Asset-Based Revolving Credit Facility | July 25, 2021 | variable | $749,000 |
| FILO Facility | July 25, 2021 | variable | $100,000 |
| Cash Pay ~~Extended~~ 2019 Term Loans | October 25, 2023 | variable | $1,193,815 |
| Cash Pay/PIK ~~Extended~~ 2019 Term Loans | October 25, 2023 | variable | $1,046,687 |
| 2013 Term Loans | October 25, 2020 | variable | $12,597 |
| 14.0% Second Lien Notes | April 25, 2024 | 8.0% cash / 6.0% PIK | $561,733 |
| 8.000% Third Lien Notes | October 25, 2024 | 8.000% | $730,534 |
| 8.750% Third Lien Notes | October 25, 2024 | 8.750% | $497,849 |
| 8.000% Cash Pay Notes | October 15, 2021 | 8.000% | $80,680 |
| 8.750%/9.500% Senior PIK Toggle Notes | October 15, 2021 | 8.750% | $56,584 |
| 7.125% Senior Debentures | June 1, 2028 | 7.125% | $125,000 |
| **Total** | | | **$5,154,479** |

A chart summarizing the relative priorities of various stakeholders to the collateral packages described below is attached as **Exhibit G**.

### 1. The Asset-Based Revolving Credit Facility.

The Debtors are party to that certain Credit Agreement, dated as of October 25, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), by and among NMG, as borrower, certain of the Debtors as co-borrowers party thereto (together with NMG, the "ABL Borrowers"), Holdings, and certain of NMG's current and future, direct and indirect, wholly owned subsidiaries (the "ABL Subsidiary Guarantors"), as guarantors, the FILO Facility lenders, Deutsche Bank AG New York Branch, as administrative agent and as collateral agent, TPG Specialty Lending, Inc., as agent for the FILO Facility lenders, and the lenders from time to time party thereto. The Asset-Based Revolving Credit Facility has a maximum committed borrowing capacity of $900.0 million (subject to a borrowing base) and matures on July 25, 2021 (subject to the terms of the ABL Credit Agreement).

The obligations under the Asset Based Revolving Credit Facility are secured by substantially all of the assets of Holdings, the ABL Borrowers, and the ABL Subsidiary Guarantors, including a first priority security interest in personal property consisting of inventory and related accounts, cash, deposit accounts, all payments received by the ABL Borrowers or the ABL Subsidiary Guarantors from credit card clearing houses and processors or otherwise in respect of all credit card charges for sales of inventory by the ABL Borrowers and the ABL Subsidiary Guarantors, certain related assets and proceeds of the foregoing (together, the "ABL Priority Collateral").

In addition, the obligations under the Asset-Based Revolving Credit Facility are secured by certain other interests such as: (a) a fourth-priority pledge of 100 percent of NMG's capital stock held by Holdings, (b) a fourth-priority security interest on certain owned and leased real property and equipment, (c) a fourth-priority security interest in ~~Extended~~ Term Loan PropCo (as defined below), and (d) a fourth-priority security interest in the Notes Priority Collateral (as defined below).

As of the Petition Date, approximately $749.0 million in borrowings and approximately $9.3 million of letters of credit are outstanding under the Asset-Based Revolving Credit Facility, and there is approximately $141.7 million of unused commitments. As of the Petition Date, there was extremely limited availability under the Asset-Based Revolving Credit Facility.

### 2. The FILO Facility.

The FILO Facility is governed by the ABL Credit Agreement and has a maximum committed borrowing capacity of $100.0 million, subject to a borrowing base. The FILO Facility matures concurrently with the Asset-Based Revolving Credit Facility on July 25, 2021 (subject to the terms of the ABL Credit Agreement).

As of the Petition Date, NMG had outstanding borrowings of $100.0 million under the FILO Facility. All obligations under the FILO Facility are guaranteed by the same entities that guarantee the Asset-Based Revolving Credit Facility and are secured by the same collateral as the Asset-Based Revolving Credit Facility, but will be last-out in payment as set forth in the FILO Credit Agreement.

### 3. The Term Loan Facility.

The Debtors are party to that Credit Agreement, dated as of October 23, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among NMG, The Neiman Marcus Group LLC, and The NMG Subsidiary LLC, as borrowers (the "Term Loan Borrowers"), Holdings and certain of NMG's current and future subsidiaries, as guarantors (the "TL Subsidiary Guarantors"), Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and the lenders from time to time party thereto.

All obligations under the Term Loan Facility, and the guarantees of those obligations, are secured by substantially all of the assets of Holdings, the Term Loan Borrowers, and the TL Subsidiary Guarantors, including (a) a first-priority security interest in, and mortgages on, a significant portion of NMG's owned real property and equipment and substantially all other tangible and intangible assets of the Term Loan Borrowers, Holdings, and certain subsidiary guarantors (the "Original Term Loan Priority Collateral"); (b) a second priority security interest in the ABL Priority Collateral; and (c) solely with respect to the ~~Extended~~2019 Term Loans, (i) a first priority security interest in certain future foreign assets, intercompany debt, and certain additional equity interests of new subsidiary guarantors, (ii) a first-priority security interest in, and mortgages on, certain of the borrowers' and any subsidiary guarantors' owned real estate interests, real estate leasehold interests, and other real property interests ("~~Extended~~2019 Term Loan Priority Real Estate Collateral"), (iii) a first-priority security interest in the equity interests of NMG Term Loan PropCo LLC, a special purpose entity that is a subsidiary of NMG (the "~~Extended~~ Term Loan PropCo") formed solely to hold certain real estate leases that cannot be mortgaged directly to secure the ~~Extended~~2019 Term Loans under the Term Loan Facility (the collateral described in the foregoing subclauses (i), (ii), and (iii), together with the Original Term Loan Priority Collateral, collectively, the "Term Loan Priority Collateral"), and (iv) a third-priority security interest in the Notes Priority Collateral.

As of the Petition Date, the outstanding balance under the Term Loan Facility was $2,253.1 million comprised of (a) $12.6 million outstanding of stub term loans with the original maturity date of October 25, 2020 (the "2013 Term Loans"), (b) $1,193.8 million outstanding of term loans with an

extended maturity date of October 25, 2023 which pay interest entirely in cash (the "Cash Pay ~~Extended~~ 2019 Term Loans"), and (c) $1,046.7 million outstanding of term loans with an extended maturity date of October 25, 2023 which pay interest partially in cash and partially in kind (the "Cash Pay/PIK ~~Extended~~ 2019 Term Loans" and, together with the Cash Pay ~~Extended~~ 2019 Term Loans, the "~~Extended~~ 2019 Term Loans," and together with the 2013 Term Loans, the "Term Loans").

### 4. The Second Lien Notes.

In connection with the Recapitalization Transactions (as defined below), NMG, The Neiman Marcus Group LLC, Mariposa Borrower, Inc., and The NMG Subsidiary LLC (collectively, the "Notes Issuers") issued $550.0 million aggregate principal amount of Second Lien Notes under the Indenture, dated June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with the Notes Issuers, as issuers, Ankura Trust Company, LLC, as trustee and notes collateral agent, and certain of the Debtors as guarantors.

The Second Lien Notes and related guarantees are secured by collateral that includes (a) a second-priority security interest in the Original Term Loan Priority Collateral and the Term Loan Priority Collateral, (b) a second priority interest in certain previously unencumbered real estate related to certain full line Neiman Marcus stores (the "Notes Priority Real Estate Collateral") mortgageable to the collateral agent, and the equity interests of a special purpose entity and subsidiary of NMG ("Notes PropCo") formed to hold certain real estate leases that cannot be mortgaged directly to the collateral agent (together, the "Notes Priority Collateral") (subject to a cap on recovery equal to $200.0 million less any amounts recovered against those assets by holders of the Third Lien Notes issued in connection with the Recapitalization Transactions (as defined below)), (c) a third-priority security interest in the ABL Priority Collateral, and (d) a senior secured guarantee of up to $200.0 million by three holding companies of the MyTheresa Operating Companies—non-debtors MYT Holding Co., MYT Intermediate Holding Co., and MYT Netherlands Parent B.V.—and a first priority pledge of the assets of such guarantors subject to customary exceptions (the "Limited Guarantee Collateral").

As of the Petition Date, $561.7 million in aggregate principal amount of Second Lien Notes remains outstanding. The Second Lien Notes mature on April 25, 2024 and require semiannual coupon payments of 8.0% cash interest and 6.0% PIK interest on April 15 and October 15. The Debtors did not pay the coupon payment due on April 15, 2020.

### 5. The Third Lien Notes.

In connection with the Recapitalization Transactions (as defined below), the Notes Issuers issued (a) approximately $730.5 million aggregate principal amount of 8.000% Third Lien Notes under the Indenture, dated June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with the Notes Issuers, as issuers, Wilmington Trust, National Association, as trustee and notes collateral agent, and certain of the Debtors as guarantors, and (b) approximately $497.8 million aggregate principal amount of 8.750% Third Lien Notes under the Indenture, dated June 7, 2019, with the Notes Issuers, as issuers, Wilmington Trust, National Association, as trustee and notes collateral agent, and certain of the Debtors as guarantors. Interest on the Third Lien Notes is payable semiannually in arrears on April 15 and October 15. The Third Lien Notes mature on October 25, 2024. The Debtors did not pay the coupon payment due on April 15, 2020.

The Third Lien Notes are secured by collateral that includes (a) a first-priority security interest in the Notes Priority Collateral (subject to a cap on recovery equal to $200.0 million), (b) a third-priority security interest in the Original Term Loan Priority Collateral and the Term Loan Priority Collateral, (c) a first priority pledge of 50 percent of the common equity interests of non-debtor MYT Holding Co., a holding company of the MyTheresa business, and (d) a fourth priority security interest in the ABL

Priority Collateral. In addition, the Third Lien Notes are guaranteed, subject to certain exceptions, by each of NMG's current and future domestic subsidiaries and future foreign subsidiaries on a senior secured basis.

### 6. The Unsecured Notes.

On October 21, 2013, NMG and Mariposa Borrower, Inc. issued $960 million aggregate principal amount of Unsecured Cash Pay Notes under the Indenture, dated October 21, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with UMB Bank, N.A. (as successor to U.S. Bank, N.A. and Drivetrain Trust Company LLC), as trustee. As of the Petition Date, the outstanding balance under the Unsecured Cash Pay Notes was $80.7 million. Interest on the Unsecured Cash Pay Notes is payable semi-annually in arrears on each April 15 and October 15. The Unsecured Cash Pay Notes mature on October 15, 2021 and are guaranteed by the same entities that guarantee the Third Lien Notes. The Debtors did not pay the coupon payment due on April 15, 2020.

On October 21, 2013, NMG and Mariposa Borrower, Inc. issued $600 million aggregate principal amount of Unsecured PIK Toggle Notes under the Indenture, dated October 21, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with NMG as issuer, Mariposa Borrower, Inc., as co-issuer, certain Debtors, as guarantors, and UMB Bank, N.A. (as successor to U.S. Bank, N.A. and Drivetrain Trust Company LLC) as trustee. As of the Petition Date, the outstanding balance under the Unsecured PIK Toggle Notes was $56.6 million. Interest on the Unsecured PIK Toggle Notes is payable semi-annually in arrears on each April 15 and October 15. The Unsecured PIK Toggle Notes mature on October 15, 2021 and are guaranteed by the same entities that guarantee the Third Lien Notes. The Debtors did not pay the coupon payment due on April 15, 2020.

### 7. The 2028 Debentures.

On May 27, 1998, the Neiman Marcus Group LLC issued $125.0 million aggregate principal amount of 2028 Debentures (the "2028 Debentures") under the Indenture, dated May 27, 1998 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with Wilmington Savings Fund Society, FSB (as successor to The Bank of New York Mellon Trust Company), as trustee. The 2028 Debentures mature on June 1, 2028.

The 2028 Debentures are secured by "equal and ratable" liens on certain owned real estate properties, real estate ground leases, and real estate operating leases of NMG and on shares of capital stock and indebtedness of certain NMG's subsidiaries, in each case pari passu with the Extended2019 Term Loans. The 2028 Debentures are guaranteed on a senior basis by NMG, Extended Term Loan PropCo, and Notes PropCo. The guarantees are full and unconditional. The 2028 Debentures are not otherwise guaranteed by any of The Neiman Marcus Group LLC's subsidiaries.

### 8. Preferred Stock of Non-Debtor MyTheresa Holding Co.

In connection with the Recapitalization Transactions (as defined below), Parent formed three new Delaware subsidiaries (the "MyTheresa Holding Companies") and contributed the MyTheresa Operating Companies to the MyTheresa Holding Companies. Further, validly tendered Unsecured Notes were exchanged for aggregate consideration consisting of new Third Lien Notes and 250,000,000 shares of Series A Preferred Stock, par value $0.001 per share (the "MYT Series A Preferred Stock"), with an initial liquidation preference of $1.00 per share, of MYT Holding Co., a MyTheresa Holding Company. In addition, MYT Holding Co. issued 250,000,000 shares of Series B Preferred Stock, par value $0.001 per share (the "MYT Series B Preferred Stock") with an initial liquidation preference of $1.00 per share, to its direct parent and a MyTheresa Holding Company, MYT Parent Co.

## VII. EVENTS LEADING TO THE CHAPTER 11 FILINGS

~~**A. Macroeconomic Challenges and Prepetition Cost-Saving and Cash Conservation Initiatives.**~~

~~While NMG has been proactive in addressing changing trends, it faces the same macro-trends that have crippled many apparel and retail companies, including a general trend from brick-and-mortar to online retail channels and a shift in consumer demographics. Recognizing this, after the Recapitalization Transactions, but prior to the COVID-19 temporary store closures, the Debtors immediately implemented a series of cost-saving and cash conservation initiatives to grow their profit margins and address their debt obligations. These initiatives included, among others, expense reduction, contract renegotiations, reduced capital expenditures, optimization of the Debtors' merchandise inventory, labor-force realignment and real estate monetization. As a result of these initiatives, the Debtors were on pace for $90 million in cost savings and a $100 million increase in liquidity by July 2020, on top of $100 million in additional liquidity obtained in the first half of fiscal year 2020. The Debtors paid all of their vendors on time and in full in the ordinary course of business.~~

### A. The Unprecedented Spread Of COVID And Store Closures Results In Neiman Marcus Preparing for A Chapter 11 Filing

Between the Distribution in September 2018 and March 2020, the Debtors made all of their regularly scheduled debt payments as they came due—a total of nearly $550 million—and were on track to meet or exceed all of their budget, earnings, and savings targets for the fiscal year ending in July 2020. The Debtors also had posted comparable store sales growth for seven of the ten previous quarters and significantly expanded gross margins during the last holiday season in line with its goal of profitable and sustainable growth.

All of that progress came to a halt in March, as governments in the United States and throughout the world imposed quarantines, social distancing protocols, and shelter-in-place orders in response to COVID-19. On March 18, 2020, the Debtors voluntarily closed all of their stores to protect the health and safety of NMG's customers and employees and dramatically reduced supply chain operations.

With the unexpected temporary closure of all of NMG's brick-and-mortar locations, the Debtors experienced an immediate reduction in cash flow of approximately 65–75%. The Debtors implemented a number of strategies to address the capital structure and liquidity challenges, including furloughing 80–90% of their employees, eliminating or deferring most capital expense projects, limiting cash disbursements and new inventory, reducing employee salaries and wages company-wide, and seeking concessions from brand partners and landlords. Almost all stores have subsequently opened.

#### 1. Landlord Engagement.

Strong relationships with the Debtors' landlords will be critical to the Debtors' success during these Chapter 11 Cases. Prior to the Petition Date, NMG engaged in fruitful rent relief negotiations with its landlords.

NMG and its advisors contacted nearly all of NMG's landlords to discuss potential postpetition rent concessions and other relief on a landlord-by-landlord basis. NMG's landlords were generally supportive and responsive, and NMG reached several agreements in principle, representing millions of dollars in rent deferrals in April, May, and June 2020. The Debtors ~~will~~have continued to discuss rent deferrals, rent concessions, and other forms of relief during these Chapter 11 Cases and will continue to do so.

### 2. Distribution Center and Store Closures.

On March 11, 2020, NMG announced its decision to permanently close most of its remaining Last Call stores by October 2020. NMG intends to file a motion requesting entry of an order approving procedures for store closures and authorizing NMG to permanently close the Last Call stores (and potentially additional underperforming or geographically undesirable stores in the NMG store portfolio). Additionally, as a result of the Last Call store closures and a detailed analysis of its supply chain, NMG identified two of its Texas distribution centers that it plans to sell and reinvest the proceeds to optimize its supply chain. NMG anticipates such closures could increase liquidity and accelerate profitable growth.

### B. COVID-19.

NMG has experienced a significant decline in store traffic and related consumer spending as well as numerous operational challenges as a result of the COVID-19 pandemic, actions taken by governments and citizens in response, and the unprecedented upheaval in the global financial markets that has followed. In response to state and local government mandates and recommendations, on March 18, 2020, NMG temporarily closed all Neiman Marcus, Bergdorf Goodman, and Last Call retail stores through at least April 30, 2020. NMG later extended its store closures through June 2020. Store closures have significantly contributed to missed sales targets, unsold inventory, and depressed profit margins. Online sales in April 2020, including associate-driven sales through NMG's digital platforms, have seen double digit increases compared to last year, but digital sales have not been sufficiently high to compensate for lost in store revenues.

In response to the outbreak of COVID-19, the Debtors immediately went into liquidity conservation mode. First, the Debtors froze discretionary spending, business travel, and NMG corporate purchase cards, stopped taking spring receipts, and froze nonemergency capital expenditures. Next, the Debtors made the incredibly difficult decision to institute the Furlough Program (as defined below). In addition, the Debtors began to discuss contingencies with their landlords regarding the temporary store closures. After taking extreme steps to conserve liquidity, the Debtors were forced to stretch accounts payable timelines.

### 2. ~~1.~~ Furlough Program.

Due to the unprecedented and unforeseen disruption to the Debtors' business caused by COVID-19, the Debtors made the incredibly difficult decision to implement temporary salary reductions and both partial and full furloughs that will affect nearly all of the Debtors' employees (the "Furlough Program"). While the Debtors initially maintained wages and salaries for their employees, effective April 5, 2020, the Debtors placed approximately 11,282 full- and part-time employees on temporary furlough (the "Furloughed Employees") and reduced the salaries of all non-furloughed exempt employees. The Debtors committed to a 60-day Furlough Program, although ongoing developments concerning COVID-19 and related governmental actions remain highly uncertain and may lead to extensions. During the duration of the Furlough Program, Furloughed Employees will remain on unpaid leave unless otherwise scheduled to work, but will remain eligible to participate in any health benefits programs in which such Furloughed Employees are currently enrolled. The Debtors will also maintain approximately 2,208 active employees to maintain the Debtors' limited business operations. The Debtors anticipate that the Furloughed Employees will return to work once the public health crisis subsides.

B. ~~C.~~ Restructuring Support Agreement and DIP Financing, and Exit Facility.

1. Restructuring Support Agreement.

The Restructuring Support Agreement contemplates a comprehensive reorganization achieved through the Plan (as defined below) that will result in a substantial deleveraging of the Debtors' balance sheet by as much as $4 billion and provide the Debtors with $750 million of fully-committed new capital. ~~The key financial components of the restructuring are as follows:~~

- ~~access to a commitment for the post-effective date Exit Facility in aggregate principal amount of $750 million, initially backstopped by the Term Loan Lender Group and the Noteholder Group, which backstop rights and obligations were further syndicated to other Extended Term Loan lenders, holders of 2028 Debentures, holders of Second Lien Notes, and holders of Third Lien Notes who executed the Restructuring Support Agreement pursuant to syndication procedures following entry of the Interim DIP Order, which will be used to refinance the term loans under the DIP Facility; and~~

~~The Restructuring Support Agreement contemplates stakeholder recoveries as follows pursuant to the Plan:[12]~~

- ~~holders of claims on account of the Asset-Based Revolving Credit Facility and FILO Facility will receive value, as of the effective date of the Plan, equal to the allowed amount of such claims, as applicable, in each case not to exceed the value of such holders' interests in the Debtors' interest in the property securing such claims;~~

- ~~holders of 2019 Term Loan Claims shall receive their pro rata share of and interest in (a) 87.5 percent of the reorganized equity (subject to dilution) and (b) 87.5 percent of the Exit Rights, subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;~~

- ~~if the class of 2013 Term Loan Claims votes in favor of the Plan, holders of 2013 Term Loans shall receive their pro rata share of and interest in (a) 0.2 percent of the reorganized equity (subject to dilution) and (b) 0.2 percent of the Exit Rights, or, if the class of 2013 Term Loan Claims does not vote in favor of the Plan, holders of 2013 Term Loan Claims will receive value, as of the Effective Date of the Plan, equal to the allowed amount of such claims not to exceed the value of each holder's interest in the estate's interest in the property securing such claims;~~

- ~~holders of 2028 Debentures Claims will receive their pro rata share of and interest in (a) 2.8 percent of the reorganized equity (subject to dilution) and (b) 2.8 percent of the Exit Rights, subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;~~

- ~~holders of Second Lien Notes Claims shall receive their pro rata share of and interest in (a) 1.0 percent of the reorganized equity (subject to dilution), (b) 1.0 percent of the Exit~~

---

~~[12] In the event of any inconsistencies between the summaries set forth below and the provisions relating to such recoveries in the Restructuring Support Agreement and/or Plan documents, the descriptions in the Restructuring Support Agreement and/or Plan, as applicable, shall control.~~

Rights, and (e) seven-year warrants (no Black-Scholes protection) to purchase up to 25.0 percent of the reorganized equity at an agreed-upon strike price;

● holders of Third Lien Notes Claims shall receive their pro rata share of and interest in (a) 8.5 percent of reorganized equity (subject to dilution) and (b) 8.5 percent of the Exit Rights;

● holders of general unsecured claims shall receive their pro rata share of a cash pool; and

● stakeholders' economic and governance rights with respect to MyTheresa shall be consistent with such stakeholders' prepetition rights, claims, and controls.

Pursuant to the Restructuring Support Agreement, the Plan is intended to minimize any potential adverse effects to the Debtors' businesses, customers, and trade partners as a result of the restructuring, and will position the Debtors for a timely emergence from bankruptcy.

## 2. DIP Financing.

In response to the outbreak of COVID-19, since March 2020, the Debtors, in consultation with their advisors, Lazard, BRG, and Kirkland, reviewed and evaluated potential financing alternatives and cash requirements necessary to operate their businesses as a going concern. The Debtors concluded that an out of court restructuring was not viable and that current cash was insufficient for the Debtors to operate during these Chapter 11 Cases. Given these conclusions, and the Debtors' work with their advisors, the Debtors determined that procuring sufficient financing at the start of these cases would be essential to fund its operating costs, its working capital needs, and these Chapter 11 Cases. The Debtors further determined that this financing was needed to pursue a value maximizing restructuring for the benefit of the Debtors' stakeholders. The Debtors' DIP budget forecasting also analyzes the effect of various COVID-19 scenarios impacting, among other things, (i) the timing of reopening stores, (ii) the potential shut down of the Debtors' e commerce operations, and (iii) various recovery trajectories. Based on those discussions, the Debtors, together with their advisors, determined that they require immediate access to DIP financing to fund the costs of administering these Chapter 11 Cases, near term working capital needs, and ongoing business operations.

The Debtors looked for financing from sources within their existing capital structure as well as third parties. No third-party lender provided the Debtors with a proposed out-of-court or postpetition financing facility that was executable. As early as March 25, 2020, the Term Loan Lender Group engaged with the Debtors regarding potential postpetition financing. In addition, after several rounds of hard fought negotiations, the Term Loan Lender Group and Noteholder Group reached an agreement that provided for an additional $50 million in liquidity under the DIP Facility and would allow the Noteholder Group to backstop a portion of the DIP Facility.

After extensive, arm's length negotiations with the Term Loan Lender Group and the Noteholder Group, and as noted in the Debtors' motion seeking authorization to enter into the DIP Facility on an interim and final basis [Docket No. 104], the Debtors were able to secure the proposed $675 million DIP Facility, open to all Prepetition Term Loan Lenders, and, after further negotiations, to the holders of the Second and Third Lien Notes, backstopped by the Term Loan Lender Group and the Noteholder Group. The DIP Facility will be~~is~~ secured ~~with~~by a perfected first priming lien on substantially all of the Debtors' assets except for a second lien on the collateral of the lenders under the ABL Facility (the "ABL Lenders"). As such, the DIP Facility does not purport to prime the ABL Lenders' collateral. The Prepetition Term Loan Lenders and the holders of the Third Lien Notes, Second Lien Notes, and 2028 Debentures have consented to granting a priming lien on their collateral.

3.      **Committed Exit Facility.**

Concurrently with the negotiations regarding the DIP Facility, the Debtors and their advisors engaged in good faith, arm's length negotiations with the same group of creditors that agreed to provide the DIP Facility, namely the Term Loan Lender Group and the Noteholder Group, on a $750 million Exit Facility, backstopped by the Term Loan Lender Group (excluding the holders of the 2028 Debentures) and the Noteholder Group, which is necessary to ensure the successful restructuring of the Debtors, especially since the long term implications of COVID-19 are still unknown.

## VIII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.      **Expected Timetable of the Chapter 11 Cases.**

The Restructuring Support Agreement contains certain milestones in relation to the Chapter 11 Cases that apply unless extended or waived in writing.  The Debtors intend to move as quickly ~~as practicable during the Chapter 11 Cases to achieve such~~ to comply with the remaining milestones, including:

- ~~entry of an order approving the Disclosure Statement by July 21, 2020;~~

- confirmation of a chapter 11 plan by September 4, 2020; and

- emergence from chapter 11 by December 3, 2020.

Should the Debtors' projected timelines prove accurate, and consistent with certain milestones set forth in the Restructuring Support Agreement, the Debtors could emerge from chapter 11 within 210 days of the Petition Date (which is December 3, 2020) and still maintain access to the DIP Facility.  **No assurances can be made, however, that the Court will enter various orders on the timetable anticipated by the Debtors or that certain conditions precedent to the Effective Date will have occurred by the outside date under the Restructuring Support Agreement.**

### B.      **Corporate Structure upon Emergence.**

Except as otherwise provided in the Plan or the Description of Transaction Steps, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### C.      **First/Second Day Relief.**

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") requesting various types of relief which were approved by the Court.  The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things: (a) an order authorizing the Debtors to obtain postpetition financing and use cash collateral during the

Chapter 11 Cases, and granting certain adequate protection to certain secured parties; (b) an order authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions; (c) an order authorizing the Debtors to pay certain prepetition taxes and fees; (d) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business; (e) an order authorizing the Debtors to maintain the surety bond program, entering into and performing under any other agreements related to the surety bond program, and paying any prepetition or postpetition obligations related to the ~~S~~surety ~~B~~bond ~~P~~program, including any amounts owed on account of ~~the B~~brokerage ~~F~~fees; (f) an order granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs; (f) an order authorizing the Debtors to make payment on account of prepetition Claims of certain critical vendors, lien claimants, customs and regulatory claimants, and 503(b)(9) claimants; (g) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance; (h) an order authorizing the Debtors to continue administer the customer programs and charity donation programs, and satisfy prepetition obligations related thereto; and (i) an order authorizing the Debtors to retain Stretto[13] as claims, noticing, and solicitation agent.

On June 2, 2020, the Debtors held their second day hearing before the Bankruptcy Court. At the second day hearing, the Bankruptcy Court granted certain of the ~~first day~~ relief requested under the First Day Motions on a final basis, including approving procedures for, among other things, determining adequate assurance for utility providers, authority for the Debtors to continue using their existing cash management system, authority to pay certain trade claimants, and authority to use cash collateral.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration, filed on the Petition Date. The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/NMG/.

> **D.** **Approval of the DIP Facility.**

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP Facilit~~ies~~y represents the best terms available, the Debtors filed a motion on the Petition Date seeking authorization to enter into the DIP Facility on an interim and final basis (the "DIP Motion"). On May 8 2020, the Court approved the DIP Motion on an interim basis [Docket No. 284]. On June 16, 2020, the Court approved the DIP Motion on ~~an interim~~a final basis [Docket No. 28450]. ~~The final hearing on the approval of the DIP Motion has been reset to June 10, 2020 at 1:00 p.m. (prevailing Central Time).~~

> **E.** **Other Procedural and Administrative Motions.**

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On June 2, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain*

---

[13] "Stretto" is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

*Professionals Utilized in the Ordinary Course of Business* [Docket No. 740] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. ~~The~~On June 25, 2020, the Court ~~will hear~~approved the OCP Motion ~~at a hearing scheduled to take place on June 26,~~[Docket No. ~~21~~0209].

- <u>Interim Compensation Motion</u>. On June 3, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 749] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code. ~~The~~On June 26, 2020, the Court ~~will hear~~approved the Interim Compensation Motion ~~at a hearing scheduled to take place on June 26,~~[Docket No. ~~21~~0270].

### F. Retention of the Debtors' Professionals.

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, on June 3-4, 2020, the Debtors filed applications requesting that the Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327 and 328 of the Bankruptcy Code: (a) Kirkland & Ellis LLP as counsel to the Debtors [Docket No. 748]; (b) Jackson Walker LLP as co-counsel to the Debtors [Docket No. 750]; (c) Lazard Frères & Co. LLC, Inc. as investment banker to the Debtors [Docket No. 762]; (d) Berkeley Research Group, LLC to provide the Debtors a Chief Restructuring Officer and certain additional personnel [Docket No. 751]; (e) Katten Muchin Rosenman LLP as counsel to Holdings at the sole direction of Anthony Horton as disinterested manager of Holdings [Docket No. 765]; and (f) Willkie Farr & Gallagher LLP as counsel to NMG LTD LLC at the sole direction of ~~Marc Beilinson and~~ Scott Vogel as the disinterested managers of NMG LTD LLC [Docket No. 763]~~; and (g) Perella Weinberg Partners~~. On June 26, 2020, the Debtors filed an application requesting that the Court authorize the Debtors to retain and employ Alvarez & Marsal North America, LLC, as financial advisors to NMG LTD LLC at the sole direction of ~~Marc Beilinson and~~ Scott Vogel as the disinterested manager~~s~~ of NMG LTD ~~LLC [Docket No. 764].~~LLC, pursuant to sections 327 and 328 of the Bankruptcy Code [Docket No. 1050]. On June 25-26, 2020, the Court approved the retention of the following advisors: (a) Kirkland & Ellis LLP [Docket No. 1071]; (b) Jackson Walker LLP [Docket No. 750]; and (c) Berkeley Research Group, LLC [Docket No. 1072]. On July 7-8, 2020, the Court approved the retention of the following advisors: (a) Katten Muchin Rosenman LLP [Docket No. 1156]; (b) Willkie Farr & Gallagher LLP [Docket No. 1132]; and (c) Alvarez & Marsal North America, LLC [Docket No. 1131]. On July 16, 2020, the Court approved the retention of Lazard Frères & Co. LLC [Docket No. 1224].

### G. Schedules of Assets and Liabilities and Statements of Financial Affairs.

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 10] seeking an extension of the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") until June 19, 2020 for a total of 44 days from the Petition Date, which the Court granted on May 8, 2020 [Docket No. 240]. The Debtors ~~intend to~~ filed their Schedules ~~by~~on June 19, 2020.

### H. Establishment of a Claims Bar Date.

As described more fully in Article ~~II.K~~ III.K of this Disclosure Statement, on June 2~~5~~, 2020, the ~~Debtors filed~~Bankruptcy Court entered the Bar Date ~~Motion proposing~~Order setting the Bar Date by which the entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date (including, without limitation, Class 10:  General Unsecured Claims)~~,~~ must file proofs of claim.  The Bar Date ~~Motion seeks to~~Order establishe~~s~~ July 20, 2020 as the general claims bar date and November 3, 2020 as the governmental claims bar date.  ~~If the Bar Date Motion is approved and an order (the "Bar Date Order") is entered, any~~Any party required to file a proof of claim under the ~~b~~Bar Date Order that fail~~s~~ed to do so before the applicable bar date will be forever barred, estopped, and enjoined from asserting such claim against the Debtors and the Debtors will be forever discharged from any indebtedness or liability relating to such claim.  Such party will not be permitted to vote to accept or reject the Plan or receive any recovery under the Plan.

### I. ~~Appointment of the Disinterested Managers and Investigation~~Store Closing Process.

On July 3, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances, and (III) Granting Related Relief* [Docket No. 1115] (the "Store Closing Motion") seeking to implement a key component of their restructuring strategy and optimize their operations by closing underperforming or geographically less desirable stores, or stores that no longer align with the Debtors' go-forward business plan.  The Store Closing Motion is scheduled to be heard before the Court on July 27, 2020.  Pursuant to the Store Closing Motion, the Debtors seek to conduct store closing procedures at seventeen (17) Last Call stores.  The Debtors also seek authority to conduct store closing procedures at additional stores after notice and, if necessary, a hearing.

The Debtors continue to evaluate their approximately 59 additional stores and leases to determine whether or not to assume or reject Unexpired Leases, continue store operations, or conduct real property sales.  The Debtors are in the middle of negotiations with many of their landlords regarding the terms of the Debtors' Unexpired Leases in an effort to procure favorable lease terms such that stores can continue to operate.  The Debtors believe that these negotiations have generally been successful, and the resulting savings will accrue to the benefit of the Debtors' estates and improve the profitability of the Debtors as a going-concern.

~~On April 28, 2020, Holdings, the Debtor parent of NMG LTD LLC, appointed disinterested manager Anthony Horton to its Board of Managers, and NMG LTD LLC appointed disinterested managers Marc Beilinson and Scott Vogel to its Board of Managers (collectively, the "Disinterested Managers") and delegated to the respective disinterested managers, among other things:  (a) the authority to review and act upon any matters pertaining to the respective company's chapter 11 cases in which a conflict exists between the respective company and its shareholders, affiliates, or managers, directors, and officers ("Conflict Matters"); (b) the authority to investigate and determine, in their business judgment and with the advice of independent counsel, whether any matter constitutes a Conflict Matter, with such determination binding the respective company; and (c) the authority to conduct all investigations and analyses related to the Conflict Matters, including but not limited to fact investigation, legal research, briefing, discovery, negotiation and settlements of Conflict Matters.  Holdings has retained Katten Muchin Rosenman LLP as legal counsel to advise Mr. Horton with respect to the matters delegated to Mr. Horton.  NMG LTD LLC has retained Willkie Farr & Gallagher LLP as legal counsel and Perella Weinberg Partners as financial advisor to advise Mr. Beilinson and Mr. Vogel with respect to the matters delegated to Mr. Beilinson and Mr. Vogel.  Prior to the Petition Date, the Disinterested Managers for NMG LTD LLC and Holdings began their respective independent investigations~~

(collectively, the "~~Independent Investigations~~") with respect to the Conflict Matters to fulfill their duties under their respective delegations.  The Independent Investigations are continuing. .

~~The Restructuring Support Agreement's release provisions are explicitly subject to investigation by the Disinterested Managers.  Likewise, the Restructuring Support Agreement contains a broad fiduciary out that allows the Debtors to consider alternatives to the Plan.  The Independent Investigations are progressing, and the Disinterested Managers and their advisors continue their efforts to evaluate potential Conflict Matters.  Should the Disinterested Managers conclude that either an alternative path forward, or amendments to the Plan are necessary to maximize the value of the estates for the benefit of all stakeholders, the Disinterested Managers will pursue such alternatives to the extent viable.~~  ~~The Disclosure Statement will be updated with the progress of the Independent Investigations prior to any hearing to approve the Disclosure Statement.  Pending the outcome of the Independent Investigations, the Debtors retain the right to withdraw any commitments to grant the releases contemplated by the Restructuring Support Agreement, and the Debtors generally retain a full "fiduciary-out" to terminate the Restructuring Support Agreement consistent with the terms thereof~~

J.     **Appointment of the ~~Official~~Creditors Committee.**

On May 19, 2020, the United States Trustee for the Southern District of Texas (the "United States Trustee") filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 455] notifying parties in interest that the United States Trustee had appointed a statutory committee of unsecured creditors (the "~~Official~~Creditors Committee") in the Chapter 11 Cases.  The ~~Official~~Creditors Committee is currently composed of the following members:  Wilmington Trust, National Association, Pension Benefit Guaranty Corporation, UMB Bank, N.A., Marble Ridge Capital LP, on behalf of Marble Ridge Master Fund LP, Simon Property Group, Inc., Chanel, Inc., Kering Americas, Inc., Estée Lauder Companies, and Ebates Performance Marketing, Inc.  The ~~Official~~Creditors Committee has retained Pachulski Stang Ziehl & Jones as its legal counsel and MIII Partners, LLC as its financial advisor.

K.     **The Debtors Appoint Disinterested Managers With Independent Advisors To Investigate Potential Estate Claims, And The Creditors Committee And The Disinterested Managers Proceed With Their Investigations**

Since 2013, the Debtors have conducted their businesses through member-managed LLCs as discussed above.  The top member of the Neiman Marcus organization is non-debtor NMG Inc., which has a board of directors.

In April 2020, in anticipation of a Chapter 11 filing, the NMG Inc. board unanimously agreed to modify the LLC agreements of Mariposa Holdings and NMG LTD LLC to create Boards of Managers at those entities that would control the Debtors' businesses, including making all decisions with respect to these chapter 11 cases.  Neiman Marcus' CEO, Geoffroy van Raemdonck, sits on both Boards of Managers along with one Disinterested Manager at Holdings (Anthony Horton) and one at NMG LTD LLC (Scott Vogel).  No representative of the Sponsors sits on either Board of Managers.

Each of the Boards of Managers executed a full delegation of authority to the Disinterested Managers to determine in their sole judgment whether a conflict exists with respect to any issue in connection with the Debtors' chapter 11 cases.  To the extent the Disinterested Managers determine there is a conflict, the Disinterested Managers have full authority to assess and act upon the conflict matter.  Since its appointment, the Creditors Committee also began its own investigation of the Designation, PropCo Transaction, Distribution and Recapitalization Transactions.

Since the Disinterested Managers and the Creditors Committee began their investigations (each with their own legal counsel and financial advisors), the Debtors have produced more than 76,000

documents to the Disinterested Managers and the Creditors Committee.  The Sponsors, Lazard and Duff & Phelps have produced more than 20,000 additional documents.  To date, the Creditors Committee and the Disinterested Managers have deposed ten witnesses: four Debtor witnesses (three of whom were involved in preparing the solvency analysis and the Debtors' 30(b)(6) representative, its current Chief Financial Officer), two corporate representatives of Lazard, NMG Inc. independent board member Norman Axelrod, Ares' corporate representative and NMG Inc. board member Dennis Gies, the former chairman of the NMG Inc. board and Ares co-founder David Kaplan, and CPPIB's corporate representative and NMG Inc. board member Cesare Ruggiero.  Additional depositions are scheduled in July and August.

### 1.   Disinterested Manager Investigation.

Mr. Vogel has conducted his investigation (the "Disinterested Manager Investigation") with alacrity to ensure that the disputes related to the MyT Transactions do not delay the Debtors' ability to timely exit from these chapter 11 cases.  Among other things, as part of the Disinterested Manager Investigation, Mr. Vogel (with his advisors at Willkie and A&M) has:

- reviewed over 80,000 documents from, among others, the Debtors and their advisors; the Sponsors; and Parent;

- in close coordination with counsel to the Committee, deposed ten representatives and financial advisors of those entities, with additional depositions scheduled to occur;

- analyzed financial issues relevant to the Disinterested Manager Investigation, including whether the Company was insolvent at the time of the Distribution; and

- analyzed legal issues relevant to the Disinterested Manager Investigation, including potential claims and related recoveries the estates might obtain through litigation.

Based on the work completed to date, Mr. Vogel concluded that there is a strong possibility that the Company was insolvent at the time of the Distribution, and therefore that the releases in favor of the Parent, directors and officers, and the Sponsors set forth in the Plan should only be granted to the extent substantial additional value is provided to the Debtors on account of the Distribution.  As part of the Disinterested Manager Investigation, Mr. Vogel identified several potential claims belonging to the estate based on information obtained in the Disinterested Manager Investigation.  Mr. Vogel's views on those claims, based on the substantial discovery taken to date, are described generally below.

(a)   The Estate Likely Has a Viable Constructive Fraudulent Conveyance Claim Against NMG Inc.

A prepetition transaction dispensing of a debtor's assets may constitute a fraudulent conveyance if (a) the debtor received less than reasonably equivalent value in exchange for the asset, and (b) the debtor was insolvent at the time of such transfer or became insolvent as a result of the transfer.  As noted above, the Distribution was structured as a dividend, and therefore the Debtors received no value in exchange for the MyT Interests.  The issue of solvency is the primary dispute in these cases.

Based on analyses performed by A&M and the discovery obtained thus far as part of the Disinterested Manager Investigation, Mr. Vogel believes that a court of competent jurisdiction likely would conclude that the Company was insolvent at the time of the Distribution.

(b)   Claims Against NMG Inc., its Directors and Officers, and the Sponsors

57

Mr. Vogel is continuing to investigate the viability of a substantial number of additional claims arising out of the MyT Transactions that could be asserted against NMG Inc., its directors and officers, the Sponsors, and the parties' respective representatives.

Potential claims against NMG Inc. include actual fraudulent conveyance, unjust enrichment, unlawful dividend, and aiding and abetting breach of fiduciary duty claims. With respect to the directors and officers of NMG Inc., potential claims against them include breach of fiduciary duty, unlawful dividends, and aiding and abetting breaches of fiduciary duty. Claims against the Sponsors could include aiding and abetting breach of fiduciary duty, civil conspiracy to breach fiduciary duty, civil conspiracy to defraud, civil conspiracy to commit fraudulent transfer, aiding and abetting fraudulent transfer, and unjust enrichment.

Mr. Vogel believes that the appropriate remedy for any and all of the MyT Claims should be measured in accordance with section 550 of the Bankruptcy Code. Section 550 provides that upon a finding of a successful fraudulent transfer claim, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). Accordingly, whether the estates pursue a constructive fraudulent conveyance action or a multitude of claims against a variety of defendants, Mr. Vogel does not believe the evidence adduced in discovery would support damages in excess of the value of the property transferred.

### 2. Committee Investigation

Since late May 2020, the Creditors Committee has conducted an investigation (the "Committee Investigation") regarding the estates' potential claims against NMG Inc., the Sponsors, and their respective non-Debtor affiliates, board members, and representatives (excluding officers running the business, the "Litigation Targets"). As part of the Committee Investigation, the Creditors Committee and its expert valuation consultant, The Michel-Shaked Group, have reviewed hundreds of thousands of pages of documents by the Litigation Targets and their professionals and conducted numerous depositions of relevant witnesses.

On July 17, 2020, the Creditors Committee filed with the Bankruptcy Court (i) the *Preliminary Report of the Official Committee of Unsecured Creditors Regarding the Bankruptcy Estates' Litigation Claims Against Neiman Marcus Group, Inc., the Sponsors and Directors of Neiman Marcus Group, Inc., and Other Parties* (the "Preliminary Report"); (ii) the *Appendix to the Preliminary Report of the Official Committee of Unsecured Creditors Regarding the Bankruptcy Estates' Litigation Claims Against Neiman Marcus Group, Inc., the Sponsors and Directors of Neiman Marcus Group, Inc., and Other Parties* (the "Appendix"); (iii) the *Initial Expert Report of The Michel-Shaked Group* (the "Expert Report"); and (iv) the *Executive Summary* to the Expert Report (the "Expert Summary," and, together with the Preliminary Report, Appendix, and Expert Report, the "Reports"). Based on the Committee Investigation to date and as outlined in detail in the Reports, the Creditors Committee has reached the conclusion that the Designation and/or Distribution of MyTheresa gave rise to, among other potential actionable claims, actionable claims for: (1) constructive fraudulent transfer claims, (2) intentional fraudulent transfer claims, and (3) breach of fiduciary duty claims against the Debtors' member-managers and the directors of the Parent.

### L. Disinterested Manager Settlement

The disinterested manager of NMG LTD, Mr. Vogel, with the assistance of counsel and advisors, has undertaken an investigation into potential conflict matters and potential estate claims, and causes of action. As a result of his investigation, Mr. Vogel determined that he could not support the releases of

certain equityholders of the Debtors absent fair consideration on account of the release of estate claims and causes of action with respect such parties.  Mr. Vogel spent several weeks negotiating at arms' length with the Sponsors, the Creditors Committee, and the Term Loan Lenders.  Mr. Horton, in connection with his ongoing investigation, has been kept apprised on a real-time basis of such settlement negotiations.

Ultimately, after several rounds of negotiation, Mr. Vogel, on behalf of the Debtors, the Consenting Sponsors, the Consenting Term Loan Lenders[, and the Creditors Committee][14] reached a settlement on account of the potential estate claims and causes of action against the Consenting Parent and the Sponsors (the "Disinterested Manager Settlement") that Mr. Vogel believes is fair, reasonable, and in the best interests of creditors.  Pursuant to the Disinterested Manager Settlement, the Consenting Parent and the Consenting Sponsors will agree to return to the Debtors, for distribution to Holders of Allowed General Unsecured Claims in accordance with the treatment provided to Classes 10 and 11 in the Plan, 140 million shares (56% of the total shares) of MYT Series B Preferred Stock.  Additionally, the Consenting Term Loan Lenders will agree that the Reorganized Debtors will contribute $10 million of Cash for distribution to Holders of General Unsecured Claims in accordance with the treatment provided to Classes 10 and 11 in the Plan.  And the Plan has been modified to incorporate an effective waiver of the Deficiency Claims that may be asserted by Holders of 2019 Term Loan Claims, 2013 Term Loan Claims, 2028 Debenture Claims, Second Lien Notes Claims, and Third Lien Notes Claims, that would otherwise be significantly dilutive to recoveries of Holders of Allowed General Unsecured Claims.

In addition, notwithstanding anything to the contrary in the Plan, in connection with the Disinterested Manager Settlement, the Consenting Parent, the Consenting Sponsors, and any applicable creditors expressly waive any right they may have to enforce a turnover of any consideration provided pursuant to the Plan that might be enforceable against the Debtors or any of their creditors pursuant to the Existing MYT Transaction Documents and the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements; provided, that to the extent the Consenting 2L Parties and the Consenting 3L Parties do not agree to waive the Second Lien Notes Deficiency Claims and the Third Lien Notes Deficiency Claims, (i) the turnover and waterfall provisions concerning MyTheresa as set forth in the Existing MYT Transaction Documents and the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements, shall apply with respect to distributions in respect of such Claims and (ii) the Parent and Sponsors agree that any recovery received by Parent or Sponsors pursuant to turnover of distributions received on account of the Second Lien Notes Deficiency Claims and the Third Lien Notes Deficiency Claims shall be distributed to Holders of Allowed Funded-Debt General Unsecured Claims and Allowed Non-Funded Debt General Unsecured Claims.  To the extent the Plan is not effectuated, all rights are reserved.

The Debtors and Mr. Vogel believe that the Disinterested Manager Settlement provides a fair and reasonable return to the Debtors, for the benefit of the Holders of Allowed General Unsecured Claims, for the release of any potential estate claims and causes of action against the Sponsors and related parties.  The return of 56% of the MYT Series B Preferred Stock, $10,000,000 cash contribution effectively by the Consenting Term Loan Lenders, and modification of the Plan to ensure that Holders of Deficiency Claims on account of 2019 Term Loan Claims 2013 Term Loan Claims, 2028 Debenture Claims, Second Lien Note Claims, and Third Lien Note Claims do not share in the distribution to Holders of Allowed

---

[14]   [The Debtors are awaiting confirmation of the support of the Creditors Committee and statements regarding support and conditionality are anticipated to be made on the record of the Disclosure Statement Hearing.  The Disclosure Statement will be modified accordingly prior to solicitation.]

General Unsecured Claims, provides General Unsecured Creditors substantially more value than they would receive if the estate retained the claims and causes of action and succeeded in a claim to return all of the MYT Series B Preferred Stock held by the Sponsors.

**M.** ~~K. Other~~ **Litigation Matters.**

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

**N.** ~~L.~~ **Treatment of Executory Contracts and Unexpired Leases.**

**1.** **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided ~~herein~~in the Plan, each Executory Contract and Unexpired Lease, including the Debtors' non-qualified compensation plans, (including those set forth as assumed in the Schedules of Assumed and Rejected Contracts) shall be deemed assumed as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was previously assumed, assumed and assigned, or rejected by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is identified as rejected on the Schedules of Assumed and Rejected Contracts; or (4) is the subject of a motion to reject that is pending on the Effective Date. On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease that is identified as rejected on the Schedules of Assumed and Rejected Contracts shall be deemed rejected as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, and the Schedules of Assumed and Rejected Contracts, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Unless otherwise specified in the Plan Supplement, the Schedules of Assumed and Rejected Contracts, or an applicable Court order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall re vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedules of Assumed and Rejected Contracts identified in Article V.A of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date~~.~~; *provided,*

*however*, that after the date of the Confirmation Hearing, the Debtors may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned on the Schedules of Assumed and Rejected Contracts absent the consent of the applicable lessor.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### 2. Indemnification Obligation.

Upon the Effective Date and consummation of the Plan on the terms set forth in the Plan, all indemnification obligations in place as of the Effective Date under the Debtors' organizational documents (including in the by-laws, certificates of incorporation or formation, limited liability company agreements, and other organizational or formation documents,) for the current and former directors, officers, managers, and employees of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose; *provided*, *however*, that the foregoing shall not apply to any obligations to indemnify any person or entity (other than natural-person managers or officers in their capacities as such serving as of the Effective Date, including the disinterested managers of Mariposa Intermediate and NMG LTD, respectively) in connection with any claims or causes of action related to the designation of MyTheresa as an unrestricted subsidiary or the distribution of MyTheresa by or through certain Debtors to NMG, Inc. and related transactions.

### 3. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent and served on the Debtors or Reorganized Debtors, as applicable, no later than thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.EF. of the Plan, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim in accordance with Article III.C. of the Plan.

### 4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that

differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided* that the Reorganized Debtors may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity; *provided, further,* that notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any such dispute and approving the assumption of any such Executory Contract or Unexpired Lease, the Reorganized Debtors shall have the right to reject any such Executory Contract or Unexpired Lease that is subject to dispute, whether by amending the Schedules of Assumed and Rejected Contracts in accordance with Article V.A of the Plan or otherwise.

At least fourteen (14) days prior to the first day of the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment and proposed Cure amounts to be sent to applicable third parties, which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related Cure amount must be Filed, served, and actually received by the Debtors no later than seven days prior to the first day of the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.D of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order,

and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

O.    **The Surety Bond Program.**

On the Effective Date, all of the Debtors' obligations and commitments to any surety providers as set forth in the *Order (I) Authorizing the Debtors to Continue Their Surety Bond Program and (II) Granting Related Relief* [Docket No. 244] shall be deemed reaffirmed by the Reorganized Debtors, including as applicable: (i) surety payment and indemnity agreements, setting forth the sureties' rights against the Debtors, and the Debtors' obligations to pay and indemnify the sureties from any loss, cost, or expense that the sureties may incur, in each case, on account of the issuance of any surety bonds on behalf of the Debtors; (ii) surety collateral agreements governing collateral, if any, in connection with the Debtors' surety bonds; and/or (iii) ordinary course premium payments to any surety for the Debtors' surety bonds.

## IX.    PROJECTED FINANCIAL INFORMATION

A projected consolidated income statement is attached hereto as **Exhibit C**.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## X.    RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

2.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

3.      **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan of reorganization, subject to the terms of the Restructuring Support Agreement.  There can be no assurance that the terms of any such alternative chapter 11 plan of reorganization would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

4.      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Even though certain creditors have agreed pursuant to the Restructuring Support Agreement to support the Plan, there can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims and Interests against them would ultimately receive on account of such Allowed Claims and Interests.

The effectiveness of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive on account of such Allowed Claims and Interests.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

##### 5.  Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

##### 6.  Continued Risk Upon Confirmation.

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their products, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief.  If the Court terminates that right, however, or the exclusivity period expires, the Debtors' ability to achieve confirmation of the Plan and achieve the Debtors' stated goals may be adversely affected.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Additional financing, if required, may not be available on commercially reasonable terms, if at all.

##### 7.  The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and

including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan, subject to the terms of the Restructuring Support Agreement. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

~~Subject to the Disinterested Managers' Independent Investigations,~~ Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to the approval of the parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

**B.      Risks Related to Recoveries under the Plan.**

**1.      The Debtors May Not Be Able to Achieve Their Financial Projections.**

The Financial Projections attached hereto as **Exhibit C** represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general and the retail industry, which has been particularly affected by the recent COVID-19 outbreak and actions taken in response thereto.  While the Debtors believe that the Financial Projections attached hereto as **Exhibit C** are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, (a) the value of the New Equity may be negatively affected, and the recoveries by Holders of General Unsecured Claims that receive New Equity may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date and (c) the Debtors may be unable to service their debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

**2.      Reorganized Neiman's New Equity May Not Be Publicly Traded.**

There can be no assurance that an active market for the New Equity will develop, nor can any assurance be given as to the prices at which such stock might be traded.  The New Equity to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange.  Further, the New Equity to be issued under the Plan has not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction.  Absent such registration, the New Equity may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws.  As explained in more detail in Article ~~III herein~~XIII of this Disclosure Statement, most recipients of New Equity will be able to resell such securities without registration pursuant to the exemption from registration provided by section 1145 of the Bankruptcy Code, subject to any restrictions set forth in the certificate of incorporation and bylaws of Reorganized Neiman.

**3.      The ~~Recovery for Holders of Allowed General Unsecured Claims~~ Value of the MYT Series B Preferred Stock is Uncertain.**

~~The ultimate distributions to Holders of General Unsecured Claims are dependent on several factors, and cannot be determined at this time.  Such distributions are also subject to the application of certain bankruptcy and non-bankruptcy laws, such as tax and securities laws, which may impose certain restrictions on the distributions or obligations on Reorganized Debtors.~~

The Plan contemplates distribution of a portion of the MYT Series B Preferred Stock to Holders of Allowed General Unsecured Claims.  The ultimate value of the MYT Series B Preferred Stock depends on the value of MyTheresa, which is uncertain.

**C.      Risks Related to the Debtors' and the Reorganized Debtors' Business.**

**1.      The Debtors and the Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Debtors' and the Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, including the DIP Facility and the Exit Facility, depends on the Debtors' and the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing

economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond their control (including the factors discussed in Articles ~~IX.C.3 IX.C.4 herein~~X.C of this Disclosure Statement).  For example, if the Debtors are mandated or recommended to keep <u>any currently-closed</u> retail stores and/or distribution centers closed to contain the spread of the COVID-19 outbreak, <u>or to close re-opened stores,</u> cash flows may significantly be limited.  The Debtors and the Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit them to pay the principal, premium, if any, and interest on their indebtedness, including the DIP Facility and the Exit Facility.

**2.  The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with brand partners, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with brand partners, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  In addition, the Debtors will need the prior approval of the Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**3.  Recent Global Economic Trends, especially in Response to the COVID-19 Outbreak Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption of the Debtors' Retail Stores.**

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses.  Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services.  In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' business may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

The recent outbreak of COVID-19 has significantly disrupted financial markets. This outbreak and the actions taken by federal, state and local governments in response to the outbreak have significantly affected virtually all facets of the U.S. and global economies. Restrictions on and public concern regarding travel and public interaction have materially curtailed retail and hospitality activity. The COVID-19 outbreak ~~has~~ resulted in the temporary closure of all of the Debtors' retail stores ~~and is likely to result in extended closures in the future~~, almost all of which have since opened. A substantial majority of the Debtors' merchandise is manufactured in numerous locations, primarily in Europe, the United States, and, to a lesser extent, Asia. The timely delivery of merchandise to the Debtors' by their brand partners could be adversely affected by supply chain disruptions and travel restrictions which could, in turn, negatively impact the Debtors' ability to meet customers' demand.

Global financial markets have experienced significant volatility and losses as a result of the recent COVID-19 outbreak. Any resulting economic downturn could negatively impact customer demand and spending in the impacted regions and cause an oversupply of goods that could result in meaningful margin pressure. In response to anticipated liquidity pressures stemming from a potential downturn, many companies are exploring liquidity options, including drawing on revolving debt facilities. Subsequent to the end of the second quarter of fiscal year 2020, the Debtors' opted to draw down $225.0 million of additional borrowings under their Asset-Based Revolving Credit Facility to ensure that cash on-hand is adequate to address any potential disruptions related to the COVID-19 outbreak and the related response.

The Debtors are closely monitoring developments in connection with this outbreak. Restrictions on travel, quarantines and other measures imposed in response to the COVID-19 outbreak, as well as ongoing concern regarding the virus' potential impact, have had and will likely continue to have a negative effect on economies and financial markets, including supply chain shortages and other business disruptions. The Debtors expect the outbreak will materially affect results in the current and potentially future operating periods; however, the duration and extent of potential supply chain, demand and other disruptions is highly uncertain and will depend on future developments with respect to the spread and severity of the virus. An extended period of further economic deterioration could exacerbate the other risks described herein.

Additional effects of the recent conditions in the global economy include higher rates of unemployment, consumer hesitancy, and limited availability of credit, each of which may constrict the Debtors' business operations. These have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline and the Debtors cannot reduce costs on a timely basis or at all, the Debtors' operating results may be materially and adversely affected.

4.    **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and brand partners will lose confidence in the

Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection and operates in the luxury retail industry which has been dramatically affected by the recent COVID-19 outbreak.

### 5. Financial Results May Be Volatile and May Not Reflect Historical Trends.

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. Moreover, there have been mandates from federal, state and local authorities requiring forced closures of non-essential retailers in response to the recent COVID-19 outbreak. The duration of such closures and the extent of the outbreak's effects on the Debtors' business is highly uncertain and will depend on future developments with respect to the spread and severity of COVID-19. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 6. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Reorganized Debtors may become party to litigation. Any claims against the Debtors, whether meritorious or not, could be time-consuming, result in costly litigation, damage the Debtors' reputation, require significant amounts of management time and divert significant resources. If any of these legal proceedings were to be determined adversely to the Debtors, or the Debtors were to enter into a settlement arrangement, the Debtors could be exposed to monetary damages or limits on the Debtors' ability to operate their business, which could have an adverse effect on the Debtors' business, financial condition and results of operations. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

7.      **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the retail industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

## XI.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order [Docket No. [●]].

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan*.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.     Holders of Claims and Interests Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article II.C III.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, and 10, and 11 (collectively, the "Voting Classes").  Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims and Interests in Classes 1, 2, 11, 12, and 13, and 14.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims and Interests in the Voting Classes, such as those Holders whose Claims and Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.     Voting Record Date.

**The Voting Record Date is [●], 2020**.  The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under

Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

    **C.**     **Voting on the Plan.**

    **The Voting Deadline is [●]August 31, 2020, at 4:00 p.m.** prevailing Central Time. The Voting Deadline for any counterparty to an Unexpired Lease which is identified as rejected on a Schedules of Assumed and Rejected Contracts filed later than one Business Day prior to the Voting Deadline shall be extended to the date of the Confirmation Hearing. In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the Ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**NEIMAN MARCUS GROUP LTD LLC BALLOTS PROCESSING**
**C/O STRETTO**
**410 EXCHANGE, SUITE 100**
**IRVINE, CALIFORNIA 92602**


OR

ONLINE PORTAL AT https://balloting.stretto.com/

---

**PLEASE SELECT JUST ONE OPTION TO SUBMIT YOUR VOTE:**
**EITHER RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**

**OR**

**VOTE ELECTRONICALLY THROUGH THE CUSTOMIZED,**
**ONLINE BALLOTING PORTAL ON THE DEBTORS' CASE WEBSITE**
**MAINTAINED BY STRETTO ("E-BALLOT")**

**Holders of claims or interests who cast a ballot via e-ballot should NOT also submit a paper ballot.**

    **E-BALLOT SHALL BE THE EXCLUSIVE MEANS OF VOTING ELECTRONICALLY. STRETTO SHALL NOT ACCEPT VOTES SUBMITTED VIA E-MAIL, FACSIMILE, OR ANY ELECTRONIC METHODS OTHER THAN E-BALLOT; *PROVIDED* THAT STRETTO SHALL ACCEPT MASTER BALLOTS FROM NOMINEES SUBMITTED VIA E-MAIL TO STRETTO.**

    **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE STRETTO TOLL FREE AT 877-670-2127 (TOLL FREE) OR 949-504-4475 (INTERNATIONAL). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED EXCEPT AS**

**OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTORS.**

    **D.**    **Ballots Not Counted.**

    **No ballot will be counted toward Confirmation if, among other things**: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile or other electronic means (other than the E-Ballot Portal); (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated or disputed for which the applicable Claims Bar Date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order and the solicitation procedures); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), an administrative agent (except as otherwise permitted by the Disclosure Statement Order), or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (vii) it lacks an original signature, with the understanding that the voting party's electronic signature through e-ballot will be deemed an original signature; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

    **E.**    **Certain Voting Matters**

    It has recently come to the attention of the Debtors and the Second Lien Notes Trustee that the outstanding principal amount of the Second Lien Notes shown on DTC's books includes PIK interest of approximately $16,852,000 (the "PIK Amount") that was due on April 15, 2020. However, PIK interest was not in fact capitalized because, on that date, as the Debtors did not authorize or issue the PIK interest (nor did they pay the cash interest due and payable on that date). Thus, the outstanding principal balance of the Second Lien Notes on DTC's records on and after April 15, 2020 should be reduced by the PIK Amount.

    Accordingly, the outstanding principal amount of the Second Lien Notes as of the Petition Date on DTC's records should be $561,733,333 (not $578,585,309), with the PIK Amount showing as accrued but unpaid interest thereon. The Debtors or the Second Lien Notes Trustee may seek a court order in connection with Confirmation that will rectify the DTC records to reflect the correct outstanding principal amount of the Second Lien Notes as of the Petition Date ($561,733,333) for purposes of the Debtors making distributions to Holders of Second Lien Notes Claims under the Plan. The Debtors' use of the the principal amount currently stated on DTC's books ($578,585,309) for voting purposes is not expected to affect acceptance or rejection of the Plan by Class 8. However, such use shall not ratify the use of such amount for any other purpose in the Chapter 11 Cases.

**XII.**    **CONFIRMATION OF THE PLAN**

    **A.**    **Confirmation Hearing.**

    The Court has scheduled the Confirmation Hearing for [September 4], 2020 at [●] [a/p].m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●]August 31, 2020, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit B** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in New York Times (national edition) and Dallas Morning News, to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**B.    Requirements for Confirmation of the Plan.**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Interests.

At the Confirmation Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

**C.    Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims and Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims and Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims and Interests under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario

would fail to capture the significant going concern value of their businesses. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### D. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their Financial Projections. Creditors and other interested parties should review Article ~~VIII~~ X of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E. Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[~~14~~15]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code provides that a class of impaired interests has accepted a plan if the holders of at least two-third's in amount of the allowed interests of such class have voted to accept the plan.

Pursuant to Article III of the Plan, if a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### F. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the

---

[~~14~~15] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the Holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the Holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the Holder of such claim or equity interest.

same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### G. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class. The Debtors submit that if the Debtors were to "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it would not "discriminate unfairly" and would satisfy the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### H. Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the valuation analysis that is set forth in **Exhibit D** attached hereto and incorporated herein by reference (the "Valuation Analysis"). As set forth in the Valuation Analysis, the Debtors' going-concern value recoveries to creditors under the Plan are substantially higher than the recoveries such creditors would receive in a hypothetical liquidation of the Debtors' enterprise under chapter 7 of the Bankruptcy Code, as illustrated in the Liquidation Analysis. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XIII. CERTAIN SECURITIES LAW MATTERS

### A. A. Plan Securities.

The Plan provides for Reorganized Neiman to distribute, among other things, the New Equity, to certain Holders of Allowed Claims. The Debtors believe that the New Equity will be "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and all applicable state securities laws.

### B. B. Issuance and Resale of Securities Under the Plan.

#### 1. 1. Exemptions from Registration Requirements of the Securities Act and Applicable State Securities Laws.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the

debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon these exemptions, as well as Section 4(a)(2) under the Securities Act, the Debtors believe that the offer, issuance and distribution under the Plan of (i) the New Equity to the Holders of Allowed Claims entitled to receive the New Equity under Article III of the Plan and the participants in the Management Incentive Plan, if any (collectively, the "New Equity Holders"), (ii) the New Warrants, and (iii) to the extent the 2L MyT Distribution, 3L MyT Distribution, and/or the Series B Preferred Stock takes the form of a distribution by a Debtor, the 2L MyT Distribution, 3L MyT Distribution and the distribution of Series B Preferred Stock, as applicable, following the filing of the Chapter 11 Cases may be made without registration under the Securities Act or any applicable state securities laws.

To the extent that the offer, issuance and distribution of the New Equity to the New Equity Holders following the filing of the Chapter 11 Cases is covered by section 1145 of the Bankruptcy Code, subject to compliance with the New Organizational Documents, such New Equity may be resold without registration under the Securities Act or other federal securities laws, unless such holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such New Equity governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state securities laws pursuant to various exemptions provided by the applicable states; however, the availability of such exemptions cannot be known unless applicable individual state securities laws are examined.

Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Bankruptcy Code, the Securities Act and any applicable state securities laws.

### 2. Resale of Certain New Equity; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or

successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Equity issued to the New Equity Holders by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Equity who are deemed to be "underwriters" may be entitled to resell their New Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the required holding period has been met and if current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

Whether any particular person would be deemed to be an "underwriter" (including whether the person is a "Controlling Person") with respect to such New Equity would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to the New Equity issued to the New Equity Holders, and, in turn, whether any person may freely resell such New Equity. The Debtors recommend that potential recipients of New Equity consult their own counsel concerning their ability to freely trade such securities under applicable federal securities law and state securities laws.

### 3. 3. Resale of New Equity Issued Pursuant to Section 4(a)(2) Under the Securities Act.

Any New Equity distributed pursuant to section 4(a)(2) under the Securities Act will be offered, issued and distributed without registration under the Securities Act and applicable state securities laws and in reliance upon the exemption set forth therein. Such issuances will not be exempt under section 1145 of the Bankruptcy Code because those securities are not being issued in exchange for an existing Claim against the Debtors. Therefore, such New Equity pursuant to section 4(a)(2) under the Securities Act will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. The Debtors express no view as to whether any person may freely resell the New Equity issued pursuant to Section 4(a)(2) under the Securities Act. The Debtors recommend that potential recipients of the New Equity issued pursuant to section 4(a)(2) under the Securities Act consult their own counsel concerning their ability to freely trade such securities without registration under the federal securities laws and applicable state securities laws.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## XIV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, Reorganized Neiman, and to certain Holders. The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion does not address

tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and Reorganized Neiman are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.** **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Neiman.**

**1.** **Characterization of the Restructuring Transactions.**

The Restructuring Transactions are expected to be structured as a recapitalization of Reorganized Neiman (which is expected to be NMG LTD LLC) pursuant to which the New Equity (which is expected to constitute all of the stock of Reorganized Neiman), together with the other consideration distributed pursuant to the Plan, is issued to the applicable Holders in exchange for their applicable Claims and the Existing Equity Interests are cancelled, released, and extinguished without any distribution or other consideration on account thereof. Accordingly, because Reorganized Neiman and certain of the other Debtors are members of a consolidated group for U.S. federal income tax purposes the common parent of which is a non-Debtor entity, the issuance of the New Equity (and cancellation of the Existing Equity Interests) pursuant to the Plan is expected to cause Reorganized Neiman and its subsidiaries to cease to be members of such consolidated group and therefore cause certain members of such consolidated group (including certain of the Debtors) to recognize certain taxable deferred intercompany gains for U.S. federal (and applicable state and local) income tax purposes. However, as a result of such transactions, Holdings, as the Debtor parent of Reorganized Neiman, is expected take a worthless stock deduction with respect to its tax basis in the Existing Equity Interests. The deferred intercompany gain recognized by the Debtors in connection with the Restructuring Transactions is expected to be fully offset by such worthless stock deduction and is therefore not expected to result in a cash tax payment obligation for the Debtors. As a result of such worthless stock deduction, Reorganized Neiman's carryforward of 163(j) Deductions (as defined below) is expected to be reduced in accordance with applicable Treasury Regulations.

**2.** **Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied, over (b) the sum of (i) the issue price of new debt instruments, (ii) the fair market value of other non-cash consideration (including stock of the taxpayer or a party related to the taxpayer), and (iii) the amount of cash, in each case, given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income pursuant to section 108 of the IRC if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer must reduce its net operating losses and certain other tax attributes (collectively, "Tax Attributes") and aggregate tax basis in assets (including the stock of subsidiaries) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in Tax Attributes and aggregate tax basis occurs only after the tax for the year of the debt discharge has been determined. In general, Tax Attributes and aggregate tax basis will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. In the absence of contrary guidance, it appears to be the case that interest expense deductions allowable under

section 163(j) of the Code (and carryforwards of any such deductions) ("163(j) Deductions") are not subject to reduction under these rules. Any excess COD Income over the amount of available items described in clauses (a) through (g), above, will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

The Debtors are expected to realize COD Income in connection with the Restructuring Transactions, with an attendant reduction in Tax Attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the Debtors' liabilities, as determined for these purposes, immediately after the Effective Date). The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of new debt instruments and the value of non-cash consideration (including the New Equity), neither of which can be determined until after the Plan is consummated.

### 3. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in Tax Attributes and aggregate tax basis pursuant to excluded COD Income and the worthless stock deduction (as described above), the ability of Reorganized Neiman and its subsidiaries to use any remaining Tax Attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.[1516]

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change" as defined under section 382 of the IRC, the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

---

[1516] The IRS issued proposed regulations in September 2019, that would revoke IRS Notice 2003-65 and make substantial changes to the way limitations under section 382 of the IRC are calculated. The changes would decrease the limitation set forth in section 382 of the IRC in most cases and potentially cause entities that would have had a net unrealized built-in gain under Notice 2003-65 to instead have a net unrealized built-in loss, which would result in additional limitations on the ability to deduct Pre-Change Losses. Additionally, the IRS issued further proposed regulations in January 2020, that would provide certain transition relief for the application of any finalized regulation. Under such transition relief, any finalized regulations would apply only to ownership changes occurring 31 days after the regulations are finalized and certain specified and identifiable transactions would be subject to a "grandfathering" rule that allows for application of the prior IRS Notice 2003-65 rules. Additionally, the "grandfathering" rule would also apply as long as a company files its chapter 11 case on or before the day that is 31 days following the issuance of final regulations, even where the applicable ownership change occurs more than 31 days after finalization of the regulations. Because the Debtors have already filed their chapter 11 cases any such finalized regulations would not be applicable and, accordingly, the remainder of this discussion assumes that IRS Notice 2003-65 will apply to the Reorganized Debtors.

The rules of section 382 of the IRC are complicated, but an ownership change is expected to occur as a result of the Restructuring Transactions. If such an ownership change occurs, the ability of Reorganized Neiman and its subsidiaries to use the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### (a)  General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation (or parent of the consolidated group) immediately before the "ownership change" (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 1.09 percent for June 2020). Under certain circumstances, the annual limitation may be increased to the extent that the corporation (or parent of the consolidated group) has an overall built-in gain in its assets at the time of the ownership change. If the corporation or consolidated group has such "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss, and deduction), any built-in gains recognized (or, according to the currently effective IRS Notice 2003-65, treated as recognized) during the following five year period (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year of such recognition, such that the loss corporation or consolidated group would be permitted to use its pre-change losses against such built-in gain income in addition to its otherwise applicable annual limitation. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)  Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and Reorganized Neiman undergo another "ownership change" within two years after the Effective Date, then Reorganized Neiman's Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change

or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period (and during the part of the taxable year prior to and including the effective date of the plan of reorganization), and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether Reorganized Neiman will elect out of its application. However, Reorganized Neiman and its subsidiaries do not expect to have significant NOL carryforwards after the completion of the Restructuring Transactions.

**C.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the Restructuring Transactions.

**1.     Consequences to Holders of Class 5, Class 6, Class 7, Class 8, and Class 9 Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, (a) each U.S. Holder of an Allowed 2019 Term Loans Secured Claim, an Allowed 2013 Term Loans Secured Claim, or an Allowed 2028 Debentures ~~Secured Claim, or an Allowed Third Lien Notes~~ Secured Claim shall receive its Pro Rata share of the New Equity and the Exit Rights ~~and~~ (b) each U.S. Holder of an Allowed Second Lien Notes Secured Claim shall receive its Pro Rata share of the New Equity, the Exit Rights, ~~and~~ the New Warrants, and the 2L MyT Distribution, and (c) each U.S. Holder of an Allowed Third Lien Notes Secured Claim shall receive its Pro Rata share of the New Equity, the Exit Rights, the New Warrants, and the 3L MyT Distribution.

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of Reorganized Neiman for U.S. federal income tax purposes. Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. As a general matter, unsecured trade claims entered into or incurred in the ordinary course of business do not constitute "securities." The stated maturity of the Allowed 2013 Term Loans Secured Claims is seven years and due to prior restructuring transactions, the term to maturity of such Claims for U.S. federal income tax purposes is expected to be treated as no less than six and a half years. Similarly, the Allowed 2019 Term Loans

Secured Claims were issued as part of a modification of previously existing 2013 Term Loans in a transaction that was expected to be treated as a "recapitalization" for U.S. federal income tax purposes and are therefore expected to retain the same maturity as the Allowed 2013 Term Loans Secured Claims described in the foregoing sentence.  The Allowed 2028 Debentures Secured Claims were originally issued with a term to maturity of ten years.  The Allowed Third Lien Notes Secured Claims were issued in a transaction expected to be treated as a tax-free "recapitalization" for U.S. federal income tax purposes in exchange for other debt instruments treated as "securities" for U.S. federal income tax purposes. The Allowed Second Lien Notes Secured Claims were originally issued for cash with a term to maturity of less than five years. Accordingly, although it is not free from doubt, the Debtors intend to take the position (and the following discussion assumes) that each of the Class 5, Class 6, Class 7, and Class 9 Claims constitute "securities" and that the Class 8 Claims do not constitute "securities."  U.S. Holders are urged to consult their own tax advisors regarding the potentially different tax treatment that could apply if their Claims were treated other than as described in the foregoing sentence.

Because the Class 5, Class 6, Class 7, and Class 9 Claims are expected to constitute "securities," a U.S. Holder of such a Claim is expected to be treated as receiving its distribution under the Plan in a transaction treated as a "recapitalization" for U.S. federal income tax purposes.  As discussed below, the Exit Rights are expected to be treated as options to acquire a portion of the Exit Facility for U.S. federal income tax purposes.  Whether an option to acquire debt instrument is a "security" for U.S. federal income tax purposes is uncertain and the Debtors intend to take the position (and the remainder of this discussion assumes) that the Exit Rights are not "securities."  U.S. Holders are urged to consult their own tax advisors regarding the potentially different tax treatment that could apply if the Exit Rights were treated as "securities."  ~~Accordingly, because the Exit Rights are not expected to be treated as "securities~~Additionally, the 3L MyT Distribution is expected to consist of one or more instruments issued by a different entity than the issuer of the Class 9 Claims.  Accordingly, the Debtors intend to take the position that, although not free from doubt, the 3L MyT Distribution will be be treated as "other property" received by holders of Class 9 Claims in such recapitalization transaction.

Accordingly,[22] a U.S. Holder of ~~such a~~ a Class 5, Class 6, or Class 7, or Class 9 Claim is expected to recognize gain (but not loss) as a result of the Restructuring Transactions.  Any gain recognized generally will equal the lesser of (a) the amount of gain realized on the exchange (computed as the difference, if any, between the amount realized on the exchange and the U.S. Holder's adjusted tax basis in its Claims) and (b) for U.S. Holders of Class 5, Class 6, or Class 7 Claims, the value of the Exit Rights received in the exchange (excluding any amounts attributable to accrued and unpaid interest on an existing Claim) or, for U.S. Holders of Class 9 Claims, the value of the Exit Rights and the 3L MyT Distribution received in the exchange (excluding any amounts attributable to accrued and unpaid interest on an existing Claim).  In general, a U.S. Holder would obtain an initial tax basis in the New Equity and the New Warrants, as applicable, received in the exchange equal to its adjusted tax basis in its existing Claim surrendered, increased by any gain recognized on the exchange and decreased by the value of the Exit Rights received in the exchange (in the case of a U.S. Holder of a Class 5, Class 6, or Class 7 Claim) or the value of the Exit Rights and the 3L MyT Distribution received in the exchange (in the case of a U.S. Holder of a Class 9 Claim), if any (excluding any amounts attributable to accrued and unpaid interest on ~~an~~the applicable existing Claim).  A U.S. Holder must allocate this aggregate tax basis between the New Equity and the New Warrants, as applicable, depending on their relative fair market values on the Effective Date.  The U.S. Holder's holding period for the New Equity and the New Warrants, as applicable, received in the exchange (excluding any amounts attributable to accrued and unpaid interest on an existing Claim) will generally include its holding period for its existing Claims.

Because the Class 8 Claims are not expected to constitute "securities," each U.S. Holder of a Class 8 Claim will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC.  Other than with respect to any amounts received that are attributable to accrued

but untaxed interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of the New Equity, New Warrants, ~~and~~ Exit Rights, and 2L MyT Distribution received in the exchange and (b) the U.S. Holder's adjusted tax basis in its Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The holding period for the New Equity, New Warrants, ~~and~~ Exit Rights, and 2L MyT Distribution received in the exchange should begin on the day following the Effective Date and the U.S. Holder should obtain a tax basis in such ~~the~~ New Equity, New Warrants, ~~and~~ Exit Rights ~~received~~, and 2L MyT Distribution equal to the fair market value of such property.

U.S. Holders should consult their own tax advisers regarding the treatment of the Restructuring Transactions for U.S. federal income tax purposes.

### 2. Consequences to Holders of Class 3, Class 4, ~~and~~ Class 10, and Class 11 Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, (a) each U.S. Holder of an Allowed ABL Loan Secured Claim or an Allowed FILO Secured Claim shall receive, in full and final satisfaction of such Claim, ~~value as of the Effective Date equal to the Allowed amount of~~(i) payment in full in Cash, (ii) consensual refinancing or other consensual modification of the ABL Loans or the FILO Facility, as applicable, giving rise to such ABL Loan Secured Claims or FILO Secured Claims, as applicable, or (iii) other treatment consistent with the Bankruptcy Code and the Disclosure Statement Order, and (b) each U.S. Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of ~~the General Unsecured Recovery Cash Pool~~(i) MYT Series B Preferred Stock, and (ii) Cash, as applicable, and in accordance with the treatment for Class 10 and Class 11.

Each U.S. Holder of Class 3, Class 4, ~~and~~ Class 10, and Class 11 ~~C~~Claims will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, ~~the~~each such U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of (1) the ~~c~~Cash and (2) the fair market value (or issue price, in the case of debt instruments) of non-cash consideration~~, if any,~~ (including the MYT Series B Preferred Stock) received, and (b) the U.S. Holder's adjusted tax basis in its Claim.

The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The holding period for any non-~~c~~Cash consideration received~~, if any,~~ (including, for the Holders of Class 10 and Class 11 Claims, the MYT Series B Preferred Stock received) should begin on the day following the Effective Date and the U.S. Holder should obtain a tax basis in such non-~~c~~Cash consideration ~~received~~ equal to the fair market value (or issue price, in the case of debt instruments) of such property.

3.     **Accrued Interest.**

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

4.     **Market Discount.**

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim. Any such market discount is generally the excess of the "revised issue price" of such Claim over such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory *de minimis* amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Restructuring Transactions.

Although not necessarily free from doubt, the "market discount" provisions of the IRC are arguably inapplicable to the kind of General Unsecured Claims that constitute the Class 10 Claims. U.S. Holders holding Class 10 Claims should consult with their own tax advisors regarding the potential application of the "market discount" rules to their Claims.

5.     **U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Equity.**

(a)     **Dividends on New Equity.**

87

Any distributions made on account of the New Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Neiman as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Equity. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### (b) Sale, Redemption, or Repurchase of New Equity.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Equity. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Equity for more than one year, taking into account the holding period rules described above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

### 6. U.S. Federal Income Tax Treatment, and Ownership, Exercise, and Disposition of, the Exit Rights and the New Warrants.

Although such position is not free from doubt, the Debtors intend to treat the New Warrants as warrants for U.S. federal income tax purposes and intend to treat the issuance of the Exit Rights and their subsequent exercise for U.S. federal income tax purposes as an issuance and exercise of options to acquire a portion of the Exit Facility for U.S. federal income tax purposes.

A U.S. Holder that elects to exercise the New Warrants or its Exit Rights will generally be treated as purchasing, (a) in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the New Equity it is entitled to purchase pursuant to the New Warrants and (b) in exchange for its Exit Rights and the amount of cash funded by the U.S. Holder to exercise the Exit Rights, the Exit Facility it is entitled to purchase pursuant to the Exit Rights. In each case, such purchase will generally be treated as the exercise of an option under general tax principles and the U.S. Holder therefore should not recognize income, gain or loss for U.S. federal income tax purposes. A U.S. Holder's aggregate tax basis in the New Equity received upon exercise of a New Warrant or the Exit Facility received upon exercise of the Exit Rights will generally equal the sum of (a) the amount of cash paid by the U.S. Holder to exercise its New Warrants or Exit Rights, as applicable, plus (b) such U.S. Holder's tax basis in its New Warrants or Exit Rights, as applicable, immediately before such New Warrants or Exit Rights are exercised. A U.S. Holder's holding period in the New Equity or Exit Facility, as applicable, will begin on the day after the exercise date of the New Warrants or Exit Rights.

A U.S. Holder that elects not to exercise the New Warrants or its Exit Rights and instead allows the New Warrants or Exit Rights to lapse may be entitled to claim a capital loss upon expiration of the

New Warrants or Exit Rights in an amount equal to the amount of tax basis allocated to the New Warrants or Exit Rights, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants or the Exit Rights. Additionally, in the event that a U.S. Holder sells its New Warrants or Exit Rights in a taxable transaction, the U.S. Holder will generally recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants or Exit Rights, as applicable. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Equity or Exit Facility to which the New Warrants or Exit Rights relate, respectively, would have had in the hands of the U.S. Holder if such New Equity or Exit Facility had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants or Exit Rights, as discussed above.

Each U.S. Holder should consult its own tax advisor regarding the proper characterization of the Exit Rights and the New Warrants for U.S. federal income tax purposes and the consequences to it of such treatment given its particular circumstances.

      **7.**      **U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Exit Facility.**

The following discussion assumes that the "contingent payment debt instrument" rules do not apply to the Exit Facility. U.S. Holders should consult their own tax advisors regarding the application of these rules.

      **(a)**      **Payments of Qualified Stated Interest.**

Payments or accruals of "qualified stated interest" (as defined below) on the Exit Facility will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Exit Facility, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

      **(b)**      **Original Issue Discount.**

A debt instrument, such as the Exit Facility, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest."

Because payments other than payments of qualified stated interest will be required before maturity, for purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the Exit Facility multiplied by the weighted average maturity of the Exit Facility (as determined under applicable Treasury Regulations). If the Exit Facility is treated as issued with OID (including as a result of an allocation due to the Exit Term Loan Participation Fee, as described below), a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Exit Facility, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize

additional income upon the receipt of any cash payment on the Exit Facility that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the Exit Facility is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the Exit Facility, and a pro rata amount of such *de minimis* OID must be included in income as principal payments are received on the Exit Facility.

Where U.S. Holders receive debt instruments and also receive other property in an exchange (such as in exchange for cash), the "investment unit" rules may apply to the determination of the "issue price" for any such debt instrument. Because the Exit Term Loan Participation Fee will be paid in New Equity, a U.S. Holder that purchases a portion of the Exit Facility pursuant to the exercise of its Exit Rights will be treated as receiving a debt instrument (the Exit Facility) as well as other property (i.e., New Equity in the form of the Exit Term Loan Participation Fee) in exchange for its cash exercise price. Accordingly, the "investment unit" rules are expected to apply to determine the "issue price" of the Exit Facility. The issue price of the Exit Facility will depend, in part, on the issue price of the "investment unit" (i.e., the Exit Facility and New Equity), and the respective fair market values of the elements of consideration that compose the investment unit. The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument. As a result, because the investment unit in this case is acquired for cash, the issue price of the investment unit will generally be equal to the first price at which a substantial amount of the investment unit is sold for money (not including sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). Such issue price determined for the investment unit under the above rules is allocated among the elements of consideration making up the investment unit (i.e., the Exit Facility and the New Equity) based on their relative fair market values, with such allocation determining the issue price of the Exit Facility. Because, as discussed above, the value the New Equity cannot be determined until after the Plan is consummated, any such allocation will not be determinable until the consummation of the Plan.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit

Accordingly, as a result of some or all of the Exit Term Equity Fees (or other similar fees paid in New Equity), it is generally expected that the Exit Facility will be treated as issued with an amount of OID that is not *de minimis*.

### (c)      Acceleration of Income Recognition for Certain U.S. Holders.

Accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally will be required to include certain items of income such as OID no later than the time such amounts are reflected on such a financial statement.  This could result in an acceleration of income recognition for income items differing from the above description, although proposed Treasury Regulations provide that OID and market discount on the Exit Facility would not be subject to acceleration under these rules.

### (d)      Sale, Taxable Exchange or other Taxable Disposition.

Upon the disposition of the Exit Facility by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (a) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (b) the U.S. Holder's adjusted tax basis in the Exit Facility, as applicable.  The calculation of a U.S. Holder's

adjusted tax basis in the Exit Facility is discussed above. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the Exit Facility for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### 8. Limitations on Use of Capital Losses.

A U.S. Holder who recognizes capital losses will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 9. Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their own tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### D. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder and the ownership and disposition of the New Equity, New Warrants, and Exit Rights.

### 1. Gain Recognition.

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

      **2.**      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Equity.**

      **(a)**      **Dividends on New Equity.**

Any distributions made with respect to New Equity (other than certain distributions of stock of Reorganized Neiman) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Neiman, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, as gain from the sale or exchange of such stock, as described below under "—Sale, Redemption, or Repurchase of New Equity"). Except as described below, dividends paid with respect to New Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Equity held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

      **(b)**      **Sale, Redemption, or Repurchase of New Equity.**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Equity unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such New Equity is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). With respect to the third exception, the FIRPTA rules are discussed in greater detail below.

### 3. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Ownership, Exercise, and Disposition, of the Exit Rights and the New Warrants.

The U.S. federal income tax treatment of the New Warrants and Exit Rights to a Non-U.S. Holder are generally expected to be the same as those described above for U.S. Holders. However, in the event that a Non-U.S. Holder sells its New Warrants or Exit Rights in a taxable transaction, a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on such sale unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- with respect to a sale of the New Warrants, the issuer of such New Warrants is or has been during a specified testing period a USRPHC under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). With respect to the third exception the FIRPTA rules are discussed in greater detail below.

4.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of the Exit Facility.**

The following discussion assumes that the "contingent payment debt instrument" rules do not apply to the Exit Facility.  Non-U.S. Holders should consult their own tax advisors regarding the application of these rules.

(a)      **Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest).**

Subject to the discussion of backup withholding and FATCA, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the voting power in Reorganized Neiman within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Reorganized Neiman, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Reorganized Neiman or Reorganized Neiman's paying agent or other withholding agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a non-U.S. person.

If all of these conditions are not met, interest on the Exit Facility paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the Exit Facility or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement (generally a properly executed IRS Form W-8ECI or suitable substitute or successor form or such other form as the IRS may prescribe) is provided to Reorganized Neiman or Reorganized Neiman's paying agent or other withholding agent) unless an applicable income tax treaty provides otherwise.  If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the

Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### (b) Sale, Taxable Exchange, or Other Disposition of the Exit Facility.

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the Exit Facility (other than any amount representing accrued but unpaid interest on the loan) unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the Exit Facility under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

### 5. FIRPTA.

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as ECI that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to New Equity and New Warrants, rules with respect to USRPHCs may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation. Taxable gain from the

disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute ECI. Further, the buyer of the New Equity or New Warrants may be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. The Debtors currently anticipate that Reorganized Neiman likely is, or that Reorganized Neiman is likely to be, a USRPHC, although no guarantees can be made in that regard.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5 percent or less of such stock (after taking into account certain attribution rules) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer. Whether and when the New Equity will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

The FIRPTA rules will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

### 6. FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### E. Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to

distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XV.     RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  ~~June 6~~July 30, 2020

Respectfully submitted,

Neiman Marcus Group LTD LLC,
on behalf of itself and each of the other Debtors

By:     */s/ Mark Weinsten*_____

Name:   Mark Weinsten

Title:    Chief Restructuring Officer
          Neiman Marcus Group LTD LLC

**Exhibit A**

**Plan of Reorganization**

**Exhibit B**

**Disclosure Statement Order**

**Exhibit C**

**Financial Projections**

[To Come]

**Exhibit D**

**Valuation Analysis**

[To Come]

**Exhibit E**

**Liquidation Analysis**

[To Come]

**Exhibit F**

**Organizational Structure Chart**





## Exhibit G

## Lien Priorities

| | ~~Extended~~2019 Term Loan Priority Real Estate Collateral | Original Term Loan Priority Collateral | ABL Priority Collateral | Notes Priority Real Estate Collateral and Notes PropCo Equity Interests | ~~Extended~~ Term Loan PropCo Equity Interests | Limited Guarantee Collateral |
|---|---|---|---|---|---|---|
| ~~Extended~~2019 Term Loans and ~~non-Extended~~2013 Term Loans | 1 | 1 | 2 | 3 | 1 | None |
| ~~Non-Extended~~2013 Term Loans | None | 1 | 2 | None | None | None |
| Asset-Based Revolving Credit Facility | 4 | 4 | 1 | 4 | 4 | None |
| Second Lien Notes | 2 | 2 | 3 | 2[i] | 2 | 1 |
| Third Lien Notes | 3 | 3 | 4 | 1[ii] | 3 | None |
| 2028 Debentures | 1[iii] | 1[iii] | None | 3[iii] | 1[iii] | None |

[i]     Recovery not to exceed $200.0 million, together with recovery for Second Lien Notes obligations.

[ii]    Recovery not to exceed $200.0 million, together with recovery for the Third Lien Notes obligations.

[iii]   Priority will be *pari passu* with the ~~Extended~~2019 Term Loan liens (or if there are no ~~Extended~~2019 Term Loan liens or ~~non-Extended~~2013 Term Loan liens, the highest priority lien on the relevant asset) solely on assets if and to the extent required by the "equal and ratable clause" set forth in the indenture governing the 2028 Debentures and related documentation in effect as of the issue date thereof.

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 7/30/2020 1:24:03 PM | |
|---|---|
| **Style name:** Color (Kirkland Default) | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS.KIRKLAND.COM/LEGAL/67515497/23 | |
| **Modified DMS:** iw://DMS.KIRKLAND.COM/LEGAL/70183091/8 | |
| **Changes:** | |
| Add | 504 |
| Delete | 403 |
| Move From | 26 |
| Move To | 26 |
| Table Insert | 17 |
| Table Delete | 15 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 4 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 995 |